Filing # 79742116 E-Filed 10/23/2018 02:43:52 PM

IN THE CIRCUIT COURT OF THE TWELFTH JUDICIAL CIRCUIT
IN AND FOR SARASOTA COUNTY, FLORIDA

BAC Home Loans Servicing, LP FKA
Countrywide Home Loans Servicing,
LP,

      Plaintiff,

vs.

      Case No.: 2010 CA 009403 NC

Kenneth Brand, *et al.*,

      Defendants.

## NOTICE OF FILING THE DEPOSITION OF ROLAND PATRICK MANTEIGA

Defendant, Kenneth Brand, by and through his undersigned attorney, gives notice of filing the Deposition of Roland Patrick Manteiga, without copies of the exhibits, taken on September 7, 2018 for purposes of hearing on Defendant's Objection to Certificate of Sale and Certificate of Title, and for all other purposes.

### CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the foregoing has been furnished by e-mail to the parties listed on the Master Service List, on this 23rd day of October, 2018.

**McKILLOP LAW FIRM**
2350 Fruitville Road, First Floor
Sarasota, Florida 34237
(941) 400-8998

/s/ H. Daniel McKillop
**H. DANIEL McKILLOP, Esq.**
Florida Bar No.: 0052745
Primary email: *pleadings@mckilloplawfirm.com*
Secondary email: *dan@mckilloplawfirm.com*

1

Attorneys for Defendant

**Master Service List**

Jennifer M. Scott, Esq.
*jscott@kasslaw.com*
*foreclosureservice@kasslaw.com*
Kass Schuler, P.A.
1505 N. Florida Ave
Tampa, FL 33602

Case 8:22-cv-01977-MSS-SPF   Document 33-18   Filed 06/10/23   Page 3 of 128 PageID 530

1

```
 1        IN THE CIRCUIT COURT OF THE TWELFTH JUDICIAL CIRCUIT
              IN AND FOR SARASOTA COUNTY, FLORIDA
 2

 3
         Bank of America, N.A.,
 4
                   Plaintiff,
 5
         vs.
 6
         James J. Ambrosia, et al.,
 7
                   Defendant.
 8
         _____/
 9

10

11       DEPOSITION OF:      ROLAND PATRICK MANTEIGA

12
         DATE:               September 7, 2018
13

14       TIME:               9:00 A.M. to 11:21 a.m.

15

16       PLACE:              Wilkes Professional Reporting, Inc.
                             100 North Tampa Street, Suite 1900
17                           Tampa, Florida  33602

18       REPORTED BY:        Jean M. Wilkes, RPR-CP
                             Notary Public
19                           State of Florida at Large

20

21

22

23            WILKES PROFESSIONAL REPORTING, INC.
                     jmwilkes77@gmail.com
24                      (813) 283-8789

25
```

2

```
 1    APPEARANCES:

 2    TARA M. McDONALD, ESQUIRE
      Gilbert Garcia Group, P.A.
 3    2313 West Violet Street
      Tampa, Florida 33603
 4    (813) 443-5087 ext. 271 PHONE
      (813) 570-7031 DIRECT
 5    (813) 443-5089 FAX
      tmcdonald@gilbertgrouplaw.com E-MAIL
 6        Attorney for Plaintiff

 7    H. DANIEL McKILLOP, ESQUIRE
      McKillop Law Firm
 8    2350 Fruitville Road
      First Floor
 9    Sarasota, Florida 34237
      (941) 400-8998 PHONE
10    (941) 953-5117 FAX
      pleadings@mckilloplawfirm.com PRIMARY
11    dan@mckilloplawfirm.com SECONDARY
          Attorney for Defendant
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                        I N D E X

2        ROLAND PATRICK MANTEIGA                    PAGE

3        Direct Examination by Mr. McKillop          6

4        Cross-Examination by Ms. McDonald          85

5        Redirect Examination by Mr. McKillop       95

6        Recross-Examination by Ms. McDonald       101

7        CERTIFICATE OF OATH                       107

8        CERTIFICATE OF REPORTER                   108

9        SIGNATURE PAGE/ERRATA SHEET               109

10       ERRATA LETTER                             110

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

4

1                          **E X H I B I T S**

2     **NO.**   **DESCRIPTION**                                        **PAGE**

3     **1**    **Agreement dated January 14, 2014,**
             **between La Gaceta Publishing and**
4             **Siete Dias**                                          **27**

5     **2**    **Letter dated November 30, 2012, from**
             **USPS Pricing and Classification Service**
6             **Center to Postmaster/Manager Business**
             **Mail Entry; Subject:  Notification of**
7             **Changes to Periodicals Authorization**               **28**

8
      **3**    **La Gaceta's subscriber list showing all**
9             **subscriptions distributed to addresses**
             **within Sarasota County**                              **28**
10

11    **4**    **Copies of all payments received by**
             **La Gaceta in 2017 and 2018 for the**
12            **subscriptions distributed to addresses**
             **within Sarasota County**                              **28**
13

14    **5**    **Printout entitled "La Gaceta Publishing**
             **Inc. Vendor Activity - Detailed,"**
15            **January 1, 2017, through December 31,**
             **2018, showing payments made to Chris Moody**         **29**
16

17

18

19

20

21

22

23

24

25

5

1              <u>E X H I B I T S</u> (Continued)

2      <u>NO.</u>    <u>DESCRIPTION</u>                               <u>PAGE</u>

3
       **6**     **Sarasota Distribution to Don Beto, U Save,**
4              **El Mariachi, Palmas de Cuba, La Gaceta**
               **office, Pastry Art and First Watch for**
5              **1/6/2017 through 8/24/2018, Delivered**
               **and Returned**                                **30**
6

7      **7**     **Photographs of the Siete Dias**
               **location in Sarasota**                        **61**
8

9      **61**

10     **8**     **La Gaceta website**                           **65**

11
       **9**     **Proof of substitute service**                **84**
12

13     **10**    **Proof of publication of sale**               **84**

14
       **11**    **Photos of newspaper stacks**                 **106**
15

16

17

18

19

20

21

22

23

24

25

Case 8:22-cv-01977-MSS-SPF   Document 33-19   Filed 06/10/23   Page 8 of 128 PageID 535

1

2                    **P R O C E E D I N G S**

3              THE COURT REPORTER:  Would you raise

4         your right hand, please?

5              Do you solemnly swear the testimony

6         you're about to give in this cause will be

7         the truth, the whole truth, and nothing but

8         the truth?

9              MR. MANTEIGA:  I do.

10             THE COURT REPORTER:  Okay.  Thank you.

11                  ROLAND PATRICK MANTEIGA,

12    being first duly sworn to testify the truth, the whole

13    truth, and nothing but the truth, was examined and

14    testified as follows:

15             MR. McKILLOP:  All right.  Good morning.  My

16        name is Dan McKillop.  I represent James and

17        Karen Ambrosia.  We are here -- this is the

18        deposition of La Gaceta, L-a G-a-c-e-t-a, and the

19        corporate representative.

20             Do you want to put your appearance on, Tara?

21             MS. McDONALD:  Yes.  Tara McDonald on behalf

22        of Bank of America, the Plaintiff.

23                  <u>DIRECT EXAMINATION</u>

24    BY MR. McKILLOP:

25             Q.   All right.  And, Mr. Manteiga, are you the

```
 1    corporate representative of La Gaceta?

 2         A.    Yes.

 3         Q.    Can you say your full name and spell your last

 4    name for the record?

 5         A.    My full name is Roland Patrick Manteiga.  The

 6    last name is spelled M-a-n-t-e-i-g-a.  I go by Patrick

 7    Manteiga.

 8         Q.    Okay.  I might slip into calling you either

 9    Mr. Manteiga or Patrick.

10         A.    That's okay.

11         Q.    Sir, have you ever had your deposition taken

12    before?

13         A.    Yes.

14         Q.    How long ago was the last time you had your

15    deposition taken?

16         A.    Six years ago; seven years ago.

17         Q.    It's been a little while, so I'm going to

18    start by going over some ground rules, just to refresh

19    your recollection.

20              The first thing is:  Everything here is

21    being taken down by the court reporter, so that means a

22    couple of things.  We have to speak clearly.  All of our

23    questions and answers need -- especially the answers --

24    need to be verbal, "yes" or "no."  Shaking the head,

25    nodding the head, that doesn't pick up on the
```

1      transcript.  So, if you're going to answer "yes" or

2      "no," just answer in that way.  "Uh-huh" and "unh-unh"

3      both sound the same to the court reporter and look the

4      same on the transcript, so the same thing, verbal

5      answers.

6             If you answer a question, it's going to be

7      assumed that you understood the question.  So, if you

8      have any questions about what I'm asking you before you

9      answer, make sure you ask for clarification; I'll be

10     happy to clarify.

11            Do you have any questions on those?

12     A.    I do not.

13     Q.    Okay.  We will take breaks as often as you

14     need to, or as often as anybody else needs to, so --

15     we're in no rush.  We just want to get through all the

16     information that we need to today.

17            So, if you need a break for the rest room or

18     for coffee, or whatever, we can take a break when you're

19     ready.

20     A.    I understand.

21     Q.    You are not represented by an attorney today?

22     A.    Correct.

23     Q.    And you -- I have some preliminary questions.

24     These are standard; they're not specific to you.  But I

25     ask them at all of our depositions.

Case 6:22-cv-01977-MSS-SPF Document 33-19 Filed 06/10/23 Page 11 of 128 PageID 536

1          Have you ever been convicted of a felony?

2     A.    No.

3     Q.    Have you ever been convicted of a crime

4  involving deceit?

5     A.    No.

6     Q.    That would include things like petty theft.

7     A.    No.  I've never been convicted of any crime.

8     Q.    Are you under the influence of any drugs or

9  alcohol today?

10    A.    No.

11    Q.    Do you take any medications that would impair

12 your ability to tell -- to give answers that are honest?

13    A.    No.

14    Q.    So, let's do a little bit of personal

15 background.  Where do you work?

16    A.    La Gaceta Newspaper.

17    Q.    Okay.  And how long have you worked there?

18    A.    Since '83.

19    Q.    How old are you?

20    A.    54.

21    Q.    What is your job title at La Gaceta?

22    A.    Publisher.

23    Q.    What does that entail?

24    A.    The publisher is the boss.

25    Q.    Are you the owner?

1          A.    Yes.

2          Q.    What other titles do you have at La Gaceta?

3          A.    Well, my corporate title would be President.

4     And the newspaper where I'm represented, I'm represented

5     as editor and publisher.

6          Q.    So, what are your duties at La Gaceta?

7          A.    To run the business.  I write a column.

8     I help with sales.  I help with layout.  I discuss

9     articles that we're doing.  I help hire writers.

10    I help -- you name it, anything involved with the

11    business, basically.  I haven't delivered newspapers

12    in a long time, but I can still do that if I need to.

13         Q.    How many people do you have working for you?

14         A.    In-house, six.  Contributors and people who

15    work out-of-house ranges probably up to about another

16    eight to ten.

17         Q.    And I saw online it looks like your main

18    office is on East 7th Avenue, Tampa?

19         A.    Correct.  Um-hum.

20         Q.    How long have you been at that location?

21         A.    I think since 1980.

22         Q.    I may alternatively use the phrase, like,

23    "you" or "your" to mean either you personally or

24    La Gaceta.  If it gets confusing, just ask me to

25    clarify.

1    A.   Okay.

2    Q.   You said you had your deposition taken

3  six or seven years ago.  What was that for?

4    A.   It was in regards to a lawsuit in regards to a

5  traffic accident.

6    Q.   Okay.  How many other times have you had your

7  deposition taken?

8    A.   I think that might be the only one.

9    Q.   Give me an idea of your education.

10    A.   I went to Plant City High School.  That's as

11  far as my education went.

12    Q.   Okay.  No college --

13    A.   No.

14    Q.   -- part-time college or anything like that?

15    A.   No.

16    Q.   So, you've been working at La Gaceta since

17  1983?

18    A.   Yes.

19    Q.   When did you take over as the owner of

20  La Gaceta?

21    A.   When my father passed away in 1998.

22    Q.   Before that, what were your duties?

23    A.   Starting back when, sir?

24    Q.   Let's say immediately before you began --

25  you took over ownership, what were you doing?

1      A.    I was the associate publisher, which meant

2  I basically did everything the publisher did when the

3  publisher wanted me to.

4          My father was sick for a period of time before

5  he passed away, so I took over most of those duties

6  under the title "associate publisher."

7      Q.    Your six in-house employees --

8      A.    Um-hum.

9      Q.    -- what do -- what are their jobs?

10     A.    I have a person who does accounting.  I have a

11 person who's assigned to dealing with legal advertising.

12 I have a person assigned to circulation, secretarial

13 work.  I have a person who's assigned to doing the

14 newspaper layout.  I have a Spanish editor and then --

15 how many are we up to now?

16     Q.    That is six for me --

17     A.    Okay.  All right.

18     Q.    -- assuming that they're all --

19     A.    Because we've got a couple part-timers who

20 come in.  I've got a proofreader who comes in a day,

21 and I got a Spanish proofreader who comes in about a day

22 and a half a week.

23     Q.    So, you have one person whose job is

24 accounting.  Who is that?

25     A.    It's my mother, Louise Schmechel.

```
 1           Q.    And the legal ads?

 2           A.    Jesse Simpson.

 3           Q.    Male or a female?

 4           A.    Female.

 5           Q.    Ms. Simpson, is that her full-time job, is

 6   legal ads?

 7           A.    Yes.

 8           Q.    Circulation.  Who is that?

 9           A.    Gene Siudut.

10                 THE COURT REPORTER:  How do you spell the

11   last name?

12                 THE WITNESS:  I always get Gene's last name

13   spelled incorrectly.  S-i-u-d-u-t.

14   BY MR. McKillop:

15           Q.    And Gene is a man --

16           A.    Yes.

17           Q.    -- G-e-n-e?

18           A.    Yes, G-e-n-e.

19           Q.    Who is your secretary?

20           A.    Gene also acts as that role.

21           Q.    Okay.  And you have someone assigned to

22   layout?

23           A.    My wife, Angie Manteiga.  She puts together

24   the newspaper.

25           Q.    And your Spanish --
```

1      A.    Gabriel Cartay.

2      Q.    And that's your Spanish editor?

3      A.    Correct.

4      Q.    Okay.  Gabriel --

5      A.    Yes.

6      Q.    -- can you spell that first and last name?

7      A.    You know what, I'll just look at a newspaper

8  and I'll get it right.  G-a-b-r-i-e-l.  Cartay is

9  C-a-r-t-a-y.

10     Q.    So, that's 1, 2, 3, 4, 5.  Anyone else that we

11 missed that's a full-time employee?

12     A.    Full-time?  No.  Leonardo Leon is -- I mean,

13 Leonardo Venta is a Spanish proofreader that comes in.

14 He comes in every week for about a day and a half.

15           Donna Campisano does English proofreading.

16 She comes in for a day.  We just replaced her.  She was

17 the last day last week.

18           We have an intern from USF.

19     Q.    So, what -- give me an idea of what

20 La Gaceta publishes as far as, you know, articles.

21 What is La Gaceta's -- do you have a mission statement

22 or a purpose that you can talk about?

23     A.    You know, like I said, it was started by my

24 grandfather in 1922.  Started off as a Spanish daily

25 newspaper, six days a week, with wire service from

Case 8:22-cv-01977-MSS-SPF   Document 33-19   Filed 06/10/23   Page 17 of 128 PageID 544

1    Cuba and Spain.  Over the years, we've added English

2    and Italian languages as our community developed and

3    changed and became a second and third generation.

4         We've always had a focus on Latino issues, on

5    Tampa's Latin colony as it spread out into other areas.

6    We've written about them.  You know, the diversity of

7    our Hispanic community has changed tremendously and so,

8    you know, we've followed that group as they've become

9    integrated and became very American in their -- in their

10   activities.

11        You know, we write about everything from

12   politics to hunting and fishing to history to -- we do

13   everything a big paper does.  We just do it smaller.

14        Q.   I read a transcript of your presentation

15   before, I think, the City Council in 2007.

16        A.   Um-hum.

17        Q.   Do you remember that?

18        A.   No.

19        Q.   Okay.  Here in Tampa, you did a -- I think it

20   was -- the issue that was being raised was the ownership

21   of local radio stations and newspapers being commingled

22   together.

23        A.   I think currently -- at that time, there was

24   an FCC -- was in town, and they were -- and they were

25   talking about The Tribune system of having a TV station,

1    a newspaper, and a radio station under one ownership,

2    and we were rallying against it because of the negative

3    effect we felt it had on minority papers.

4        Q.   One of the statements you made there was, "Our

5    goal" -- meaning La Gaceta's -- "Our goal is to inform,

6    promote and serve the Latin community."  Does that sum

7    up La Gaceta's goal pretty well?

8        A.   You know, it could be one of our goals, sure.

9    I have a lot of goals.

10       Q.   Walk me through the production of a newspaper.

11   I'm an attorney; never been involved in newspaper

12   production at all.

13            To produce one of these issues --

14       A.   Um-hum.

15       Q.   I don't think that we've said on the record:

16   It's now a weekly newspaper?

17       A.   Correct; come out every Friday.

18       Q.   Okay.  What does the production look like for

19   putting together, say, today's paper?

20       A.   We have writers who are working on a copy as

21   they're producing it.  We have columnists who are

22   sending in their stuff.

23            We get a list of advertising that we're

24   going to run this week and our associate publisher sits

25   at a computer and melds all these things together into a

1    newspaper.

2              It gets proofread several times.  Layout gets

3    double-checked.

4              We go to prepress art and we send it to a

5    press in Lakeland and they print it up and we pick it up

6    and then we process it.  Put some in the mail; put some

7    out for delivery.

8         Q.   You talk about writers and columnists and it

9    seems like you were talking about them as two separate

10   jobs.  Are they?

11        A.   Well, columnists, generally, are very -- not

12   supervised.  They're -- they're generally coming up with

13   ideas that they want to do and so you just get their

14   stuff and you make sure that there's nothing in there

15   that you feel that's inappropriate, or whatever, and you

16   print it.  A writer sometimes -- you're directing.  You

17   want them to do this.  You want them to cover that.

18        Q.   Okay.  Who are your writers?

19        A.   Well, we have a girl named Tiffany Rizzano,

20   a lady who does work for us.  Gene also will do some

21   writing for us.  So will Jesse; so will I.

22        Q.   Okay.  Tiffany, we haven't talked about her

23   yet.  What's --

24        A.   She's out of house.

25        Q.   What's her last name?

Case 6:22-cv-01977-MSS-SPF   Document 33-19   Filed 06/10/23   Page 20 of 128 PageID 547

1      A.    Rizzano.

2      Q.    R-i --

3      A.    -- z-z-a-n-o.

4      Q.    Okay.  And what sort of issues does she cover?

5      A.    We generally have her do a spotlight once a

6  week on people that we feel need some recognition.

7      Q.    So, people around the Tampa area?

8      A.    Yes.

9      Q.    What about Gene?  What sort of columns does he

10  write?

11      A.    Gene -- you know, if we have an item that we

12  want to cover this week, like Martinez' birthday -- I

13  mean, Ybor's birthday, we would maybe say, you know,

14  "Gene, why don't you write something in regards to

15  that?"  But it could be anything, an event.  It could

16  be politics.  He also does a column.

17      Q.    You said once the layout is put together, it

18  gets sent to a press in Lakeland?

19      A.    Yeah.

20      Q.    Who is that?

21      A.    Sun Publications.

22      Q.    And what is it that they for you?

23      A.    They print a newspaper.

24      Q.    So, the newspaper itself gets printed by

25  Sun Publications?

Case 6:22-cv-01977-MSS-SPF   Document 33-19   Filed 06/10/23   Page 21 of 128 PageID 548

1        A.    They put ink to paper.

2        Q.    Okay.  And then how does that newspaper then

3    get distributed?

4        A.    We bring it back to the office.  We process

5    it for the Postal Service.  We deliver it to the Postal

6    Service, to the post office, and then we have delivery

7    people who either pick up the newspaper from our

8    location or we get them the newspaper to their location

9    and then they deliver it.

10        Q.    So, you say "we bring it to the office."

11    You have someone drive to Lakeland every week?

12        A.    Um-hum.

13        Q.    Okay.  Who does that?  Is that your

14    circulation person?

15        A.    No.  It's Randall Kelly, another part-timer.

16        Q.    One "L" or two "L's" in his first name?

17        A.    Two.

18        Q.    R-a-n-d-a-l-l?

19        A.    Yeah.

20        Q.    And Kelly, K-e-l-l-y?

21        A.    Yeah.

22        Q.    Okay.  So, Randall will drive to Lakeland and

23    then pick up all of the newspapers?

24        A.    Yes.

25        Q.    What's your weekly run amount?  How much --

1    how many newspapers do you have --

2         A.    4,000.

3         Q.    Randall will bring it back to the office.  Is

4    that the same one we were talking about in Ybor City?

5         A.    Correct.

6         Q.    And walk me through the steps for what you do

7    with it then.  I heard, broad strokes, you process it

8    for the mail and you send it out for -- you set it up

9    for delivery for your physical locations?

10        A.    Um-hum.

11        Q.    Okay.  Let's break those two --

12        A.    No.  We don't set it up for delivery.  We put

13   100 papers there; it goes to this person.  300 papers

14   there; it goes to that person.  They then set it up for

15   their deliveries.

16        Q.    Okay.  Let's -- talk me through that because

17   that is something I have no idea --

18        A.    Um-hum.

19        Q.    -- no understanding about.

20              So, other than the mail, you have the

21   newspaper being delivered to physical locations?

22        A.    Correct.

23        Q.    Okay.  How does that work?  Walk me through

24   that more step by step.

25        A.    We would give a route driver a list of

Case 6:22-cv-01977-MSS-SPF   Document 33-19   Filed 06/10/23   Page 23 of 128 PageID 550

1    locations and how many to drop off.  He would -- or

2    she -- would go, and go to those locations; pick up old

3    papers; drop off new papers.  That's about it in regards

4    to that.

5        Q.    How many route drivers do you have?

6        A.    1, 2, 3, 4, 5, 6, 7.  I believe seven.

7        Q.    So, they're not employees?

8        A.    Independent contractors.

9        Q.    And how do they get paid?

10       A.    Write them a check.

11       Q.    Do they get paid on a daily basis, hourly,

12    number of newspapers?  How do you determine how much

13    they get paid?

14       A.    Whatever we agree to for them delivering

15    our papers is what it is, and generally that's what

16    it is all year long, unless we substantially change the

17    route.

18       Q.    Okay.  Do you have -- do you have a written

19    plan for routes for these people to deliver newspapers

20    to?

21       A.    Generally, we have a list of locations to be

22    delivered.  We allow them to organize it however they

23    want.

24       Q.    When they drop off old newspapers, do you keep

25    a log of how many -- how many newspapers each driver has

1    been allocated to drop off?

2         A.   Yes, we do.  Generally, it's a fairly set

3    thing.  You don't change it too frequently.  So, yes,

4    they -- we know how many deliver and then they report

5    back to us how many they return --

6         Q.   Okay.

7         A.   -- how many are returned, so that if there's

8    an issue, we can start to address it.

9         Q.   So, they keep logs on how many unsold

10   newspapers they're picking up?

11        A.   You know, it depends on where they're at.  We

12   have some people just call them in once a week and tell

13   us what they are.  In the case of Sarasota, that's how

14   it's transmitted.

15        Q.   Who is your Sarasota driver?

16        A.   Let's see.  What is his name?  I don't deal

17   with him.  Gene deals with him.  Let's see here.

18   Chris Moody.

19        Q.   M-o-o-d-y?

20        A.   Yes.

21        Q.   Okay.  Where does Chris live, do you know?

22        A.   I don't.

23        Q.   Do you see Chris once a week?

24        A.   No.  I never see Chris.

25        Q.   Who does?

Case 8:22-cv-01977-MSS-SPF   Document 33-19   Filed 06/10/23   Page 25 of 128 PageID 552

1          A.    Nobody from our staff sees him once a week.

2     We have newspapers delivered to Sarasota and he picks

3     them up from there.

4          Q.    Okay.  So, walk me through that.  How do the

5     newspapers get delivered from Ybor City to Sarasota?

6          A.    We have a neighbor, Sunny Florida Dairy, and

7     we go over to Sunny Florida Dairy and we give him a

8     stack of newspapers.  He puts them on a milk truck that

9     goes Friday morning to their plant down there.

10              The driver takes it and puts it on the dock

11     and then Chris picks it up off the dock.

12          Q.    So, Sunny Florida Dairy?

13          A.    Uh-huh.

14          Q.    Okay.

15          A.    In a small business world, you do what you can

16     to make things work.

17          Q.    So, the -- that dock, is that the Manatee

18     County office that you have listed on your website?

19          A.    Yes.  Um-hum.

20          Q.    When do the papers get delivered to La Gaceta

21     from your publisher?  What day?

22          A.    From my printer?

23          Q.    Or from your printer, yes.

24          A.    When we pick them up.  Generally, we try to

25     get them back in the office around 3:00.

1      Q.   3:00 in the morning?

2      A.   No, 3:00 in the afternoon on Thursday.

3      Q.   Okay.  Your delivery drivers, they use their

4    own vehicles or do they use La Gaceta's?

5      A.   They use their own vehicles.

6      Q.   Do they keep track of their mileage?

7      A.   Not for me.

8      Q.   One question I forgot to ask you at the

9    beginning:  Did you talk to anybody before -- about

10   today's deposition before you came here today?

11     A.    No, not particularly.  When I first got your

12   note, I sent it to a lawyer friend of mine.

13     Q.   Okay.  Who is that?

14     A.   David Singer.

15     Q.   Okay.  Gil Singer?

16     A.   No, David.

17     Q.   But he's not representing you today?

18     A.   No.

19     Q.   Okay.  Did you talk to anybody at

20   Gilbert Garcia Law Group?

21     A.   No.

22     Q.   Who runs your website?

23     A.   We do, with the help of Steve Saladino.

24     Q.   Who is responsible for -- or who makes updates

25   to the website?

 1          A.    Depending on what they are, either Gene or

 2     Steve.

 3          Q.    Can you spell Steve's last name?

 4          A.    S-a-l-a-d-i-n-o.

 5          Q.    Do you ever direct the website to be changed?

 6          A.    Generally, I'm the one who's saying we need to

 7     do this or that, yes.

 8          Q.    Okay.  When was the last time you directed the

 9     website to be changed?

10          A.    I think this week.

11          Q.    What was that change?

12          A.    Our Sarasota office changed locations.

13          Q.    Okay.

14          A.    I don't know if the update's been made or not.

15          Q.    You were given a notice and I also sent

16     you a subpoena and it had a list of documents to bring.

17          A.    Correct.

18          Q.    So, let's go over that.  I see a big stack of

19     newspapers.  So, let's just start with the -- first, I

20     asked for a copy of every issue of La Gaceta from

21     October 2016 through today.  Is that what we have?

22          A.    I asked -- I asked Randall to produce those

23     for me and he's tied them up in nice little bundles

24     and --

25          Q.    And that's all of these?

1    A.    Yes.

2    Q.    Okay.  So, I see one stack for 2016, one for

3    2017, and this one says, "2018 through 8/31."

4    A.    Yeah.

5    Q.    Okay.  Very good.

6         MR. McKILLOP:  I don't know that I'm going

7         to have you scan all these in, so let's put these

8         to the side and, Tara, we can talk about how we

9         want that handled.

10        MS. McDONALD:  Yes.  That would make a very

11        lengthy transcript.

12        MR. McKILLOP:  Yes, it would.

13   BY MR. McKILLOP:

14   Q.    So, the next series of documents -- I asked

15   for written agreements between La Gaceta and a few

16   different places.  One was a U Save/Atco, located

17   at 3800 North Washington Boulevard in Sarasota.

18   A.    No document.

19   Q.    Okay.  Does that mean no document exists or

20   you just didn't bring it?

21   A.    No document exists.

22   Q.    Okay.  Let's go down -- because I asked

23   for the same thing for a few other locations:

24   Palmas de Cuba, Pastry Art Sandwich Shop,

25   First Watch.  Did you bring any of those documents?

1      A.    No document exists.

2      Q.    Okay.  So you have no written agreements with

3      any of those locations to sell your newspaper?

4      A.    Correct.

5      Q.    Okay.  So, let's go down to Number 6.  I

6      asked for receipts for any of your newspapers sold.

7      And, again, this is -- 6, 7, 8 and 9 are all asking

8      for the same thing for various locations.

9      A.    No document exists for 6, 7, 8, 9.

10     Q.    Okay.  Number 10, a copy of your lease

11     agreement with the La Gaceta office at 2555 Porter

12     Lake Drive.  That's this?

13     A.    Yes.

14          MS. McDONALD:  Can I see it after you're

15          done?

16          MR. McKILLOP:  Sure.  Let's go ahead and

17          mark this.

18          (The document was marked as Manteiga

19          Exhibit Number 1 for identification.)

20     BY MR. McKILLOP:

21     Q.    Eleven:  Receipts for periodicals sold at the

22     La Gaceta office, 2555 Porter Lake Drive.

23     A.    None.  No documents exist.

24     Q.    Twelve:  La Gaceta's application with the

25     postal office in Sarasota County for qualification.

1    Do you have that?

2            MR. McKILLOP:  Let's go ahead and mark

3        this.

4            (The document was marked as Manteiga

5        Exhibit Number 2 for identification.)

6            MR. McKILLOP:  Thirteen:  I asked for the

7        subscriber list for subscriptions distributed to

8        Sarasota County.

9            Let's go ahead and mark this one.

10            (The document was marked as Manteiga Exhibit

11        Number 3 for identification.)

12            BY MR. McKILLOP:  The next one was:  Copies of

13        payments received in 2017 and 2018 for these.  So,

14        let's mark this one as 4.

15            (The document was marked as Manteiga

16        Exhibit Number 4 for identification.)

17    BY MR. McKILLOP:

18        Q.    And, fifteen, I asked for documents for

19    the years of 2017 and 2018 related to deliveries of

20    La Gaceta.

21        A.    Um-hum.

22        Q.    Did you bring any of those documents?

23        A.    Well, travel logs for delivery vehicles,

24    I do not have anything.

25            Receipts for delivery costs.  What we did was

Case 8:22-cv-01977-MSS-SPF   Document 33-19   Filed 06/10/23   Page 31 of 128 PageID 558

1     ask our accountant to print up all the payments to

2     Chris Moody, so here you go.

3           For (c) and (d), I also have something.

4     Q.   Okay.

5     A.   What we did was --

6     Q.   Wait.  Let's mark each separately.

7           So, for 15(a), travel logs, there is none.

8     Correct?

9     A.   Yes.

10    Q.   None exist.  Right?

11    A.   None exist.

12    Q.   Okay.  For (b), receipts for delivery costs,

13    what we have that we're going to mark as 5, these are --

14    this is a printout from your accounting system showing

15    payments that you made to Chris Moody in 2017 and 2018?

16    A.   Correct.

17    Q.   Okay.

18          MR. McKILLOP:  Let's mark that.

19          THE COURT REPORTER:  Number 5.

20          (The document was marked as Manteiga

21        Exhibit Number 5 for identification.)

22    BY MR. McKILLOP:

23    Q.   All right.  So, 15(c), records showing

24    date, time, and number of periodicals delivered to

25    four locations within Sarasota.

Case 6:22-cv-01977-MSS-SPF   Document 33-19   Filed 06/10/23   Page 32 of 128 PageID 559

1          A.    What we did was, we went to our spreadsheet

2     that we keep on distribution for Sarasota, so it

3     actually has more than those four locations.

4          Q.    Okay.

5          A.    And the top is what is delivered to it.

6     The subsequent numbers are what was returned on each

7     of the -- for each of the addition dates.

8          Q.    Okay.  So, we've got two, one for 2017 and one

9     for 2018?

10         A.    Yes.

11               MR. McKILLOP:  Let's just do that as a

12         composite.  We can do that as a composite exhibit.

13               THE COURT REPORTER:  Number 6.

14               (The document was marked as Manteiga Exhibit

15         Number 6 for identification.)

16    BY MR. McKILLOP:

17         Q.    And then 15(d), records showing date, time,

18    and number of periodicals sold.

19         A.    I consider (c) and (d) to be satisfied by

20    the exhibit there.

21         Q.    So, what I don't see -- oh, now I do.

22    I see a "La Gaceta Office."

23         A.    Yes.

24         Q.    So, (c) and (d) are both on here.  Okay.

25               MS. McDONALD:  Off the record for just a

1        second.

2                MR. McKILLOP:  Sure.

3                (Discussion off the record.)

4                MR. McKILLOP:  We're back on the record.

5        BY MR. McKILLOP:

6        Q.    How long has La Gaceta been delivering

7        newspapers to Sarasota County?

8        A.    I believe -- I don't have an exact -- 2012,

9        '13.  I mean, we've mailed to Sarasota occasionally for

10       God knows how long.  I've been in business for 96 years,

11       and we've had mailing since 1923.

12       Q.    When you decided to expand into Sarasota --

13       A.    Um-hum.

14       Q.    -- was that your decision personally?

15       A.    Yes.  Yeah.

16       Q.    And how did you go about that?  How did you go

17       about that expansion?

18       A.    Well, we got the idea from The Business

19       Observer, who had expanded into a number of counties,

20       and so we talked to the post office about how to obtain

21       a Second Class Mailing Permit in each of those counties

22       and took a look at the Florida Statutes and worked with

23       the post office to meet their -- their requirements for

24       Second Class.  Generally, that means you have to be a

25       distributor in that county for a year in advance.

 1      Q.    This was -- Exhibit Number 2 is your

 2   application for --

 3      A.    No.  There is no application, per se.  At the

 4   time, when we were trying to get this satisfied, the

 5   post office's only office in the United States that

 6   handled periodicals was under water in New York because

 7   of a storm.  And so, we ended up dealing with some

 8   people out of California to do it.

 9           And so, what happens is, is that with Second

10   Class Mailing, you don't necessarily have a different

11   permit number per county.  You have your permit number,

12   which we've had since 1923.  And they then say that --

13   in this county, you can mail Periodical or Second Class.

14           So, on that sheet what you'll see is -- on the

15   back of it, you'll see a list of post offices that we're

16   allowed to mail Second Class -- Periodical Class in.

17      Q.    Okay.

18      A.    With Manatee -- you use basically the Sarasota

19   one for Manatee because the post office no longer has

20   post offices in each county that accept Second Class or

21   Periodicals, and so this is a constantly changing thing

22   with the post office as they contract their business.

23   You know, what used to be, you know, every post office

24   I could take Periodical mail to now, you're limited to

25   here and others.

1          Q.    And so, Exhibit Number 3, this is a list of

2     19 names?

3          A.    Yes.

4          Q.    These are everyone in Sarasota County who --

5          A.    Is mailed a newspaper.

6          Q.    -- is mailed a copy every single week?

7          A.    Yes.

8          Q.    And each of these 19 are subscribers?

9          A.    No.

10         Q.    Which ones are not subscribers?

11         A.    I think there's four that are and the rest are

12    free.

13         Q.    Who are the four that pay?  We've got --

14    it looks like Exhibit Number 4 says Liz Alpert --

15         A.    Correct.

16         Q.    -- with a check from Liz?

17               The next one is Kirschner?

18         A.    Yes.

19         Q.    Vicki Vega is the third one?

20         A.    Okay.

21         Q.    And Robert and Teresa Manteiga?

22         A.    Yeah.

23         Q.    Okay.  Any relation to you?

24         A.    Distant cousins.

25         Q.    How distant?

1          A.   I don't know.  But they weren't at my birthday

2     party, so --

3          Q.   So, everyone else gets a free copy,

4     Natalya Soshnikova?

5          A.   Correct.  Correct.

6          Q.   Okay.  Jason Ramos?

7          A.   Yes.

8          Q.   They are both attorneys?

9          A.   Yeah.  I assume so, yes.

10         Q.   Okay.  Nora Patterson was the Commissioner?

11         A.   Yes.

12         Q.   Clerk of Court in Sarasota?

13         A.   Yeah.  When we started doing Sarasota, we

14    wanted people to start to realize we were available.

15    So, we picked some names down there and started sending

16    them down there to become better aware of what's going

17    on.

18         Q.   So, when you started the -- expanding into

19    Sarasota --

20         A.   Yeah.

21         Q.   -- who -- how did you determine the demand for

22    your newspapers in Sarasota?

23         A.   Well, you have to build demand.

24         Q.   Okay.  How did you do that?

25         A.   By starting to do free distribution in

1    Sarasota.

2         Q.    Okay.  So, you did free distribution.  Where

3    did you do that?

4         A.    Those retail locations.

5         Q.    Okay.  Are they -- so, each of these that are

6    on -- let's talk about Exhibit 6.

7         A.    Sure.

8         Q.    Don Beto, the U Save, El Mariachi --

9         A.    Um-hum.

10        Q.    -- this list was all for -- given away for

11   free at a certain point in time?

12        A.    Yes.  It still is.

13        Q.    They're still given away for free?

14        A.    Yes.

15        Q.    At all of those locations?

16        A.    Yes, sir.

17        Q.    Who set up these individual locations?

18        A.    Gene and I drove down there and went in;

19   talked to people.

20        Q.    That was 2012 or 2013?

21        A.    Yeah.  Occasionally, you go back and do it

22   again and pick up new places.

23        Q.    When was the last time you went down and

24   picked up new places?

25        A.    About a year ago.

Case 8:22-cv-01977-MSS-SPF   Document 33-19   Filed 06/10/23   Page 38 of 128 PageID 565

1          Q.    About a year ago?

2          A.    Yeah.

3          Q.    You did personally?

4          A.    Yeah.

5          Q.    Okay.  What were the new places that you

6    picked up about a year ago?

7          A.    God, I couldn't remember.  I don't know if it

8    was just checking on it or picking them up.  Let me see

9    here.

10              Well, I think it was Don Beto because we had

11   one close.

12         Q.    So, all of these are -- these distributions

13   are still given away for free --

14         A.    Sure.

15         Q.    -- every single week?

16         A.    Yes.

17         Q.    So, if I'm understanding correctly, of all the

18   people that receive La Gaceta's newspaper in Sarasota

19   County, only four of them currently pay for it?

20         A.    Correct.

21         Q.    Do you ever go down to -- or do you ever go

22   out to the counties other than Hillsborough and

23   Pinellas, other than the Tampa area?

24         A.    Yes.

25         Q.    Do you ever personally go out to these other

Case 6:22-cv-01977-MSS-SPF  Document 33-19  Filed 06/10/23  Page 39 of 128 PageID 566

```
 1      locations that you use for distribution and see how
 2      things are going and talk to the owners?
 3           A.   Occasionally.
 4           Q.   When was the last time you did that to
 5      anywhere other than the, you know, Tampa area?
 6           A.   Well, when you say "Tampa area," are you
 7      talking about Hillsborough County?
 8           Q.   Hillsborough and Pinellas, let's say.
 9           A.   Pinellas?
10           Q.   Yes.
11           A.   Hernando, about three months ago.
12           Q.   Okay.  When was the last time you made it down
13      to Sarasota?
14           A.   Sarasota was about then, to actually do
15      business.
16           Q.   Okay.  So, three months ago?
17           A.   Yeah.  No, no.  Hernando was three months ago.
18      2017.
19           Q.   2017 was the last time?
20           A.   Sarasota.
21           Q.   Okay.  Did you go and --
22                At that point in time, if I'm understanding
23      what you're saying --
24           A.   Um-hum.  We had lost a location.  We went down
25      to pick up another location.
```

1          Q.     Okay.  So, you lost the U Save --

2          A.     Right.

3          Q.     -- in 2017 --

4          A.     Um-hum.

5          Q.     -- August of 2017?

6                 How did you know that you lost the U Save

7     location?

8          A.     I communicated with the route driver.

9          Q.     Okay.  And the route driver told you that it

10    wasn't there anymore?

11         A.     Yeah.

12         Q.     So, you talked to Chris Moody and --

13         A.     I did not talk to Chris Moody.

14         Q.     Okay.  So, who did?

15         A.     Gene.

16         Q.     So, Gene talked to Chris in 2017?

17         A.     Yeah.  He talks to him once a week.

18         Q.     So, how do you know that that -- walk me

19    through how you learned about U Save being closed.

20         A.     Gene said, "U Save is closed" --

21         Q.     Okay.

22         A.     -- and "Should we pick up somebody else?"

23                I said, "Yeah, let's go do it."

24                And I went down there; had some other stuff to

25    do down there and then went -- stopped around and picked

Case 6:22-cv-01977-MSS-SPF   Document 33-19   Filed 06/10/23   Page 41 of 128 PageID 568

1     up a location.

2          Q.   Okay.  What do you remember about Don Beto?

3          A.   I don't really remember much.  I mean, you

4     know, you knock on -- in my business, you knock on some

5     doors.  You say, "Listen, can I drop off some newspapers

6     here?  Here's my newspaper.  This is what we do," you

7     know, "We think your customers might be interested."

8               And some people say "yes."  Some people say

9     "no."  If they say, "Yes," you say, "Where can we put

10    these?"  And they tell you, "Put it on top of here.

11    Put it over there."  And then you write it down.

12              You communicate with the route driver that we

13    talked to somebody and that it should go over here.  So,

14    when he goes in the first time or second time and

15    somebody questions him, he'd say, "Yeah, they talked to"

16    -- whoever, and whoever said "yes."

17         Q.   Do you ever go -- do you have a way of

18    confirming the accuracy of the numbers on Exhibit 6?

19         A.   No.  If Chris is lying to me, he's lying to me

20    until I catch him.

21              Generally, what you'll do is, occasionally

22    you'll get a call -- and I'm not saying particularly in

23    this case -- but you'll get a call from somebody saying,

24    "Listen, I went to go pick up my newspapers at so-and-so

25    and they're not there."

Case 6:22-cv-01977-MSS-SPF  Document 33-19  Filed 06/10/23  Page 42 of 128 PageID 569

1    Q. Right.

2    A. And when you talk to the route driver and

3 the route driver says, "Well, I did this, that, or the

4 other," or "They are there," and so then you figure it

5 out.

6    Q. So, the reason that you didn't bring any

7 receipts for sales is because you don't have any

8 sales --

9    A. Correct.

10    Q. -- at these locations?

11    Your website says that you deliver to, I

12 think, ten counties.

13    A. Yes.

14    Q. Sarasota and Manatee?

15    A. Um-hum.

16    Q. Orange?

17    A. Yeah.

18    Q. Citrus?

19    A. Osceola.

20    Q. Osceola, Polk?

21    A. Um-hum.

22    Q. And Hernando?

23    A. Yeah.

24    Q. Hillsborough, Pinellas?

25    A. Yeah.

1        Q.   Did I miss any?

2        A.   You're pretty good.

3        Q.   Okay.  Of those, how many of these retail

4   locations actually sell La Gaceta?

5        A.   Generally, we sell in Pinellas, Hillsborough

6   and Pasco.  Hernando is half and half.  Orange has got

7   some that are sold.  Osceola is mostly free or all free.

8   Hernando -- Citrus is all free.

9        Q.   Polk?

10       A.   Polk is, I think, mostly free.

11            We have an agreement with Wawa.  Any Wawas

12   that open up, we can sell into there.

13       Q.   When you do sell at these locations, how do

14   they -- how do they track sales and get you the money

15   that you're owed?

16       A.   With Wawa, they scan in and they send you a

17   check once a month.

18       Q.   Okay.  That Wawa that you're talking about is

19   in Polk County?

20       A.   Oh, I'm talking about all over.

21       Q.   All over.

22       A.   In other words, you get a corporate check,

23   yeah.

24       Q.   Okay.

25       A.   They scan it in, so you don't have a

1    receipt.  You get your return.  So, if you find there's

2    a discrepancy between their money and your money or your

3    accounting, then you would say something to them.

4           There's other places we deliver to that pay

5    for a newspaper and they pay once a month and they --

6    some will give away a newspaper.  We have some banks

7    that buy a newspaper and give them away.

8           Then we have some retailers that sell our

9    newspaper and those we would get receipts from directly.

10    Q.    So, this Exhibit 3, it says, "Page 5 of 5."

11    A.    Uh-huh.

12    Q.    Talk to me about where this was -- where this

13    information is kept.

14    A.    In a computer at our office.

15    Q.    Okay.  What are the other four pages?  Is that

16    the rest of your mailing list?

17    A.    It would -- no.  It would be in the OMX sack.

18    Q.    Okay.  So, what does that mean?

19    A.    That means that there is a bag that is labeled

20    "OMX," which this bundle of papers would go into, and

21    probably five other bundles of paper would go into.

22    That bag, when we take it to the post office, the

23    post office would send that sack to a particular

24    location for the post office to open up that sack and

25    to distribute it.

1    If this was a 33601 sack, which is here in

2    downtown Tampa, we would take it to the post office.

3    The post office would take that whole sack, deliver it

4    to downtown.

5         Q.   Okay.

6         A.   The downtown post office would then open it up

7    and put it into the individual delivery areas.

8              With OMX, generally, this means that this is

9    going to either Jacksonville, Manasota, or Tampa to be

10   opened up and then to be sorted and then distributed.

11        Q.   Okay.

12        A.   So, this is a communication with the post

13   office of what to do with the papers based on post

14   office rules.

15        Q.   Okay.  How many -- you said your total print

16   run --

17        A.   4,000.

18        Q.   4,000.  How many of those are mailed?

19        A.   About 2,000.

20        Q.   How many -- about how many total paid

21   subscribers do you have?

22        A.   Paid newspapers?

23        Q.   Yes.

24        A.   Probably about 3,000 of those.

25        Q.   Okay.

Case 8:22-cv-01977-MSS-SPF   Document 33-19   Filed 06/10/23   Page 46 of 128 PageID 573

1          A.   And I have to say "paid newspapers," because I

2     have some people who will buy 10 papers, 20 papers, and

3     so --

4               MR. McKILLOP:  We're at about an hour.  Are

5          you doing okay?  Anybody want a break?  We can do

6          a rest room break.

7               (There was a recess.)

8     BY MR. McKILLOP:

9          Q.   So, let's talk about the corporate office --

10         A.   Okay.

11         Q.   -- in Sarasota, not in Ybor City.

12              I see this agreement.

13         A.   Sure.

14         Q.   Help me understand the -- what your

15    relationship is with this Siete Dias.

16         A.   Siete Dias is a Spanish language newspaper

17    in Sarasota, Manatee, Hillsborough.  And we found that

18    the most efficient way of trying to open up satellite

19    offices and have them manned was to work with existing

20    businesses.  So, Siete Dias agreed that they would act

21    as our office and we gave them a manual.  So, if anybody

22    came in to do business directly, they would be able to

23    assist them.

24              In our business nowadays, very few people --

25    well, in fact, nobody walks into an office anymore for

1    this kind of stuff.  Legal ads, ad agencies, almost all

2    of this is done by e-mail anymore.

3              So, we wanted to be able to have a place

4    where, if somebody needed a newspaper, they needed to

5    physically place an ad with us, they could go, and

6    Siete Dias agrees with it.

7              And the way we pay Siete Dias is based on the

8    number of ads we get out of that county, so that they

9    basically -- their pay is a commission.  It's worked out

10   very well for us and I find it an innovative way of

11   trying to deal with living in today's newspaper world.

12        Q.   So, if I understand correctly, what you do is

13   La Gaceta handles the processing of advertisements and

14   legal ads --

15        A.   Yes.

16        Q.   -- through Sarasota -- that are coming from --

17   originating from Sarasota County?

18        A.   Everybody e-mails me stuff, yeah.

19        Q.   And Siete Dias gets a commission for you being

20   able to use their mailing address?

21        A.   And to be able to use their staff, if

22   necessary.

23        Q.   Okay.

24        A.   Yeah.

25        Q.   How often do you use their staff?

Case 6:22-cv-01977-MSS-SPF   Document 33-19   Filed 06/10/23   Page 48 of 128 PageID 575

1        A.    Never.

2        Q.    So, you only use, basically, their mailing

3    address to be able to put down that you've got a

4    location in Sarasota?

5        A.    Yes.

6        Q.    Is that correct?

7        A.    Correct.

8        Q.    Okay.  And at some point in time, I thought

9    that I heard you say that you have a new location in

10   Sarasota?

11       A.    They just moved.

12       Q.    Okay.  Where are -- so, are you still using

13   that location under the new owner?

14       A.    Yes.  Yeah, I have a new -- I got a new

15   agreement, updated, with a new address on it and --

16   yeah.

17       Q.    Okay.  Well -- so, let me ask my question so

18   that you understand what I'm asking.

19       A.    All right.  I'm sorry.

20       Q.    It's okay.  It happens from time to time.

21   That's not a problem.

22       A.    I was supposed to only say "yes" or "no" at

23   depositions, though.

24       Q.    Are you still using Siete Dias or are you

25   still using 2555 Porter Lake Drive, Suite 107?

```
 1          A.    Siete Dias.

 2          Q.    Okay.  Where is their new location?

 3          A.    I don't know exactly off the top of my head.

 4          Q.    When was the last time you visited the

 5    Siete Dias office?

 6          A.    Probably three years ago.

 7          Q.    So, around 2015?

 8          A.    Yeah.

 9          Q.    What did you find at that office when you

10    visited?

11          A.    The last time I was there, they have a

12    secretary up front.  Luis Baron met me there.  He's

13    their publisher.  He introduced me to a couple of their

14    staff.  It's a small office.

15                It was an industrial park area of Manatee/

16    Sarasota -- of Sarasota, and that was it.

17          Q.    Where did they keep your newspaper?

18          A.    On the desk, on the -- in the reception area.

19          Q.    Okay.  Do you know how long ago Siete Dias

20    moved out of that location?

21          A.    I think last week.

22          Q.    When was the last time that you talked to --

23    is it Mr. Baron?

24          A.    Gene talked to his wife last week.

25          Q.    And what did Gene tell you about that
```

1    conversation?

2         A.    That they had moved.

3         Q.    Who initiated that conversation?  Was it Gene

4    or was it Mr. Baron?

5         A.    I couldn't tell you.

6         Q.    That conversation would have been had after

7    you got the initial subpoena.  Correct?

8         A.    Sure.  Yeah.

9         Q.    Okay.  Do you have a new agreement with

10   Siete Dias?

11        A.    I e-mailed -- Gene e-mailed them when I wrote

12   it up.  I have not seen it signed yet.

13        Q.    Okay.  Do you keep copies of all the checks

14   that you've written to Siete Dias since January of 2014?

15        A.    Yes.  Well, do I keep copies of it?  You know,

16   typical banking records, so the bank statement normally

17   has some of that.  My accountant certainly could track

18   what we've written.

19        Q.    Okay.  La Gaceta has not always published

20   legal advertisements for Sarasota County?

21        A.    Correct.

22        Q.    There was a point in time where you started

23   doing that.  Do you remember when that was?

24        A.    It would have been probably several months

25   after getting my Second Class Mailing Permit -- I'm

1    sorry, Periodicals.  I'm very old-fashioned.

2        Q.   The first legal advertisement that I was able

3    to find was sometime March of 2014.

4        A.   Okay.

5        Q.   Does that sound accurate?

6        A.   I really couldn't tell you.

7        Q.   Do you --

8        A.   I did not familiarize myself with it or try to

9    before I came here.

10       Q.   Were you the one that would have been

11   responsible for finding legal advertisers during that

12   time frame or would it have been someone else at

13   La Gaceta?

14       A.   Probably me.

15       Q.   Okay.

16       A.   There's other people who sometimes, you know,

17   let people know that we're now offering legal ads in

18   Sarasota, so -- it might have been an existing client.

19       Q.   The first legal advertisement for Sarasota

20   County that I could find was two of them with Gilbert

21   Garcia Group.

22       A.   Okay.

23       Q.   Would you have been the point of contact with

24   Gilbert Garcia?

25       A.   At that time, I don't know.  I would have

1    originally started as the contact with them, but I don't

2    know if I would have been the contact with them on --

3    on the Sarasota issue.

4          Q.   Okay.  Who else might it have been?

5          A.   It could have been whoever handled -- handling

6    our legal advertising at that time.

7          Q.   Was it still Jessie Simpson?

8          A.   It might have been.

9          Q.   Who else might it have been?

10          A.   It might have been my daughter, who worked

11    with me for a while.

12          Q.   Okay.  Who was that?

13          A.   Erin Manteiga.

14          Q.   E-r-i-n?

15          A.   Yes.

16          Q.   And you've been doing legal advertising in

17    Sarasota since 2014?

18          A.   Yes.

19          Q.   Do you remember when your -- when you applied

20    to be able to mail Second Class Mail in Sarasota County,

21    this Exhibit 2, was that the first time that you made

22    that application?

23          A.   Yes, if I understand your -- ask me that one

24    more time.  Let me see if I understand your -- your

25    question.

Case 6:22-cv-01977-MSS-SPF   Document 33-19   Filed 06/10/23   Page 53 of 128 PageID 580

1    Q.    The first -- the first time that you applied

2    to be registered as a Periodical with the post office in

3    Sarasota County --

4    A.    Correct.

5    Q.    -- is Exhibit 2 showing when that first

6    occurred?

7    A.    Let me look.  This is when they told us that

8    we had our Second Class Mailing Permit, so I believe

9    there would have been a year before this that we were

10   working in Sarasota to make sure we were doing

11   distribution down there.

12   Q.    Okay.

13   A.    You have to wait a year after you ask the

14   post office for Second Class mailing before you receive

15   -- I'm sorry -- Periodical mailing before you receive

16   it.

17   Q.    So, when you ask, you don't ask verbally?  You

18   put in an application.  Correct?

19   A.    Not that I think -- I don't think there's an

20   application process.  It's very strange.  The post

21   office is an odd bird.

22   Q.    If there were an application process and there

23   were an application, would you have kept a copy of the

24   application?

25   A.    That's what we have in our records as our

1     proof of Second Class mailing.

2         Q.   This is the only thing that you have?

3         A.   Yes.  Correct.  That's the only thing that we

4     can get from the post office.

5         Q.   Did you check all of your records for an

6     application?

7         A.   There was no physical application.

8         Q.   Okay.  Did you check your electronic records?

9         A.   No.  I'm sure there was no application there.

10    There might have been an e-mail saying, "This is what

11    we'd like to do."

12        Q.   If there was an e-mail, who would have been

13    the person who would have written that e-mail?

14        A.   Gene.

15        Q.   So, Gene would have made that application and

16    Gene would have been the one that would have gotten the

17    response.  Is that right?

18        A.   Gene was in charge of finding out how we would

19    go through the process of getting Second Class mailing

20    status or Periodical Class status in these other

21    counties.

22        Q.   Okay.  Does Gene -- do you know Gene's process

23    for keeping or deleting e-mail?

24        A.   We don't really try to delete -- we try not to

25    delete anything we have, but sometimes you have to just

1    because of size.  No, I do not know.

2         Q.   Who is Salvatore Guagliardo,

3    G-u-a-g-l-i-a-r-d-o?

4         A.   Sal?

5         Q.   Yes.

6         A.   He is the owner of Sunny Florida Dairy.

7         Q.   He's also -- doesn't he own or operate a

8    restaurant here in town?

9         A.   I don't think so.

10        Q.   He runs the Italian Club, doesn't he?

11        A.   The Italian Club is not a restaurant, sir.

12        Q.   Okay.  What is the Italian Club?

13        A.   The Italian Club is a mutual aid society

14   started in the turn of the century for Italians.

15   Currently, it's a social club and operates as an event

16   center.

17        Q.   So, he runs the Italian Club then.  So, I made

18   a mistake.  I assumed it was a restaurant from what I

19   saw on the outside of it, but he operates the Italian

20   Club?

21        A.   I don't know if I would say that.  I think

22   he's the President of the Italian Club, but it's a

23   non-profit group of people, so -- he's in charge of it,

24   yes.

25        Q.   Okay.  Is that where you first met Sal?

1      A.    No.

2      Q.    Where did you first meet him?

3      A.    Sal?  I don't know.  I've known Sal for a long

4    time.  Probably since I started doing -- going to the

5    newspaper with my father, 'so 83, '84, '85, '86.

6      Q.    Okay.  Are there two Sals or two Salvatore --

7    I'm going to screw up the last name unless you say it

8    for me.

9      A.    Guagliardo.

10      Q.    Guagliardo?

11      A.    Yeah.

12      Q.    Okay.  Is there a father and son with the same

13    first and last name?

14      A.    I don't know.

15      Q.    Okay.

16      A.    I know him as Sal Guagliardo.

17      Q.    Okay.

18      A.    I assume you're talking about the owner of

19    Sunny Florida Dairy.

20      Q.    Okay.  Sal J.  Does he go by "Joe" at all?

21      A.    Don't know him by "J."  Don't know him by

22    "Joe."

23      Q.    All right.  How old is he, about?

24      A.    Sal?  My age.

25      Q.    He also owns the address -- or the building

1     at 2909 62nd Avenue East in Bradenton.  Right?

2          MS. McDONALD:  I'm just going to put an

3     objection on the record.  Obviously, I can't tell

4     him not to answer.  But, again, you're asking

5     questions about other people that are not him.

6     You didn't ask him to bring any of this

7     information.  I mean, I just think that this

8     line of questioning --

9          MR. McKILLOP:  I'm asking for his knowledge.

10          MS. McDONALD:  Okay.  I just think this line

11     of questioning is a little bit -- I'm just going

12     to object to the form.

13          MR. McKILLOP:  Okay.  "Object to form" is

14     fine.

15          You -- if she makes objections, which she is

16     allowed to do, "object to form" is preserving an

17     objection on the record. It doesn't mean that the

18     questioning stops.  You can still answer the

19     question.

20          THE WITNESS:  Can I not answer the question?

21          MR. McKILLOP:  No.

22          THE WITNESS:  Okay.

23          MR. McKILLOP:  So, unless you are going to

24     plead the Fifth Amendment, then there's no reason

25     that you would not answer the question.

1           MS. McDONALD:  But, if you don't know, you can

2       say you don't know.

3           MR. McKILLOP:  If you don't know, say you

4       don't know.

5   BY MR. McKILLOP:

6       Q.   But Sal owns the building that you have

7   registered -- or that you have listed on your website as

8   your Manatee County office.  Correct?

9       A.   I assume so.  I do not know who owns the

10  building.

11      Q.   Okay.

12      A.   You're telling me that.  I have nothing to say

13  "no," "yes."

14      Q.   Okay.  When you went to set up the --

15      A.   Um-hum.

16      Q.   -- the ability to use the 2909 62nd Avenue

17  building, who did you go to to set that up?

18          MS. McDONALD:  Object to form.

19      A.   I think I talked to Sal.

20  BY MR. McKILLOP:

21      Q.   Okay.  Do you have the same arrangement with

22  Sal that you do with Siete Dias?

23      A.   I have the same arrangement with all of my

24  outside locations outside of 7th Avenue, yes.

25      Q.   Okay.  Let's look at the distribution list

1      again, Exhibit 6.  How often are these numbers updated?

2          A.     I think Gene talks to him once a week.  I

3      don't know how often Gene inputs.

4          Q.    So, Gene is the one that puts this information

5      into this spreadsheet?

6          A.    Correct.

7          Q.    How often do you talk to Gene about the

8      accuracy of this information?

9          A.    The last time I talked to Gene about the

10     accuracy of it?  I can't remember when I've said, "Gene,

11     is this information accurate?"

12         Q.    Okay.  Do you know -- let's start with --

13     let's start with the newest one, Don Beto.

14         A.    Um-hum.

15         Q.    Do you know why -- I'm going to make some

16     representations to you.  If you need me to, I can pull

17     up the PI report to show you it, but I'm going to make

18     some representations because the representations go to

19     my question.

20         A.    Okay.

21         Q.    Do you know why Don Beto would say that they

22     don't -- the employees at Don Beto would say that they

23     don't have any knowledge of La Gaceta being offered at

24     the restaurant?

25         A.    No, I do not.

1          MS. McDONALD:  Object to form.

2    BY MR. McKILLOP:

3          Q.   Do you know why La Gaceta would not show up in

4    the actual restaurant Don Beto?

5          A.   No.

6          MS. McDONALD:  Object to form.

7    BY MR. McKILLOP:

8          Q.   I want to skip U Save, but I'm going to ask

9    you the same questions regarding El Mariachi.  Do you

10   know why no one at El Mariachi has ever heard of

11   La Gaceta newspaper?

12         MS. McDONALD:  Object to form.

13         A.   No.

14   BY MR. McKILLOP:

15         Q.   What about Palmas de Cuba?  Do you know why no

16   one at Palmas de Cuba had ever heard of La Gaceta?

17         A.   No.

18         MS. McDONALD:  Object to form.

19   BY MR. McKILLOP:

20         Q.   Pastry Art.  Do you know why no one at

21   Pastry Art had ever heard of La Gaceta?

22         A.   No.

23         MS. McDONALD:  Object to form.

24         If you don't mind, just let me throw that

25         in there before your answer.

1              THE WITNESS:  Okay.  No problem.  Sorry.

2              MS. McDONALD:  Thanks.  It's okay.

3              MR. McKILLOP:  I'm going to ask -- I'm going

4       to ask one more.

5  BY MR. McKILLOP:

6        Q.   Same question for First Watch.  Do you know

7  why no one at First Watch had ever heard of La Gaceta?

8              MS. McDONALD:  Object to form.

9        A.   No.

10  BY MR. McKILLOP:

11        Q.   I will make this other representation.

12  I've had -- I've personally gone to each of these

13  locations.  I've also had a private investigator go

14  to each of these locations.  And on both occasions,

15  La Gaceta's newspaper was not anywhere in any of these

16  locations, whether for sale or offered for free.  Do

17  you know why that would be?

18              MS. McDONALD:  Object -- object to form.

19        A.   No.

20              MS. McDONALD:  Compound and assumes facts not

21       in the record, et cetera, et cetera.

22              MR. McKILLOP:  Sure.

23  BY MR. McKILLOP:

24        Q.   This U Save location --

25        A.   Uh-huh.

1   Q. -- do you know why it was -- why you stopped

2 offering it, your newspaper there?

3   A. No.

4   Q. This actually stopped being a U Save sometime

5 in 2014 and turned into a tile -- marble and tile

6 installation office --

7   A. Okay.

8   Q. -- in 2014.

9    MS. McDONALD: Object to form.

10 BY MR. McKILLOP:

11   Q. Any idea why your form still shows deliveries

12 after this had changed from being a U Save to a tile

13 location?

14   A. I assume it's because our route driver said he

15 was delivering to them.

16   Q. I'm going to show you --

17    MS. McDONALD: If you're going to be showing

18   him things and you don't have copies of those,

19   then, are they being included or --

20    MR. McKILLOP: Yes. I will stamp them and

21   e-mail them to her and to you direct from the

22   iPad. We'll put it up there. Let me see if

23   I can put it up.

24    (Discussion off the record.)

25 BY MR. McKILLOP:

1      Q.  All right.  Patrick, I'm going to show you

2  some stuff on the screen behind you.

3        MR. McKILLOP:  So, this set of pictures, I'm

4      going to -- we'll mark as Exhibit 7.

5        (The document was marked as Manteiga Exhibit

6      Number 7 for identification.)

7  BY MR. McKILLOP:

8      Q.  Are you familiar with that location?

9      A.  Yeah.  I think that's one I went to.

10     Q.  Okay.  That's the Siete Dias location in

11  Sarasota?

12     A.  Uh-huh.

13     Q.  This would be -- you would remember this

14  from 2012 or 2011 when you went to --

15     A.  Yeah.  Yeah.  I mean, it's a very close-up

16  shot.  I think that's it.

17     Q.  Okay.  La Gaceta's name doesn't show up on

18  this location?

19     A.  Correct.

20     Q.  That looks like the front door?

21     A.  It's a long time ago, sir.

22     Q.  Okay.  This is a shot of the inside.  Maybe

23  that's a little clearer.  That would be the front

24  entrance that has carpet and nothing else.

25        Would this have been where that secretary was

Case 6:22-cv-01977-MSS-SPF   Document 33-19   Filed 06/10/23   Page 64 of 128 PageID 581

1    when you visited in 2015?

2        A.    I assume so.  Your picture is out of context.

3              MS. McDONALD:  And I'm going to say object to

4        form again.  He's already testified that that

5        location had closed down, so --

6              MR. McKILLOP:  Sure.  This -- these set

7        of pictures were taken in April of this year.

8    BY MR. McKILLOP:

9        Q.    Does that look familiar, the front

10   entranceway --

11       A.    No.

12       Q.    -- what you're looking at in that picture?

13       A.    I can't tell from that context.

14       Q.    Okay.  The picture is being taken through the

15   front door glass.

16       A.    Okay.  I can't tell from that context, sir.

17       Q.    Okay.  Do you remember where the secretary's

18   desk was in Siete Dias when you walked in?

19             MS. McDONALD:  Object to form.

20   BY MR. McKILLOP:

21       Q.    Would it have been right in this front

22   entrance area?

23       A.    I think so.

24       Q.    Okay.  Do you remember who was in these now

25   empty offices?

1      A.    Not exactly.

2      Q.    If these numbers here on Exhibit 6 --

3      A.    Um-hum.

4      Q.    -- are untrue, if they are made up --

5      A.    Um-hum.

6         MS. McDONALD:  Object to form.

7      Q.    -- would they have been made up by you?

8      A.    No, sir.

9      Q.    Okay.  Would they have been made up by Gene?

10         MS. McDONALD:  Object to form.

11      A.    Sir, you're asking me to speculate on who

12 would make up numbers I don't know if were made up,

13 so --

14      Q.    Okay.

15      A.    That's kind of an odd question for me to ask

16 (sic) and I don't think I can answer it.

17      Q.    Sure.  Well, let's talk about that, because

18 there's a couple of ways to get to the bottom of the

19 discrepancy between what these numbers say and what my

20 private investigator says.  One of them would be for me

21 to set down the deposition of Gene, Chris Moody and to

22 ask them the same questions.

23      A.    Um-hum.

24      Q.    The other one would be to set down the

25 deposition of all of these people.

1       A.   Um-hum.

2       Q.   Would Gene know whether these numbers are

3  accurate or not?

4            MS. McDONALD:  Object to form.

5       A.   I don't know.

6  BY MR. McKILLOP:

7       Q.   How long has Chris Moody been working for you

8  doing distribution?

9       A.   I don't know.  I think for the entire time

10  we've been talking about.  Maybe longer.

11      Q.   Have you ever -- have you ever found that

12  Chris lied to you about his distributions?

13           MS. McDONALD:  Object to form.

14      A.   Never met Chris.  In fact, I don't talk to him

15  directly.

16  BY MR. McKILLOP:

17      Q.   Okay.  So you've never had any conversations

18  with Chris?

19      A.   No, not that I know of.

20      Q.   Who would have hired Chris?

21      A.   Gene.

22      Q.   Does Chris distribute to any other -- any

23  other locations other than Sarasota and Manatee County?

24      A.   No.

25      Q.   Let's talk about your website.

Case 6:22-cv-01977-MSS-SPF   Document 33-19   Filed 06/10/23   Page 67 of 128 PageID 584

1         A.    Okay.

2         Q.    This will be Exhibit -- and I'll have you look

3    up there.

4         A.    Okay.

5         Q.    This will be Exhibit 8.

6               (The document was marked as Manteiga

7               Exhibit Number 8 for identification.)

8    BY MR. McKILLOP:

9         Q.    I can zoom in on any area that you need to,

10   but I want to start with -- you see in the upper

11   right-hand corner --

12        A.    Yes.

13        Q.    -- the date of 8/15/18?

14        A.    Um-hum.

15        Q.    So, does this look like an accurate

16   representation of La Gaceta's website as it would

17   have looked like on 8/15/18?

18              MS. McDONALD:  Object to form.

19        A.    I don't know.  I didn't look on it that day.

20        Q.    Okay.  Do you see anything that looks

21   inappropriate or something that would not have been on

22   the subscribed to La Gaceta portion of your website on

23   that day?

24        A.    It looks appropriate.

25        Q.    So, this is page 5 of 8 for that section.

1           A.    Okay.

2           Q.    So, these addresses here on the right --

3           A.    Um-hum.

4           Q.    -- Marathon, Don Beto, El Mariachi --

5           A.    Um-hum.

6           Q.    -- and then Palmas de Cuba, La Gaceta,

7    Pastry Art Sandwich Shop and First Watch, are those all

8    of the locations where a person in Sarasota County could

9    pick up La Gaceta for free?

10          A.    Yes.

11          Q.    Even the Marathon?

12          A.    I mean, I don't know exactly the status of

13   Marathon.  Sometimes they're late on updating websites,

14   so, to the best of my knowledge, but I don't know.

15          Q.    The Marathon, would you have been the one

16   responsible for picking up Marathon as a new location

17   for La Gaceta?

18          A.    I can't remember.

19          Q.    Okay.  So, these three locations here --

20          A.    Um-hum.

21          Q.    -- you testified earlier that you were the one

22   that went down to Sarasota to pick up Don Beto?

23          A.    I think so, yes.

24          Q.    Okay.  El Mariachi is right next door.  Would

25   you have gone there as well?

1          A.    Don't know.  Don't know if that was one that

2      was done beforehand.

3          Q.    Okay.  And what about the Marathon?  That's

4      right across the street.  They're all in the same

5      location.

6          A.    Okay.

7          Q.    Did you -- were you the one that set up the --

8      set up the Marathon location?

9              MS. McDONALD:  Object to form.

10         A.    I don't know.

11     BY MR. McKILLOP:

12         Q.    You don't remember?

13         A.    I don't remember.

14         Q.    Okay.  I'm going to show you another

15     of La Gaceta.  This one is 8/13/18 in the upper

16     right-hand corner.

17         A.    Okay.

18         Q.    Does this also look like a copy of La Gaceta

19     from the same time, 8/13/18?

20         A.    Yeah.  I mean, it looks like it's the

21     information I would carry.

22         Q.    Let me show you, again, page 5.  We're looking

23     at the portion of the La Gaceta website that talks about

24     Sarasota County.

25         A.    Um-hum.

Case 6:22-cv-01977-MSS-SPF   Document 33-19   Filed 06/10/23   Page 70 of 128 PageID 587

1        Q.   On 8/13/18, what is missing is the Marathon,

2   the Don Beto, and the El Mariachi.

3        A.   It kind of looks like somebody updated the

4   website.

5        Q.   Do you know who ordered that the website be

6   updated?

7        A.   I don't know.  It wasn't me on that particular

8   -- I did not ask somebody to update the website for

9   that.

10       Q.   Okay.  8/13/18 would have been the same date

11   that you were served with the subpoena to appear at the

12   hearing.

13       A.   Okay.

14       Q.   And you were served about 12:30 in the

15   afternoon.

16       A.   Okay.

17       Q.   So, between the time that you were served and

18   two days later --

19       A.   Um-hum.

20       Q.   -- the website changed to include Marathon,

21   Don Beto and El Mariachi?

22       A.   It looks like the website was updated.

23       Q.   Okay.  You were not the one that ordered that

24   to be done?

25       A.   Ordered that update?  No.

1      Q.   After you were served with the subpoena, who

2   did you talk to?

3      A.   The whole office knew.  I have a small office.

4      Q.   Okay.  Who did you talk to about the Sarasota

5   locations?

6      A.   It would have been Gene.

7      Q.   What did you talk to Gene about?

8      A.   I told him about what you guys were asking

9   for.

10      Q.   Okay.  Walk me through that conversation.

11      A.   I don't really know what it was.  I mean, at

12   the time most of the conversation was over the fact that

13   I had two days to respond to a subpoena and I was a

14   little upset that I couldn't get you to grant me a

15   change, so that would have been most of my conversation.

16      Q.   Okay.  What did Gene tell you about these

17   locations?

18          MS. McDONALD:  Object to form.

19      A.   I didn't ask him.

20   BY MR. McKILLOP:

21      Q.   So, you didn't ask Gene any information about

22   these locations?

23      A.   I probably asked Gene to take a look at it.

24   This is what we're going to need.

25      Q.   Okay.

1          A.    You know, I have to say, updating a website is

2    updating a website.   Sometimes they're not as updated as

3    they need to be.

4          Q.    What's the name of the person that would have

5    actually made the change to the website?

6          A.    It could have either been Gene or Steve.

7          Q.    They have access to go onto the website and

8    make the changes themselves?

9          A.    They have the knowledge to do so, yes, and

10   access.

11         Q.    What about you?

12         A.    I've never made an update to the website.

13         Q.    What is the -- what's the tool that you use

14   for hosting the website; do you know?

15         A.    I couldn't tell you.

16         Q.    All right.   So, you wouldn't know whether it's

17   a WordPress form or --

18         A.    I wouldn't be able to tell you.   WordPress

19   sounds familiar but --

20         Q.    Gene or Steve would be the two that would have

21   the ability to change it?

22         A.    Yes.

23         Q.    Anybody else?

24         A.    I think my wife posts up to it, but I don't

25   think she changes it, per se.

Case 6:22-cv-01977-MSS-SPF   Document 33-19   Filed 06/10/23   Page 73 of 128 PageID 600

1       Q.   Okay.  For the rest of your website for these

2   locations, how up-to-date is it?

3       A.   I don't know.

4       Q.   Who would?

5       A.   Probably Gene.

6       Q.   Let me have you look up there again.  These

7   are both the same, so it doesn't matter whether we look

8   at 8 or 9.

9       A.   Um-hum.

10       Q.   Hillsborough County.  These locations on the

11   left-hand side, they say "Downtown Tampa" --

12       A.   Yeah.

13       Q.   -- and they have an "NR" next to them.  What

14   does "NR" mean?

15       A.   Should be a newsrack.

16       Q.   Okay.

17       A.   That's a metal box.

18       Q.   It's what we would think of as a, you know,

19   classic way of picking up a newspaper; going and putting

20   change into a box and pulling a handle and grabbing a

21   newspaper.  Right?

22       A.   Yes, sir.  Um-hum.

23       MS. McDONALD:  Object to form.

24   BY MR. McKILLOP:

25       Q.   Okay.  Who owns those boxes?

1          A.    Some were originally owned by

2     The Tampa Tribune.  I think The Times owned some

3     of them.

4          Q.    Okay.  So, the newsracks that are listed there

5     are owned by -- not owned by La Gaceta?

6          A.    I don't believe any of those sites are owned

7     by La Gaceta.

8          Q.    What about the ones in -- that is not correct.

9                What about these on 7th Ave in Ybor, the

10    Italian Club?

11         A.    That one is a newsrack that we own, and so is

12    the Columbia.

13         Q.    Columbia.  And the 15th and 7th?

14         A.    15th and 7th.  I don't know where that one is.

15         Q.    Okay.  So, the newsracks downtown Tampa --

16         A.    Uh-huh.

17         Q.    -- the newsracks -- how does that work?  Do

18    you put your paper in newsracks owned by somebody else?

19         A.    A few years ago, the City of Tampa encouraged

20    newspapers to cooperate, to not have individual

21    newsracks in downtown.  So, The Times and The Tribune

22    purchased racks of racks.

23         Q.    Okay.

24         A.    And then, inside of those, you then bought

25    your space in that rack.

Case 6:22-cv-01977-MSS-SPF   Document 33-19   Filed 06/10/23   Page 75 of 128 PageID 602

1    Q.    Okay.  And you keep -- you keep spaces for all

2    of these racks currently?

3    A.    I believe so, unless somebody's moved one of

4    them.  Occasionally, The Times will pull one in to rehab

5    it, or whatever.  Sometimes a car will hit something and

6    it will disappear and hopefully you'll get it back after

7    a period of time.  Sometimes the City changes things.

8    Sometimes people steal your equipment, too.

9    Q.    How would you find out about that, if one of

10   these racks were no longer in commission?

11   A.    I mean, you would get a report back from

12   whoever is doing distribution of that.  They should be

13   able to either put a note on the list saying it's not

14   there, communicate directly to Gene or to somebody in

15   the office saying it's not there.

16   Q.    Have you ever found that one of your

17   distributors is just not doing their job?

18        MS. McDONALD:  Object to form.

19   A.    Yeah.  I've run into things where we found

20   somebody wasn't doing something.  You would call them.

21   They would normally have an excuse and correct it.

22   BY MR. McKILLOP:

23   Q.    Are you familiar with the term "sewer

24   mail" --

25        MS. McDONALD:  Object to form.

Case 6:22-cv-01977-MSS-SPF   Document 33-19   Filed 06/10/23   Page 76 of 128 PageID 603

1    BY MR. McKILLOP:

2        Q.    -- where people just -- it's an older phrase

3    where --

4        A.    No.  I'm not familiar with the term "sewer

5    mail."

6        Q.    Okay.  Do you think that any of your

7    distributors just throw their newspapers in the garbage

8    instead of distribute them?

9             MS. McDONALD:  Object to form.

10       A.    I would hope not.

11   BY MR. McKILLOP:

12       Q.    You never run into that, with one of your

13   distributors actually doing that?

14       A.    No.

15       Q.    Who would know whether these newsracks are

16   still in operation, these that are shown up on the

17   screen right now, the six?

18       A.    You have to probably talk to Gene, talk to the

19   route driver, find out if they are and find out when

20   they -- so that's how we would do it.

21       Q.    If I gave you a ten-minute break, could you

22   talk to Gene and confirm whether all of these newsracks

23   are still in operation?

24       A.    I can ask him if he knows.

25       Q.    Sure.

1            A.    I don't have a cell phone with me.

2                  MR. McKILLOP:  Let's go off the record.

3                  (Discussion off the record.)

4                  MR. McKILLOP:  Let's go back on the record.

5      BY MR. McKILLOP:

6            Q.    So, we were talking about the website.  More

7      generally, can you say for certain that your website's

8      location section is accurate to where a person can buy

9      or pick up La Gaceta?

10           A.    I'm sure it has --

11                 MS. McDONALD:  Object to form.

12           A.    I'm sure it has inaccuracies.

13     BY MR. McKILLOP:

14           Q.    Okay.  You aren't the person that would have

15     the most knowledge regarding those inaccuracies, are

16     you?

17           A.    Correct.

18           Q.    Okay.  It sounds like Gene would be.  Is that

19     right?

20           A.    Yes.

21           Q.    Let's talk about Sarasota and your newspaper's

22     relationship with Sarasota.

23           A.    Okay.

24           Q.    You have -- you said you have writers and you

25     have columnists?

1          A.    Yes.

2          Q.    Do you have any writers who write specifically

3     about Sarasota?

4          A.    No.

5          Q.    You have writers that write about Tampa.

6     Correct?

7          A.    Specifically, no.

8          Q.    Your columns are mostly regarding Tampa,

9     aren't they?

10              MS. McDONALD:  Object to form.

11         A.    My columns are about a variety of things,

12    about politics and happenings and my opinions.  Are

13    a lot of that centered around Tampa politics?  Yes.

14    BY MR. McKILLOP:

15         Q.    Okay.  I saw that some of your most recent

16    papers had information or endorsements of various

17    political candidates.  Right?

18              MS. McDONALD:  Object to form.

19         A.    Correct.

20    BY MR. McKILLOP:

21         Q.    Those endorsements that you put in your paper

22    are regarding -- some of them are regarding statewide

23    offices.  Right?

24         A.    Yes, sir.

25         Q.    And some of them are local Hillsborough

1    offices.  Right?

2         A.   Yes, sir.

3         Q.   None of them are Sarasota offices?

4              MS. McDONALD:  Object to form.

5         A.   I don't know if some of the congressional

6    districts wrapped over.

7    BY MR. McKILLOP:

8         Q.   Okay.  Do you personally recall ever making an

9    endorsement of a Sarasota politician in your newspaper?

10        A.   Yes.

11             MS. McDONALD:  Object to form.

12   BY MR. McKILLOP:

13        Q.   When was the last time that was done?

14        A.   Liz Alpert running for City Council.

15        Q.   Okay.

16        A.   And I think I endorsed her.  I know I wrote

17   about the article.  I wrote about her running down

18   there.  Did I endorse her?  I cannot actually remember

19   I endorsed her, but I certainly did cover that

20   particular race.  I've covered Vern Buchanan's stuff

21   down there, too.

22        Q.   Okay.  But none of your writers focus on

23   Sarasota?

24        A.   No.

25             MS. McDONALD:  Object to form.

1   BY MR. McKILLOP:

2       Q.   Would you -- would it be accurate to say that

3   you rarely have an article that's specifically about an

4   event happening in Sarasota?

5           MS. McDONALD:  Object to form.

6       A.   I don't know if I could say that.

7   BY MR. McKILLOP:

8       Q.   How much of your weekly columns are devoted to

9   -- solely to Sarasota issues?

10      A.   I don't think many, but I don't know if many

11  of them are solely devoted to Tampa issues.  You know,

12  when you write about hunting and fishing and when you're

13  writing about women's rights issues and things like

14  that, sometimes they're not necessarily -- or social

15  security -- they're not a county issue.

16      Q.   But there is oftentimes that you'll have a

17  column that is solely related to Tampa?

18      A.   Yes.

19          MS. McDONALD:  Object to form.  Can we just

20          specify what you mean?  "Oftentimes" is a little

21          vague.

22          MR. McKILLOP:  If he's comfortable with

23          answering it, that's fine.

24  BY MR. McKILLOP:

25      Q.   And you will -- you will regularly have

1      articles that are only relevant or only focused on

2      Ybor City issues.  Correct?

3              MS. McDONALD:  Object to form.

4      A.    I write about Ybor City.  We have other

5      writers who occasionally write about Ybor City.

6              MR. McKILLOP:  Why don't we take

7              another short break.

8                  (There was a recess.)

9              MR. McKILLOP:  Let's go back on.

10     BY MR. McKILLOP:

11     Q.    I'm going to have you -- I'm going to

12     reference Exhibit 6 and I'm going to reference

13     Exhibit 3.  So, I counted up --

14             MS. McDONALD:  Can you remind me on the

15             record what they are?  I'm sorry.

16             MR. McKILLOP:  Sure.  Exhibit 6 is the

17             Sarasota distribution.

18             MS. McDONALD:  Okay.

19             MR. McKILLOP:  Exhibit 3 is the mailing list

20             for Sarasota County.

21     BY MR. McKILLOP:

22     Q.    So, between these two, this would be your

23     total publication run in Sarasota County in 2017 and

24     2018.  Is that correct?

25     A.    I don't think your question is one I can

Case 8:22-cv-01977-MSS-SPF   Document 33-19   Filed 06/10/23   Page 82 of 128 PageID 609

1     answer the way you put it.

2          Q.    Okay.

3          A.    You said "publication run."  I don't know what

4     a publication run is.

5          Q.    Okay.  This is -- and I don't, either.

6          A.    Okay.

7          Q.    So, this would be -- but these two exhibits

8     would show all of the newspapers delivered to Sarasota

9     County?

10         A.    To the best of my knowledge, correct.

11         Q.    Okay.  I counted this up and I found 19 --

12    do you find that to be accurate? -- on Exhibit 3?

13         A.    Yes.

14         Q.    Okay.  So, 19 people get a mailing?

15         A.    Um-hum.

16         Q.    And if I count up on Exhibit 6, there's -- in

17    2017, there was 1, 2, 3, 4, 5, 6 -- seven locations,

18    each getting ten newspapers?

19         A.    Yes.

20         Q.    Okay.  So, in 2017, there would have been a

21    total of 90 newspapers delivered to Sarasota County --

22         A.    Yes.

23         Q.    -- on a weekly basis?

24         A.    Yes.

25         Q.    Okay.  And that number would have gone down in

1      2018 because you lost the U Save.  So, according to your

2      Sarasota distribution for 2018, it's 1, 2, 3, 4, 5 --

3      six locations?

4           A.   Correct.

5           Q.   So, it would have been 79 --

6           A.   Yes.

7           Q.   -- total newspapers delivered to Sarasota

8      County.  Right?

9           A.   Um-hum.

10          Q.   Okay.  Are you a member of the Florida Press

11     Association?

12          A.   No, sir.

13          Q.   Were you ever --

14               MS. McDONALD:  I'm sorry.  Was the

15          answer --

16               THE COURT REPORTER:  Was it "no, sir"

17          or --

18               THE WITNESS:  No, sir.

19               Well, hold on.  Hold on.  Let me re-define

20          that.  I believe I have to be in order to post

21          on their site.  I have a real problem of being --

22          belonging to any association whatsoever, and so I

23          think -- I do post to their site.  I don't know

24          if that is -- if that means I'm a member or not.

25     BY MR. McKILLOP:

1          Q.    Okay.  I looked at the Florida Press

2    Association's website and you weren't listed as a

3    member.

4          A.    Okay.

5          Q.    Do you remember --

6          A.    Then I would not be, but I do post to the

7    site.

8          Q.    Okay.  Why -- why not?  What is the Florida

9    Press Association?

10         A.    They're a lobbying group for newspapers.

11         Q.    Okay.  Any reason that you're not part of

12   them?

13         A.    If I ever lobby, it's for myself.

14         Q.    Okay.  Have you ever -- have you ever been

15   part of a lobbying group for newspapers in the past?

16         A.    Never.

17         Q.    I remember looking at some documents related

18   to the 2007 FCC event that we were talking about before.

19         A.    Yes.

20               MS. McDONALD:  Object to form.

21   BY MR. McKILLOP:

22         Q.    And your newspaper and your name were attached

23   to certain responses to the FCC in 2007.

24               MS. McDONALD:  Object to form.

25   BY MR. McKILLOP:

1        Q.    Did you do that on your own or did you do that

2   as part of a group?

3        A.    As my -- on my own.

4        Q.    Okay.  Did you hire an attorney for that?

5        A.    No.

6        Q.    Okay.  Do you know what a --

7        A.    I was invited, I believe, to comment.

8        Q.    Okay.  Do you know what a USPS Statement of

9   Ownership Management and Circulation is?

10       A.    Yes.

11       Q.    Do you keep one?

12       A.    Yes.  We have to do one every October.

13             MS. McDONALD:  What were the initials for that

14       again?

15             MR. McKILLOP:  USPS, Postal Service.

16             MS. McDONALD:  Okay.

17   BY MR. McKILLOP:

18       Q.    When you gave your circulation number of

19   4,000, is that the average run for the last three

20   months?

21       A.    I think so.  I'd have to take a look.  I don't

22   know if it's thirty-nine hundred or four, but that's a

23   general.

24       Q.    The 4,000, would that -- that's not just

25   Sarasota?  Is that your entire --

```
 1          A.    That's entire, yeah.

 2          Q.    Okay.  So, for all ten counties together?

 3          A.    Um-hum.

 4          Q.    Yes?

 5          A.    Yes.

 6                MR. McKILLOP:  Okay.  I don't have any

 7          further questions.

 8                Oh, sorry.

 9                MS. McDONALD:  Go ahead.

10                MR. McKILLOP:  Let me -- one more thing I

11          want to -- two more things I want to have you look

12          at.  I'm going to label these -- where are we at,

13          9 and 10?

14                THE COURT REPORTER:  We're at 9 and 10.

15                MR. McKILLOP:  All right.  I'll have you look

16          back over there again on the screen.

17                THE WITNESS:  Yes, sir.

18                (The documents were marked as Manteiga

19          Exhibit Numbers 9 and 10 for identification.)

20     BY MR. McKILLOP:

21          Q.    We'll call this one -- we'll call this one

22     Exhibit 9.  This is the Proof of Substitute Service

23     in this case.

24          A.    Yes, sir.

25          Q.    Is that your signature on that?
```

1        A.    Yes, it is.

2        Q.    It's dated the 24th of November.

3        A.    Yes.

4        Q.    So that's 9.  Number 10, Proof of

5  Publication of Sale in this case.

6        A.    That's my signature.

7        Q.    That's also your signature?

8        A.    Yes, sir.

9        Q.    Okay.  Gene Siudut, is that --

10       A.    Siudut.

11       Q.    Siudut.  That's his signature?

12       A.    As the notary, yes.

13       Q.    As the notary.  Thank you.

14       MR. McKILLOP  Now I don't have any further

15  questions.

16                  <u>CROSS-EXAMINATION</u>

17  BY MS. McDONALD:

18       Q.    Good morning.  It's still morning.

19           As you know, I'm Tara McDonald.  I represent

20  the Plaintiff, Bank of America, in this action, and I'm

21  just going to ask you a few questions.  Some of them

22  might overlap a little bit with what counsel has

23  previously asked you.

24       A.    Yes, ma'am.

25       Q.    So, I'm going to start by asking you just a

Case 8:22-cv-01977-MSS-SPF Document 33-19 Filed 06/10/23 Page 88 of 128 PageID 615

1     couple general questions about your newspaper.

2         A.    Yes.

3         Q.    How often is the newspaper published?

4         A.    Weekly.  We come out every Friday.  We're

5     dated Friday.

6         Q.    So, your newspaper is published once a week?

7         A.    Yes.

8         Q.    Are at least 25 percent of the words in the

9     newspaper in English?

10         A.    Yes, ma'am.

11         Q.    And I know that it says that it is published

12     in three different languages.  Is that how it works?

13         A.    Spanish, Italian and English.

14         Q.    So, is that all within the same newspaper

15     or --

16         A.    Yes.

17         Q.    And, as you previously testified, the

18     newspaper is entered or qualified to be admitted as

19     a Periodical in the post office?

20         A.    Yes, ma'am.

21         Q.    And that's done in each one of the

22     ten counties that you've previously --

23         A.    It's qualified to be admitted in each of

24     those.  We do not mail out of each of those.

25         Q.    Okay.  Do you mail out of Sarasota County?

1          A.    Once a year.

2          Q.    Okay.  But it is qualified as a Periodical in

3    Sarasota County?

4          A.    Correct.

5          Q.    Is your newspaper available for sale to the

6    public generally?

7          A.    Yes.

8          Q.    Can you tell me a little bit about the Wawa

9    distribution that you mentioned earlier?  You now have

10   a relationship with Wawa locations?

11         A.    Yes.  We've -- Wawa allows us to put our

12   newspaper in their locations.  We deliver to them.  We

13   come back each week; pick up the extras that are not

14   sold.  And once a month they send us a check -- or once

15   a week they send us a check to pay for what's sold.  I

16   think they -- since our paper is 50 cents, I think that

17   they keep -- I think we get 35 and they get the rest --

18         Q.    And so --

19         A.    -- but I'm not sure about that breakdown.

20   But it's roughly that.

21         Q.    This relationship with Wawa, how long have you

22   been working with them?

23         A.    Maybe four or five years.

24         Q.    Is that relationship expanding to additional

25   counties?

1          A.    As they open up and we find out about

2     locations, we try to take advantage of it.   They're

3     -- it's very good for us.   Small newspapers like

4     ourselves have a hard time dealing with large

5     corporations.   They've been very kind.

6          Q.    Does your newspaper accept and publish

7     official and other notices from the general public?

8          A.    Yes.

9          Q.    And, in your opinion, does your newspaper

10    customarily contain news and other information of a

11    public character?

12         A.    Yes.

13              MR. McKILLOP:   Object to form.

14    BY MS. McDONALD:

15         Q.    Does it generally contain information of

16    interest or of value to the residents or owners of

17    property in the county where it's published?

18              MR. McKILLOP:   Object to form.

19         A.    Yes.

20    BY MS. McDONALD:

21         Q.    Does it generally or customarily contain

22    information of interest or of value to the general

23    public?

24              MR. McKILLOP:   Object to the form.

25         A.    Yes.

Case 8:22-cv-01977-MSS-SPF   Document 33-19   Filed 06/10/23   Page 91 of 128 PageID 616

1    BY MS. McDONALD:

2         Q.   You had mentioned that there are some columns

3    in the newspaper?

4         A.   Yes.

5         Q.   So, are these columns that are basically

6    weekly columns?

7         A.   Yes.

8         Q.   Can you tell us what those columns are about?

9    Do they have, like, titles?  Are they general --

10        A.   Yes.  Gene Siudut writes a column.  He writes

11   about everything from his childhood to odds and ends.

12   He would -- he would best describe it as being ascribed

13   by the human condition.

14             Doris Weatherford writes an article for us

15   that -- Doris has written many books about women, about

16   women's rights, and so a lot of times her column takes

17   on those edges, but it can be about whatever she wants.

18             Joe O'Neill writes a column similar to what I

19   do that has a wide variety of things, everything from

20   maybe something happening, to events in Cuba, to he

21   hates the President, to whatever else.

22             Richard Muga writes a column -- this is

23   Richard's last month for us, which is very sad.  He's

24   been with us for, God, maybe 25 years.  Richard writes

25   an outdoors column.  So, he will write about hunting,

1    fishing, people going off to hunt and -- you know, elk

2    in Canada, or whatever.

3             I write a column.  It's a -- I like to call it

4    "political gossip column."  It can have a wide variety

5    of things.

6             We have Gabriel.  Gabriel, our Spanish editor,

7    writes a Spanish language article, generally, on

8    history.

9             Leonardo Venta does a column and he likes to

10   write about the arts, especially ballet, the performing

11   arts.

12            We have a Social Security column.

13            Let's see.  What else do we have?  I think we

14   have a couple others in Spanish.

15            And then we have our Italian editor, who

16   writes about everything from Italian travel to cultural

17   issues with the Italian community.  That's about it.

18        Q.   So, it sounds like a lot of your subjects are

19   things that would be generally interesting to the

20   public, not, per se, like a county-specific?  It's --

21        A.   We hope so, yeah.  We don't run a lot of

22   calendar issues about things happening in Tampa or

23   St. Pete or anywhere.

24        Q.   And you said you've been in business since

25   1923?  Is that when you said the paper started?

1          A.    My grandfather started the business in 1922.

2     Our Second Class Mailing Permit started in 1923 because

3     you have to be in business a year before you can get

4     your permit.

5          Q.    And has your newspaper, during that time,

6     generally followed a similar format or has it -- you

7     know, how has it changed?

8          A.    Well, originally, it was a

9     Spanish-language-only newspaper and a daily.  In the

10    fifties -- well, during the war, it had to scale back

11    and sometimes it was difficult to get out because of

12    paper shortage and things like that.

13          The -- after the war, when the soldiers

14    started coming back, we started to add English, and we

15    also, later on, started to add Italian when people from

16    the Italian community came to us and talked about them

17    losing their language and would like -- would like us

18    to put Italian in there so they could help keep their

19    culture together.

20          Q.    And during the -- how many years is that that

21    you've been in business?  I don't know if I can do math

22    that fast.

23          A.    96.

24          Q.    Okay.  During the 96 years, has your

25    publication amounts -- the physical number of papers

1    that you have produced, has that increased over time

2    or --

3        A.    Decreased, increased, changed.  I mean, we're

4    in a struggling industry, but we've roughly been this

5    circulation for quite a while.

6        Q.    So your newspaper has definitely been in

7    existence for more than one year?

8        A.    Yes.

9        Q.    How long have you been publishing legal ads?

10       A.    I think our first legal ads was in the

11   fifties.  We had to pass a -- there had to be a law

12   change.  I think it was '55.  I think it's called --

13   it was called the La Gaceta bill, that allowed

14   newspapers to carry legal advertisement, so long as

15   they were 25 -- was it 25 percent in the English

16   language?  Yes.  That was because of us.

17       Q.    Oh, okay.  That's interesting.

18            Do you publish --

19       A.    Before that, if you had Spanish, you could not

20   do it.

21       Q.    Do you have any clients that are local

22   government offices that produce any -- that publish any

23   of their --

24       A.    Yes.

25       Q.    Which local governments that you can think of

Case 6:22-cv-01977-MSS-SPF   Document 33-19   Filed 06/10/23   Page 95 of 128 PageID 622

1    off the top of your head?

2         A.   City of Tampa, Hillsborough County,

3    Temple Terrace.  St. Pete Sheriff's Office just

4    did one with us.  Tampa Sheriff's Office, State of

5    Florida, Attorney General's Office.

6         Q.   So, the State Florida and the Attorney

7    General's Office both use you to publish --

8         A.   Correct.

9         Q.   -- legal notifications?

10        A.   The Attorney General's Office uses us for

11   children --

12        Q.   Department of Children and Families?

13        A.   No, it -- I think it's when they're taking

14   kids away.

15        Q.   Okay.

16        A.   And the state uses us -- one of the state

17   uses us for the -- when they take away people's licenses

18   for cosmetology, things like that.

19        Q.   Do they only use you -- the state and the

20   Attorney General, do they only use you in specific

21   counties or do they use you in all the counties that

22   you service?

23        A.   I'd have to look at each individual client.

24   I think I have some that use me in many counties.  I

25   don't know if all but many.  Since we only publish one

1   newspaper, the ads get seen in all counties.

2       Q.   Do you also do regular advertisements?  I

3   didn't notice.

4       A.   Yes, ma'am.

5            MS. McDONALD:  We can go off for a second.

6            (Discussion off the record.)

7            MS. McDONALD:  Okay.  We can go back on the

8       record.

9   BY MS. McDONALD:

10      Q.   So, counsel had asked you questions about the

11  Sarasota physical office.

12      A.   Yes, ma'am.

13      Q.   And I know that there is some confusion, it

14  sounds like, because the office physically moved.

15      A.   Yes.  And I don't know when it moved.  It was

16  represented it was very recently, but --

17      Q.   Also, I know that, based on your testimony --

18  I just wanted to confirm that the office is available

19  for people who need to go in and place ads.  Correct?

20      A.   Yes.

21      Q.   And the reason that it's not utilized is

22  because of current technology and people mostly contact

23  you by e-mail or on the internet?

24      A.   Most of our legal business is by government

25  or attorneys, so, of course, they would never physically

Case 6:22-cv-01977-MSS-SPF   Document 33-19   Filed 06/10/23   Page 97 of 128 PageID 624

1    go in.  The only time we have people physically go in

2    is generally if they've been sent directly by the

3    courthouse to us.  And most of their divorce ads, in

4    Sarasota the courthouse doesn't encourage people to

5    come to us.  In Tampa, they do, so we get a lot of

6    people here in Tampa.

7         Q.   Okay.  But the office is available?  It's just

8    not utilized based on the market --

9         A.   Yes.

10         Q.   -- not because it's not available?

11         A.   Yes.  In St. Pete, we have an insurance agency

12    that operates as our office.  In Orlando, we have

13    another insurance agency that operates and --

14              MS. McDONALD:  I might be almost done.

15         There's a lot of pages.

16              That's all the questions I have at the

17         moment, but I will just reserve that in case

18         I have anything else after you, okay?

19              MR. McKILLOP:  Of course.

20                     REDIRECT EXAMINATION

21    BY MR. McKILLOP:

22         Q.   You don't mail out of the Sarasota office, is

23    what I heard.  Is that accurate?

24         A.   The post office prefers us to mail out of one

25    office.  And if I did mail out of Sarasota, it would

1   only come back to Tampa for sorting, so they do not sort

2   out of Sarasota.  So, I would end up going to Sarasota

3   to be mailed out of Tampa.

4        Q.   You said "except for once a year."  What did

5   you mean by that?

6        A.   Once a year we mail out of all the offices.

7        Q.   Okay.  How is that accomplished?  Well, let's

8   talk about -- when was the last time that happened?

9        A.   I couldn't tell you.  I'd have to look at the

10  calendar.

11       Q.   Has it happened yet in 2018?

12       A.   I don't think so.

13       Q.   So, the last time --

14       A.   I don't think it's required anymore.  When we

15  first started this, the post office encouraged us to do

16  it once a year.  I don't think they've asked for us to

17  do it ever since, but I think we're still doing it.

18       Q.   Okay.  So, how do you accomplish that?

19       A.   Drive down and take a bag and hand it to the

20  post office.

21       Q.   Who does that?

22       A.   It depends on which county.

23       Q.   Sarasota County.

24       A.   It would have been me.

25       Q.   Do you remember the last time that you took a

Case 8:22-cv-01977-MSS-SPF   Document 33-19   Filed 06/10/23   Page 99 of 128 PageID 626

1      bag of newspapers down to Sarasota County?

2           A.   I wish I could.  I can't.

3           Q.   Would it have been last year?

4           A.   Maybe.

5                MS. McDONALD:  Object to form.

6      BY MR. McKILLOP:

7           Q.   How much does it cost for you to -- for your

8      printer to print out 4,000 copies of the newspaper every

9      week?

10               MS. McDONALD:  Object to form.

11     BY MR. McKILLOP:

12          Q.   On a weekly basis, how much is it?

13               MS. McDONALD:  Object to form.

14     BY MR. McKILLOP:

15          Q.   And I don't need down to the penny; just

16     roughly.

17          A.   About thirteen, fourteen hundred dollars.

18          Q.   So -- I don't want to do that.

19               Thirteen or fourteen hundred dollars for

20     4,000 copies.  Roughly 25 cents a copy?

21          A.   I'd have to -- you know, I'd have to look at

22     the particular item.  You know, if the color costs me

23     more, but color also gets paid for by advertisers who

24     pay more for color.  So, you know, some of it is passed

25     directly through to the client; some isn't.  So, I

1    couldn't, you know --

2              If you're trying to figure out how much that

3    individual newspaper cost me, that would take a little

4    bit of time for me to figure that one out for you.

5         Q.    Okay.  How much does it cost to mail to

6    Sarasota County?

7         A.    I couldn't tell you.

8         Q.    Who could?

9         A.    Don't know.  I mean, that would also be a very

10   difficult thing because of the way we pay for our

11   newspaper.

12        Q.    Well, doesn't the post office charge you by

13   the piece or do they charge you by the pound?  How do

14   they charge you?

15        A.    The post office charges us by the piece

16   based on the zone and the distance from the post office.

17   They charge us by the pound based on the amount of

18   advertising pounds versus copy pounds.  There are

19   then some fees and some other issues on top of that.

20             Postal accounting is like financing our

21   schools.  You're not going to figure out exactly

22   what's going on.  We type it in the computer; it comes

23   out.  But to tell you how much it is for Sarasota, I

24   couldn't tell you that because we're not paying for

25   Sarasota; we're paying for zones.

1          Q.    Okay.

2          A.    Or in county or out of county.  And then

3     there's advertising poundage, which is a separate item

4     and that's based on all papers.

5          Q.    Do you make or lose money publishing to

6     Sarasota County, just based on a comparison of

7     subscriptions versus the cost to distribute?

8               MS. McDONALD:  Object to form.

9          A.    I don't know.

10    BY MR. McKILLOP:

11         Q.    If my -- you said earlier -- I want to make

12    sure that I got this right.

13              You have four paid subscribers in Sarasota

14    County?

15         A.    Yes.

16         Q.    So, you make $160 -- or you made $160 in the

17    last year on subscriptions?

18         A.    I don't think our paper --

19              MS. McDONALD:  Object to form.

20              THE WITNESS:  Okay.

21    BY MR. McKILLOP:

22         Q.    Would that be accurate, 160?

23         A.    Yes.  I mean, it depends on what they paid

24    individually.  We have a two-year discount, so I'd have

25    to take a look, but --

Case 6:22-cv-01977-MSS-SPF   Document 33-19   Filed 06/10/23   Page 102 of 128 PageID 628

1      Q.   Sure.  Well, let's just double-check.  I want

2  to make sure that I've got the numbers accurate.

3           So, if we look at Exhibit 4 and we said that

4  this is all your paid subscribers --

5      A.   Um-hum.

6      Q.   Just go ahead and look through it.  Am I

7  accurate, it's --

8      A.   Forty and forty and forty, and there's an

9  eighty, so 200.

10      Q.   Well, the eighty is for two years.  Right?

11      A.   Yeah.

12      Q.   So, I'm just looking -- trying to find one

13  year.

14      A.   Well, it looks like 240, is what I've got

15  total here.

16      Q.   240 total?

17      A.   Yeah.

18      Q.   A $40 one-year subscription?

19      A.   Yeah.

20      Q.   A $40 one-year subscription for

21  Kerry Kirschner?

22      A.   Um-hum.

23      Q.   A $80 two-year --

24      A.   Two-year.

25      Q.   -- subscription, so that would be

Case 8:22-cv-01977-MSS-SPF   Document 33-19   Filed 09/15/23   Page 103 of 128 PageID 630

1    $40 per year?

2        A.    Um-hum.

3        Q.    And this is another $40?

4        A.    Okay.

5        Q.    So, four times $40, $160, is the income that

6    you get from subscriptions in Sarasota County?

7        A.    Yes, sir.

8        Q.    It cost you $1900 -- or $1855 last year to

9    have Chris Moody deliver --

10       A.    Yes.

11       Q.    -- papers to Sarasota County.  Correct?

12       A.    Yes.

13       Q.    And then, on top of the $1855 from -- that you

14    spent on Chris Moody, there's also mailing costs for

15    mail to Sarasota County?

16       A.    Yes.  Yes.

17           MR. McKILLOP:  All right.  That's it.

18           MS. McDONALD:  Real short.

19                 RECROSS-EXAMINATION

20    BY MS. McDONALD:

21        Q.    Even though you don't necessarily mail out

22    of Sarasota County post offices, you're permitted

23    and authorized, based on your application with the

24    post office?

25        A.    Yes.  Yes.  We have a permit.

Case 6:22-cv-01977-MSS-SPF   Document 33-19   Filed 09/10/23   Page 104 of 128 PageID 631

1          Q.    You have the permit.

2                And would you say that it's standard in the

3    newspaper industry to not necessarily make all of your

4    funds from subscriptions?

5                MR. McKILLOP:  Object to form.

6          A.    I don't make my money from subscriptions, and

7    I think most newspapers have a -- many newspapers have

8    a similar form where, you know, subscriptions they hope

9    to break even with; make money with advertising.  Then

10   there's some that are completely making money off

11   subscriptions and using advertising to kind of just

12   subsidize a little bit.

13               MS. McDONALD:  I have no further questions.

14               MR. McKILLOP:  Okay.  Let's stay on the

15               record.

16               We have three bundles of newspaper that

17               Patrick brought.  Those are not going to get put

18               into the transcript, but they will all be kept at

19               my office.  They'll be available.  If I need to

20               scan individual newspapers, if you need copies of

21               them, then I can scan them and send them to you.

22               I won't scan the whole stack.  If you want the

23               whole stack, come to my office to look at them.

24               But if you need up to 20 of them, let me know,

25               and I'll scan them, however that's going to be

1          accomplished, and get them to you.  Is that okay?

2               MS. McDONALD:  Yes.  That makes sense.

3               And then you're also going to send me copies

4          of all of the exhibits --

5               MR. McKILLOP:  Yes.  I'm going to --

6               MS. McDONALD:  -- including the photos?

7               MR. McKILLOP:  Yes, and we're going to do that

8          before we're done.

9               I don't have any other questions for

10         Mr. Manteiga.

11              You need to tell the court reporter whether

12         you want to read your deposition or whether you

13         want to waive reading.  Are you familiar with

14         what that is?

15              THE WITNESS:  No, I'm not.

16              MR. McKILLOP:  Okay.  She is going to type

17         up everything that was said here.  You have the

18         opportunity to read for inaccuracies, inaccuracies

19         in her reporting; not inaccuracies in anybody's

20         statement.

21              THE WITNESS:  Where I thought I said "this"

22         and she wrote "that"?  Okay.

23              MR. McKILLOP:  Yes.  So, you know, you said

24         "27" and she put down "72."  You can read to check

25         for a transcription inaccuracy.

1          THE WITNESS:  I would like --

2          MR. McKILLOP:  It's most likely not her fault;

3     it's going to be the computer.

4          THE WITNESS:  I would like to read.

5          MR. McKILLOP:  Okay.  She will let you know

6     once it's been typed up and you'll have 30 days

7     to go read and sign the errata sheet.

8          THE WITNESS:  All right.

9          THE COURT REPORTER:  I'll e-mail it to you.

10    You can do a PDF, right?

11         MS. McDONALD:  And this is my card.

12         MR. McKILLOP:  We'll order.

13         THE COURT REPORTER:  You're going to order,

14    Dan?  And is a PDF okay or do you need hard copies?

15         MR. McKILLOP:  I need a PDF and I need a dot

16    "txt" also.  Can you do a "txt"?

17         THE COURT REPORTER:  The text and the PDF?

18         MR. McKILLOP:  Yes, I need txt and PDF.

19         THE COURT REPORTER:  And no hard copy?

20         MR. McKILLOP:  I don't need a hard copy.

21         THE COURT REPORTER:  How about you, Tara?

22         MS. McDONALD:  I'm not sure yet.  I have to

23    check with my client and see what they want to do.

24         THE COURT REPORTER:  Okay.

25         MS. McDONALD:  I mean, I'm assuming they'll

1          want a copy but I just don't know yet.

2               THE COURT REPORTER:  Okay.  I may e-mail you

3          when I get close and just --

4               MS. McDONALD:  E-mail me how much.

5               THE COURT REPORTER:  Yes.  I'll e-mail you and

6          give you an estimate.

7               MR. McKILLOP:  So, what we're going to do is,

8          I'll release Patrick.  We will go back on the

9          record to confirm that everything's been taken

10         care of as far as e-mailing the electronic

11         exhibits, okay, and we'll put that all on the

12         record, but --

13              THE COURT REPORTER:  Are we off right now?

14              MR. McKILLOP:  We're off right now, yeah,

15         but you're -- you're released, so you can you

16         leave.

17              (Witness excused at 11:21 a.m.)

18              (At 12:08 p.m., the following statement

19         was put on the record:)

20              MR. McKILLOP:  All right.  So, we cleaned up

21         the exhibits.  Exhibits 7, 8, 9, 10 and 11 have

22         been e-mailed to Ms. McDonald and to the court

23         reporter to be attached.

24              Exhibit 11 was added on as pictures of the

25         stacks of newspapers, so it's three pictures of

Case 6:22-cv-01977-MSS-SPF   Document 33-19   Filed 06/10/23   Page 108 of 128 PageID 635

1          the stacks of newspapers, which will be kept in

2          my office.

3               MS. McDONALD:  Correct.  And then Exhibits 1

4          through 6 are going to be e-mailed by the court

5          reporter, and you're going to send me those even

6          before we get anywhere with the transcript.

7               THE COURT REPORTER:  I'll send it in the next

8          couple of days, by Monday.

9               MS. McDONALD:  Just the exhibits, at least.  I

10         just want to be able to have those.

11              THE COURT REPORTER:  Yes.

12              MR. McKILLOP:  If you could send a copy to

13         both of us.

14              THE COURT REPORTER:  I will.

15              (The deposition was adjourned at

16         12:09 p.m.)

17

18

19

20

21

22

23

24

25

1

2                    <u>CERTIFICATE OF OATH</u>

3

4    STATE OF FLORIDA         )

5    COUNTY OF HILLSBOROUGH )

6

7

8              I, Jean M. Wilkes, RPR-CP, Court Reporter,

9    Notary Public, State of Florida at Large, certify that

10   ROLAND PATRICK MANTEIGA personally appeared before me

11   and was duly sworn.

12

13             WITNESS my hand and official seal this 8th day

14   of October, 2018.

15

16

17

18                          _____
                            JEAN M. WILKES, RPR-CP
19                          NOTARY PUBLIC AT LARGE
                            STATE OF FLORIDA
20                          My Commission No. FF 979710
                            Expires:  April 6, 2020
21

22

23

24

25

1

2                    **CERTIFICATE OF REPORTER**

3

4     STATE OF FLORIDA        )

5     COUNTY OF HILLSBOROUGH )

6

7              I, Jean M. Wilkes, RPR-CP, Court Reporter,

8     certify that I was authorized to and did

9     stenographically report the foregoing deposition

10    of ROLAND PATRICK MANTEIGA, that a review of the

11    transcript was requested, and that the transcript is

12    a true record of the testimony given by the witness.

13

14             I further certify that I am not a relative,

15    employee, attorney, or counsel of any of the parties,

16    nor am I a relative or employee of any of the parties'

17    attorneys or counsel connected with the action, nor am I

18    financially interested in the action.

19

20             Dated this 8th day of October, 2018.

21

22             _____

23             **JEAN M. WILKES, RPR-CP**

24

25

## SIGNATURE PAGE/ERRATA SHEET

CASE STYLE:  Bank of America, N.A. vs.
             James J. Ambrosia, et al.
CASE NO.:    2017 CA 004346 NC

     I, ROLAND PATRICK MANTEIGA, do hereby certify
that I have read the preceding pages and that they are
correct, to the best of my knowledge, with the following
exceptions:

**PAGE NO.**  **LINE NO.**  **CHANGE**              **REASON**

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

Under penalties of perjury, I declare that I have read
the foregoing document and that the facts stated in it
are true.

_____    _____
**ROLAND PATRICK MANTEIGA**                 **DATE**

October 9, 2018

ROLAND PATRICK MANTEIGA
3210 East 7th Avenue
Tampa, FLorida 33605

RE:  Bank of America, N.A. vs.
     James J. Ambrosia, et al.
DATE:  September 7, 2018
DEPONENT:  Roland Patrick Manteiga

Dear Mr. Manteiga:

     This letter is to advise that the transcript of
the above-referenced deposition has been completed and
it is available for review.  Please contact our office
at (813) 283-8789 to make arrangements to read and
sign or sign below to waive review of the transcript.

     It is suggested that the review of the transcript
be completed within 30 days of your receipt of this
letter, as considered reasonable under Federal Rules*;
however, there is no Florida Statute to this regard.

     The original of this transcript has been forwarded
to the ordering party and your errata, once received,
will be forwarded to all ordering parties.

                         Sincerely,


                         JEAN M. WILKES
                         Wilkes Professional Reporting

cc:  H. DANIEL McKILLOP, ESQUIRE
     TARA M. McDONALD, ESQUIRE

WAIVER:

I,_____, hereby waive the reading
and signing of my deposition transcript.

_____        _____
Deponent Signature                          Date

*Federal Civil Procedure Rule 30(e)
Florida Civil Procedure Rule 1.310(e)

**< Dates >**
**1/6/2017** 5:7
**8/13/18** 67:14, 67:18, 67:25, 68:9
**8/15/18** 65:12, 65:16
**8/24/2018** 5:7
**April 6, 2020** 107:22
**December 31** 4:26
**January 1, 2017** 4:26
**January 14, 2014** 4:3
**November 30, 2012** 4:7
**November.** 85:1
**October 2016** 25:20
**October 9, 2018** 110:1
**October, 2018.** 107:13, 108:19
**October.** 83:11
**September 7, 2018** 1:24, 110:8
**"2018** 26:2
**"27"** 103:23
**"72.** 103:23
**$160** 99:15, 101:4
**$1855** 101:7, 101:12
**$1900** 101:7
**$40** 100:17, 100:19, 100:25, 101:2, 101:4
**$80** 100:22
**'13.** 31:8
**'55.** 92:11
**'83.** 9:17
**'84** 54:4
**'85** 54:4
**'86.** 54:4
**\*federal** 110:45


**< 0 >**
**004346** 109:4


**< 1 >**
**1** 4:3, 14:9, 21:5, 27:18, 80:16, 81:1, 106:2
**1.310(e** 110:46
**10** 5:19, 27:9, 44:1, 84:12, 84:18, 85:3, 105:20
**10.** 84:13
**100** 1:30, 20:12
**101** 3:6
**106** 5:22
**107** 3:7, 46:24
**108** 3:8

**109** 3:9
**11** 5:22, 105:20, 105:23
**110** 3:10
**11:21** 1:27, 105:16
**12:08** 105:17
**12:09** 106:15
**12:30** 68:13
**15(a** 29:6
**15(c** 29:22
**15(d** 30:16
**15th** 72:12, 72:13
**160** 99:21
**19** 33:1, 33:7, 80:10, 80:13
**1900** 1:30
**1922.** 14:23, 90:25
**1923** 90:24, 91:1
**1923.** 31:10, 32:11
**1980.** 10:20
**1983** 11:16
**1998.** 11:20


**< 2 >**
**2** 4:7, 14:9, 21:5, 28:4, 31:25, 50:20, 51:4, 80:16, 81:1
**2,000.** 43:18
**20** 44:1, 102:23
**200.** 100:8
**2007** 82:17
**2007.** 15:14, 82:22
**2011** 61:13
**2012** 31:7, 35:19, 61:13
**2013** 35:19
**2014** 48:13, 50:16, 60:4
**2014.** 49:2, 60:7
**2015** 47:6, 61:25
**2016** 26:1
**2017** 4:20, 26:2, 28:12, 28:18, 29:14, 30:7, 37:18, 38:2, 38:4, 38:15, 79:22, 80:16, 80:19, 109:4
**2017.** 37:17
**2018** 4:20, 4:27, 28:12, 28:18, 29:14, 30:8, 80:25, 81:1, 96:10
**2018.** 79:23
**2313** 2:4
**2350** 2:14
**240** 100:13, 100:15
**24th** 85:1

**25** 86:7, 89:23, 92:14, 97:19
**2555** 27:10, 27:21, 46:24
**27** 4:5
**271** 2:6
**28** 4:11, 4:16, 4:22
**283-8789** 1:45, 110:16
**29** 4:27
**2909** 54:25, 56:15


**< 3 >**
**3** 4:14, 14:9, 21:5, 28:10, 32:25, 42:9, 79:18, 80:11, 80:16, 81:1
**3,000** 43:23
**3.** 79:12
**30** 5:8, 104:5, 110:20
**30(e** 110:45
**300** 20:12
**3210** 110:3
**33601** 42:25
**33602** 1:31
**33603** 2:5
**33605** 110:4
**34237** 2:16
**35** 87:16
**3800** 26:16
**3:00** 23:25, 24:1
**3:00.** 23:24


**< 4 >**
**4** 4:19, 14:9, 21:5, 28:15, 33:13, 80:16, 81:1, 100:2
**4,000** 83:18, 83:23, 97:7, 97:19
**4,000.** 20:1, 43:16, 43:17
**4.** 28:13
**400-8998** 2:17
**443-5087** 2:6
**443-5089** 2:8


**< 5 >**
**5** 4:24, 21:5, 29:12, 29:20, 42:9, 65:24, 80:16, 81:1
**5.** 14:9, 29:18, 42:9, 67:21
**50** 87:15
**54.** 9:19
**570-7031** 2:7

**< 6 >**
**6** 3:3, 5:4, 21:5, 27:6, 27:8, 30:14, 39:17, 63:1, 79:11, 79:15, 80:15, 80:16, 106:3
**6.** 27:4, 30:12, 35:5, 56:25
**61** 5:11, 5:12
**62nd** 54:25, 56:15
**65** 5:13

**< 7 >**
**7** 5:10, 27:6, 27:8, 61:5, 105:20
**7.** 21:5, 61:3
**79** 81:4
**7th** 10:17, 56:23, 72:8, 72:12, 72:13, 110:3

**< 8 >**
**8** 5:13, 27:6, 27:8, 65:6, 65:24, 71:7, 105:20
**8.** 65:4
**8/31.** 26:2
**813** 1:45, 2:6, 2:7, 2:8, 110:16
**83** 54:4
**84** 5:16, 5:19
**85** 3:4
**8th** 107:12, 108:19

**< 9 >**
**9** 5:16, 27:6, 84:12, 84:13, 84:18, 105:20
**9.** 27:8, 71:7, 84:21, 85:3
**90** 80:20
**941** 2:17, 2:18
**95** 3:5
**953-5117** 2:18
**96** 31:9, 91:23
**96.** 91:22
**979710** 107:21
**9:00** 1:27

**< A >**
**A.M.** 1:27, 105:16
**ability** 9:11, 56:15, 70:20
**able** 44:21, 45:2, 45:19, 45:20, 46:2, 49:1, 50:19, 70:17,

73:12, 106:9
**above-referenced** 110:14
**accept** 32:19, 88:5
**access** 70:6, 70:9
**accident** 11:4
**accomplish** 96:17
**accomplished** 96:6, 102:25
**according** 80:25
**accountant** 28:25, 48:16
**accounting** 12:9, 12:23, 29:13, 42:2, 98:19
**accuracy** 39:17, 57:7, 57:9
**accurate** 49:4, 57:10, 64:2, 65:14, 75:7, 78:1, 80:11, 95:22, 99:21, 100:1, 100:6
**across** 67:3
**act** 44:19
**action** 85:19, 108:16, 108:17
**activities** 15:9
**Activity** 4:25
**acts** 13:19
**actual** 58:3
**actually** 30:2, 37:13, 41:3, 60:3, 70:4, 74:12, 77:17
**ad** 44:25, 45:4
**add** 91:13, 91:14
**added** 14:25, 105:23
**addition** 30:6
**additional** 87:23
**address** 22:7, 45:19, 46:2, 46:14, 54:24
**addresses** 4:15, 4:21, 66:1
**adjourned** 106:14
**admitted** 86:17, 86:22
**ads** 12:25, 13:5, 44:25, 45:7, 45:13, 49:16, 92:8, 92:9, 93:25, 94:18, 95:2
**advance** 31:24
**advantage** 88:1
**advertisement** 49:1, 49:18, 92:13
**advertisements** 45:12, 48:19, 94:1
**advertisers** 49:10, 97:22
**advertising** 12:10, 16:22, 50:5, 50:15, 98:17, 99:2, 102:8, 102:10
**advise** 110:13
**afternoon** 24:1, 68:14
**age** 54:23

**agencies** 44:25
**agency** 95:10, 95:12
**ago** 7:13, 7:15, 11:2, 35:24, 35:25, 36:5, 37:10, 37:15, 37:16, 47:5, 47:18, 61:20, 72:18
**agree** 21:13
**agreed** 44:19
**Agreement** 4:3, 27:10, 41:10, 44:11, 46:14, 48:8
**agreements** 26:14, 27:1
**agrees** 45:5
**ahead** 27:15, 28:1, 28:8, 84:8, 100:5
**aid** 53:12
**al** 1:12, 109:3, 110:7
**alcohol** 9:8
**allocated** 21:25
**allow** 21:21
**allowed** 32:15, 55:15, 92:12
**allows** 87:10
**almost** 44:25, 95:13
**Alpert** 33:13, 77:13
**already** 62:3
**alternatively** 10:21
**Ambrosia** 1:12, 6:16, 109:3, 110:7
**Amendment** 55:23
**America** 1:6, 6:21, 85:19, 109:2, 110:6
**American** 15:8
**amount** 19:24, 98:16
**amounts** 91:24
**Angie** 13:22
**answer** 7:25, 8:1, 8:5, 8:8, 55:3, 55:17, 55:19, 55:24, 58:24, 63:15, 79:25, 81:14
**answering** 78:22
**answers** 7:22, 8:4, 9:11
**Anybody** 8:13, 24:8, 24:18, 44:4, 44:20, 70:22, 103:18
**appear** 68:10
**appearance** 6:19
**APPEARANCES** 2:1
**appeared** 107:9
**application** 27:23, 32:1, 32:2, 50:21, 51:17, 51:19, 51:21, 51:22, 51:23, 52:5, 52:6, 52:8, 52:14, 101:22
**applied** 50:18, 50:25

appropriate 65:23
April 62:6
area 18:6, 36:22, 37:4, 37:5,
    47:14, 47:17, 62:21, 65:8
areas 15:4, 43:6
around 18:6, 23:24, 38:24, 47:6,
    76:12
arrangement 56:20, 56:22
arrangements 110:16
Art 5:6, 17:3, 26:23, 58:19,
    58:20, 66:6
article 77:16, 78:2, 89:13, 90:6
articles 10:8, 14:19, 78:25
arts 90:9, 90:10
ascribed 89:11
assigned 12:10, 12:11, 12:12,
    13:20
assist 44:22
associate 11:25, 12:5, 16:23
Association 81:10, 81:21, 82:1,
    82:8
assume 34:8, 54:17, 56:8, 60:13,
    62:1
assumed 8:6, 53:17
assumes 59:19
assuming 12:17, 104:24
attached 82:21, 105:22
Attorney 2:10, 2:21, 8:20, 16:10,
    83:3, 93:4, 93:5, 93:9, 93:19,
    108:14
attorneys 34:7, 94:24, 108:16
August 38:4
Authorization 4:11
authorized 101:22, 108:7
available 34:13, 87:4, 94:17,
    95:6, 95:9, 102:18, 110:15
Ave 72:8
Avenue 10:17, 54:25, 56:15,
    56:23, 110:3
average 83:18
aware 34:15
away 11:20, 12:4, 35:9, 35:12,
    36:12, 42:5, 42:6, 93:13,
    93:16

< B >

back 11:22, 19:3, 20:2, 22:4,
    23:24, 31:3, 32:14, 35:20,
    73:5, 73:10, 75:3, 79:8, 84:15,

87:12, 91:9, 91:13, 94:6,
    95:25, 105:7
background 9:14
bag 42:18, 42:21, 96:18, 96:25
ballet 90:9
Bank 1:6, 6:21, 48:15, 85:19,
    109:2, 110:6
banking 48:15
banks 42:5
Baron 47:11, 47:22, 48:3
based 43:12, 45:6, 94:16, 95:7,
    98:15, 98:16, 99:3, 99:5,
    101:22
basically 10:10, 12:1, 32:17,
    45:8, 46:1, 89:4
basis 21:10, 80:22, 97:11
became 15:2, 15:8
become 15:7, 34:15
beforehand 67:1
began 11:23
beginning 24:8
behalf 6:20
behind 61:1
believe 21:5, 31:7, 51:7, 72:5,
    73:2, 81:19, 83:6
belonging 81:21
below 110:17
best 66:13, 80:9, 89:11, 109:8
Beto 5:4, 35:7, 36:9, 39:1, 57:12,
    57:20, 57:21, 58:3, 66:3,
    66:21, 68:1, 68:20
better 34:15
big 15:12, 25:17
bill 92:12
bird 51:20
birthday 18:11, 18:12, 33:25
bit 9:13, 55:10, 85:21, 87:7, 98:3,
    102:11
books 89:14
boss 9:23
bottom 63:17
bought 72:23
Boulevard 26:16
box 71:16, 71:19
boxes 71:24
Bradenton 54:25
break 8:16, 8:17, 20:10, 44:4,
    44:5, 74:20, 79:6, 102:8
breakdown 87:18
breaks 8:12

bring 19:3, 19:9, 20:2, 25:15,
    26:19, 26:24, 28:21, 40:5,
    55:5
broad 20:6
brought 102:16
Buchanan 77:19
build 34:22
building 54:24, 56:5, 56:9, 56:16
bundle 42:19
bundles 25:22, 42:20, 102:15
Business 4:9, 10:6, 10:10,
    23:14, 31:9, 31:17, 32:21,
    37:14, 39:3, 44:21, 44:23,
    90:23, 90:25, 91:2, 91:20,
    94:23
businesses 44:19
buy 42:6, 44:1, 75:7

< C >

C-a-r-t-a-y 14:8
CA 109:4
calendar 90:21, 96:9
California 32:7
call 22:11, 39:21, 39:22, 73:19,
    84:20, 90:2
called 92:11, 92:12
calling 7:7
Campisano 14:14
Canada 90:1
candidates 76:16
car 73:4
card 104:10
care 105:9
carpet 61:23
carry 67:20, 92:13
Cartay 13:25, 14:7
CASE 22:12, 39:22, 84:22, 85:4,
    95:16, 109:2, 109:4
catch 39:19
cause 6:5
cc 110:34
cell 74:25
Center 4:9, 53:15
centered 76:12
cents 87:15, 97:19
century 53:13
certain 35:10, 75:6, 82:22
certainly 48:16, 77:18
CERTIFICATE 3:7, 3:8, 107:1,

108:1

**certify** 107:8, 108:7, 108:13, 109:6

**cetera** 59:20

**CHANGE** 21:15, 22:2, 25:10, 69:14, 70:4, 70:20, 71:19, 92:11, 109:10

**changed** 15:2, 15:6, 25:4, 25:8, 25:11, 60:11, 68:19, 91:6, 92:2

**Changes** 4:11, 70:7, 70:24, 73:6

**changing** 32:20

**character** 88:10

**charge** 52:17, 53:22, 98:11, 98:12, 98:13, 98:16

**charges** 98:14

**check** 21:9, 33:15, 41:16, 41:21, 52:4, 52:7, 87:13, 87:14, 103:23, 104:22

**checking** 36:7

**checks** 48:12

**childhood** 89:10

**Children** 93:10, 93:11

**Chris** 4:27, 22:17, 22:20, 22:22, 22:23, 23:10, 29:1, 29:14, 38:11, 38:12, 38:15, 39:18, 63:20, 64:6, 64:11, 64:13, 64:17, 64:19, 64:21, 101:8, 101:13

**CIRCUIT** 1:1

**Circulation** 12:11, 13:7, 19:13, 83:8, 83:17, 92:4

**Citrus** 40:17, 41:7

**City** 11:9, 15:14, 20:3, 23:4, 44:10, 72:18, 73:6, 77:13, 79:1, 79:3, 79:4, 93:1

**Civil** 110:45, 110:46

**clarification** 8:8

**clarify** 8:9, 10:24

**Class** 31:20, 31:23, 32:9, 32:12, 32:15, 32:19, 48:24, 50:19, 51:7, 51:13, 51:25, 52:18, 52:19, 91:1

**classic** 71:18

**Classification** 4:8

**cleaned** 105:19

**clearer** 61:22

**clearly** 7:21

**Clerk** 34:11

**client** 49:17, 93:22, 97:24,

104:22

**clients** 92:20

**close** 36:10, 105:2

**close-up** 61:14

**closed** 38:18, 38:19, 62:4

**Club** 53:9, 53:10, 53:11, 53:12, 53:14, 53:16, 53:19, 53:21, 72:9

**coffee** 8:17

**college** 11:11, 11:13

**colony** 15:4

**color** 97:21, 97:22, 97:23

**Columbia** 72:11, 72:12

**column** 10:6, 18:15, 78:16, 89:9, 89:15, 89:17, 89:21, 89:24, 90:2, 90:8, 90:11

**column.** 90:3

**columnists** 16:20, 17:7, 17:10, 75:24

**columns** 18:8, 76:7, 76:10, 78:7, 89:1, 89:4, 89:5, 89:7

**comes** 12:19, 12:20, 14:12, 14:13, 14:15, 98:21

**comfortable** 78:21

**coming** 17:11, 45:15, 91:13

**comment** 83:6

**commingled** 15:20

**Commission** 45:8, 45:18, 73:9, 107:21

**Commissioner** 34:9

**communicate** 39:11, 73:13

**communicated** 38:7

**communication** 43:11

**community** 15:1, 15:6, 90:16, 91:15

**community.** 16:5

**comparison** 99:5

**completed** 110:14, 110:20

**completely** 102:9

**composite** 30:11

**Compound** 59:19

**computer** 16:24, 42:13, 98:21, 104:2

**condition** 89:12

**confirm** 74:21, 94:17, 105:8

**confirming** 39:17

**confusing** 10:23

**confusion** 94:12

**congressional** 77:4

**connected** 108:16

**consider** 30:18

**considered** 110:21

**constantly** 32:20

**contact** 49:22, 49:25, 50:1, 94:21, 110:15

**contain** 88:9, 88:14, 88:20

**context** 62:1, 62:12, 62:15

**Continued** 5:1

**contract** 32:21

**contractors** 21:7

**Contributors** 10:13

**conversation** 47:25, 48:2, 48:5, 69:9, 69:11, 69:14

**conversations** 64:16

**convicted** 8:25, 9:2, 9:6

**cooperate** 72:19

**Copies** 4:19, 28:11, 48:12, 48:14, 60:17, 97:7, 97:19, 102:19, 103:2, 104:13

**copy** 16:19, 25:19, 27:9, 33:5, 34:2, 51:22, 67:17, 97:19, 98:17, 104:18, 104:19, 104:25, 106:11

**corner** 65:10, 67:15

**corporate** 6:18, 6:25, 10:2, 41:21, 44:8

**corporations** 88:4

**correctly** 36:16, 45:11

**cosmetology** 93:17

**cost** 97:6, 98:2, 98:4, 99:6, 101:7

**costs** 28:24, 29:11, 97:21, 101:13

**Council** 15:14, 77:13

**counsel** 85:21, 94:9, 108:14, 108:16

**count** 80:15

**counted** 79:12, 80:10

**counties** 31:18, 31:20, 36:21, 40:11, 52:20, 84:1, 86:21, 87:24, 93:20, 93:23, 93:25

**county-specific** 90:19

**couple** 7:21, 12:18, 47:12, 63:17, 85:25, 90:13, 106:7

**course** 94:24, 95:18

**Court** 1:1, 6:2, 6:9, 7:20, 8:2, 13:9, 29:18, 30:12, 34:11, 81:15, 84:13, 103:10, 104:8, 104:12, 104:16, 104:18, 104:20, 104:23, 105:1, 105:4, 105:12, 105:21, 106:3, 106:6,

Case 8:22-cv-01977-MSS-SPF   Document 33-19   Filed 09/15/23   Page 116 of 128 PageID 643

106:10, 106:13, 107:7, 108:6
**courthouse** 95:2, 95:3
**cousins** 33:23
**cover** 17:16, 18:3, 18:11, 77:18
**covered** 77:19
**crime** 9:2, 9:6
**CROSS-EXAMINATION** 3:4,
    85:15
**Cuba** 5:5, 14:25, 26:23, 58:14,
    58:15, 66:5, 89:19
**cultural** 90:15
**culture** 91:18
**current** 94:21
**Currently** 15:22, 36:18, 53:14,
    73:1
**customarily** 88:9, 88:20
**customers** 39:6


**< D >**
**daily** 14:23, 21:10, 91:8
**Dairy** 23:5, 23:6, 23:11, 53:5,
    54:18
**Dan** 6:15, 104:13
**dan@mckilloplawfirm.com**
    2:20
**DANIEL** 2:12, 110:34
**Date** 1:24, 29:23, 30:16, 65:12,
    68:9, 109:29, 110:8, 110:43
**Dated** 4:3, 4:7, 85:1, 86:4,
    108:19
**dates** 30:6
**daughter** 50:9
**David** 24:13, 24:15
**day** 12:19, 12:20, 14:13, 14:15,
    14:16, 23:20, 65:18, 65:22,
    107:12, 108:19
**days** 14:24, 68:17, 69:12, 104:5,
    106:7, 110:20
**de** 5:5, 26:23, 58:14, 58:15, 66:5
**deal** 22:15, 45:10
**dealing** 12:10, 32:6, 88:3
**deals** 22:16
**Dear** 110:11
**deceit** 9:3
**decided** 31:11
**decision** 31:13
**declare** 109:24
**Decreased** 92:2
**Defendant** 1:14, 2:21

**definitely** 92:5
**delete** 52:23, 52:24
**deleting** 52:22
**deliver** 19:4, 19:8, 21:18, 22:3,
    40:10, 42:3, 43:2, 87:11,
    101:8
**Delivered** 5:7, 10:10, 20:20,
    21:21, 23:1, 23:4, 23:19,
    29:23, 30:4, 80:7, 80:20, 81:6
**deliveries** 20:14, 28:18, 60:10
**delivering** 21:13, 31:5, 60:14
**delivery** 17:6, 19:5, 20:8, 20:11,
    24:2, 28:22, 28:24, 29:11,
    43:6
**demand** 34:20, 34:22
**Department** 93:11
**Depending** 24:25
**depends** 22:10, 96:21, 99:22
**Deponent** 110:9, 110:43
**DEPOSITION** 1:21, 6:17, 7:10,
    7:14, 11:1, 11:6, 24:9, 63:20,
    63:24, 103:11, 106:14, 108:8,
    110:14, 110:40
**depositions** 8:24, 46:22
**describe** 89:11
**DESCRIPTION** 4:2, 5:2
**desk** 47:17, 62:17
**Detailed** 4:25
**determine** 21:11, 34:20
**developed** 15:1
**devoted** 78:7, 78:10
**Dias** 4:5, 5:10, 44:14, 44:15,
    44:19, 45:5, 45:6, 45:18,
    46:23, 46:25, 47:4, 47:18,
    48:9, 48:13, 56:21, 61:9,
    62:17
**different** 26:15, 32:9, 86:11
**difficult** 91:10, 98:9
**DIRECT** 2:7, 3:3, 6:22, 25:4,
    60:20
**directed** 25:7
**directing** 17:15
**directly** 42:8, 44:21, 64:14,
    73:13, 95:1, 97:24
**disappear** 73:5
**discount** 99:23
**discrepancy** 42:1, 63:18
**discuss** 10:7
**Discussion** 31:2, 60:23, 75:2,
    94:5

**distance** 98:15
**Distant** 33:23, 33:24
**distribute** 42:24, 64:21, 74:7,
    99:6
**distributed** 4:15, 4:21, 19:2,
    28:6, 43:9
**Distribution** 5:4, 30:1, 34:24,
    35:1, 36:25, 51:10, 56:24,
    64:7, 73:11, 79:16, 81:1, 87:8
**distributions** 36:11, 64:11
**distributor** 31:24
**distributors** 73:16, 74:6, 74:12
**districts** 77:5
**diversity** 15:5
**divorce** 95:2
**do.** 52:10
**dock** 23:9, 23:10, 23:16
**document** 26:17, 26:18, 26:20,
    26:25, 27:8, 27:17, 28:3, 28:9,
    28:14, 29:19, 30:13, 61:4,
    65:5, 109:25
**documents** 25:15, 26:13, 26:24,
    27:22, 28:17, 28:21, 82:16,
    84:17
**doing** 10:8, 11:24, 12:12, 34:12,
    44:4, 48:22, 50:15, 51:9, 54:3,
    64:7, 73:11, 73:16, 73:19,
    74:12, 96:16
**dollars** 97:16, 97:18
**Don** 5:4, 35:7, 36:9, 39:1, 57:12,
    57:20, 57:21, 58:3, 66:3,
    66:21, 68:1, 68:20
**done** 27:14, 45:1, 67:1, 68:23,
    77:12, 86:20, 95:13, 103:7
**Donna** 14:14
**door** 61:19, 62:14, 66:23
**doors** 39:4
**Doris** 89:13, 89:14
**dot** 104:14
**double-check** 99:25
**double-checked** 17:2
**down** 7:20, 23:8, 26:21, 27:4,
    34:14, 34:15, 35:17, 35:22,
    36:20, 37:11, 37:23, 38:23,
    38:24, 39:10, 46:2, 51:10,
    62:4, 63:20, 63:23, 66:21,
    77:16, 77:20, 80:24, 96:18,
    96:25, 97:14, 103:23
**Downtown** 43:1, 43:3, 43:5,
    71:10, 72:14, 72:20

**Drive** 19:10, 19:21, 27:11, 27:21, 46:24, 96:18
**driver** 20:24, 21:24, 22:14, 23:9, 38:7, 38:8, 39:11, 40:1, 40:2, 60:13, 74:18
**drivers** 21:4, 24:2
**drop** 20:25, 21:2, 21:23, 21:25, 39:4
**drove** 35:17
**drugs** 9:7
**duly** 6:11, 107:10
**During** 49:10, 91:4, 91:9, 91:19, 91:23
**duties** 10:5, 11:21, 12:4

**< E >**
**E-mail** 2:9, 45:1, 52:9, 52:11, 52:12, 52:22, 60:20, 94:22, 104:8, 105:1, 105:3, 105:4
**e-mailed** 48:10, 105:21, 106:3
**e-mailing** 105:9
**e-mails** 45:17
**E-r-i-n** 50:13
**earlier** 66:20, 87:8, 99:10
**East** 10:17, 54:25, 110:3
**edges** 89:16
**editor** 10:4, 12:13, 14:1, 90:5, 90:14
**education** 11:8, 11:10
**effect** 16:2
**efficient** 44:17
**eight** 10:15
**eighty** 100:8, 100:9
**either** 7:7, 10:22, 19:6, 24:25, 43:8, 70:5, 73:12, 80:4
**EI** 5:5, 35:7, 58:8, 58:9, 66:3, 66:23, 68:1, 68:20
**electronic** 52:7, 105:9
**Eleven:** 27:20
**elk** 89:25
**employee** 14:10, 108:14, 108:15
**employees** 12:6, 21:6, 57:21
**empty** 62:24
**encourage** 95:3
**encouraged** 72:18, 96:14
**end** 96:1
**ended** 32:6
**endorse** 77:17
**endorsed** 77:15, 77:18

**endorsement** 77:8
**endorsements** 76:15, 76:20
**ends** 89:10
**English** 14:14, 14:25, 86:8, 86:12, 91:13, 92:14
**entail** 9:22
**entered** 86:17
**entire** 64:8, 83:24, 83:25
**entitled** 4:24
**entrance** 61:23, 62:21
**entranceway** 62:9
**Entry** 4:10
**equipment** 73:7
**Erin** 50:12
**ERRATA** 3:10, 104:6, 110:25
**especially** 7:22, 90:9
**ESQUIRE** 2:2, 2:12, 110:34, 110:35
**estimate** 105:5
**et** 1:12, 59:20, 109:3, 110:7
**event** 18:14, 53:14, 78:3, 82:17
**events** 89:19
**Everybody** 45:17
**everyone** 33:3, 34:2
**Everything** 7:19, 12:1, 15:10, 15:12, 89:10, 89:18, 90:15, 103:16, 105:8
**exact** 31:7
**exactly** 47:2, 62:25, 66:11, 98:20
**EXAMINATION** 3:3, 3:5, 6:22, 95:19
**examined** 6:12
**except** 96:3
**exceptions** 109:9
**excuse** 73:20
**excused** 105:16
**Exhibits** 80:6, 103:3, 105:10, 105:20, 106:2, 106:8
**exist** 27:22, 29:9, 29:10
**existence** 92:6
**existing** 44:18, 49:17
**exists** 26:18, 26:20, 26:25, 27:8
**expand** 31:11
**expanded** 31:18
**expanding** 34:17, 87:23
**expansion** 31:16
**Expires** 107:22
**ext.** 2:6
**extras** 87:12

**< F >**
**fact** 44:24, 64:13, 69:11
**facts** 59:19, 109:25
**fairly** 22:1
**familiar** 61:7, 62:8, 70:18, 73:22, 74:3, 103:12
**familiarize** 49:7
**Families** 93:11
**far** 11:10, 14:19, 105:9
**fast** 91:21
**father** 11:20, 12:3, 54:4, 54:11
**fault** 104:1
**FAX** 2:8, 2:18
**FCC** 15:23, 82:17, 82:22
**Federal** 110:21
**feel** 17:14, 18:5
**fees** 98:18
**felony** 8:25
**felt** 16:2
**Female** 13:2, 13:3
**few** 26:14, 26:22, 44:23, 72:18, 85:20
**FF** 107:21
**fifteen** 28:17
**Fifth** 55:23
**fifties** 91:9, 92:10
**figure** 40:3, 98:1, 98:3, 98:20
**financially** 108:17
**financing** 98:19
**find** 41:25, 45:9, 47:8, 49:2, 49:19, 73:8, 74:18, 80:11, 87:25, 100:11
**finding** 49:10, 52:17
**fine** 55:13, 78:22
**Firm** 2:13
**First** 2:15, 5:6, 6:11, 7:19, 14:5, 19:15, 24:10, 25:18, 26:24, 39:13, 49:1, 49:18, 50:20, 50:25, 51:4, 53:24, 54:1, 54:12, 59:5, 59:6, 66:6, 92:9, 96:14
**fishing** 15:11, 78:11, 89:25
**five** 42:20, 87:22
**Floor** 2:15
**Florida** 1:2, 1:31, 1:35, 2:5, 2:16, 23:5, 23:6, 23:11, 31:21, 53:5, 54:18, 81:9, 81:25, 82:7, 93:4, 93:5, 107:3, 107:8, 107:20, 108:3, 110:4, 110:22, 110:46

**focus** 15:3, 77:21
**focused** 78:25
**followed** 15:7, 91:5
**following** 105:17, 109:8
**follows** 6:13
**foregoing** 108:8, 109:25
**forgot** 24:7
**format** 91:5
**Forty** 100:7
**forwarded** 110:24, 110:26
**found** 44:16, 64:10, 73:15,
    73:18, 80:10
**four** 29:24, 30:2, 33:10, 33:12,
    36:18, 42:14, 83:21, 87:22,
    99:12, 101:4
**fourteen** 97:16, 97:18
**frame** 49:11
**free** 33:11, 34:2, 34:24, 35:1,
    35:10, 35:12, 36:12, 41:6,
    41:7, 41:9, 59:15, 66:8
**frequently** 22:2
**Friday** 16:16, 23:8, 86:3, 86:4
**friend** 24:11
**front** 47:11, 61:19, 61:22, 62:8,
    62:14, 62:20
**Fruitville** 2:14
**full** 7:2, 7:4
**Full-time** 13:4, 14:10, 14:11
**funds** 102:3


**< G >**
**G-a-b-r-i-e-l** 14:7
**G-a-c-e-t-a** 6:17
**G-e-n-e** 13:16, 13:17
**G-u-a-g-l-i-a-r-d-o** 53:2
**Gabriel** 13:25, 14:3, 90:5
**garbage** 74:6
**Garcia** 2:3, 24:19, 49:20, 49:23
**gave** 44:20, 74:20, 83:17
**General** 83:22, 85:25, 88:6,
    88:21, 89:8, 93:4, 93:6, 93:9,
    93:19
**Generally** 17:10, 17:11, 18:4,
    21:14, 21:20, 22:1, 23:23,
    25:5, 31:23, 39:20, 41:4, 43:7,
    75:6, 87:5, 88:14, 88:20, 90:6,
    90:18, 91:5, 95:1
**generation** 15:2
**gets** 10:23, 17:1, 18:17, 18:23,

    34:2, 45:18, 97:22
**getting** 48:24, 52:18, 80:17
**Gil** 24:14
**Gilbert** 2:3, 24:19, 49:19, 49:23
**girl** 17:18
**Give** 6:5, 9:11, 11:8, 14:18,
    20:24, 23:6, 42:5, 42:6, 105:5
**given** 25:14, 35:9, 35:12, 36:12,
    108:11
**glass** 62:14
**goal** 16:4, 16:6
**goals** 16:7, 16:8
**God** 31:9, 36:6, 89:23
**gossip** 90:3
**gotten** 52:15
**government** 92:21, 94:23
**governments** 92:24
**grabbing** 71:19
**grandfather** 14:23, 90:25
**grant** 69:13
**ground** 7:17
**Group** 2:3, 15:7, 24:19, 49:20,
    53:22, 82:9, 82:14, 83:1
**Guagliardo** 53:1, 54:8, 54:9,
    54:15
**guys** 69:7


**< H >**
**H.** 2:12, 110:34
**half** 12:21, 14:13, 41:5
**hand** 6:3, 96:18, 107:12
**handle** 71:19
**handled** 26:8, 32:5, 50:4
**handles** 45:12
**handling** 50:4
**happened** 96:7, 96:10
**happening** 78:3, 89:19, 90:21
**happenings** 76:11
**happens** 32:8, 46:19
**happy** 8:9
**hard** 88:3, 104:13, 104:18,
    104:19
**hates** 89:20
**head** 7:23, 7:24, 47:2, 92:25
**heard** 20:6, 46:8, 58:9, 58:15,
    58:20, 59:6, 95:22
**hearing** 68:11
**Help** 10:7, 10:8, 10:9, 24:22,
    44:13, 91:17

**hereby** 109:6, 110:39
**Hernando** 37:10, 37:16, 40:21,
    41:5, 41:7
**High** 11:9
**HILLSBOROUGH** 36:21, 37:6,
    37:7, 40:23, 41:4, 44:16, 71:9,
    76:24, 93:1, 107:4, 108:4
**hire** 10:8, 83:3
**hired** 64:19
**Hispanic** 15:6
**history** 15:11, 90:7
**hit** 73:4
**Hold** 81:18
**honest** 9:11
**hope** 74:9, 90:20, 102:7
**hopefully** 73:5
**hosting** 70:13
**hour** 44:3
**hourly** 21:10
**house** 17:23
**human** 89:12
**hundred** 83:21, 97:16, 97:18
**hunt** 89:25
**hunting** 15:11, 78:11, 89:24


**< I >**
**I.** 17:20
**idea** 11:8, 14:18, 20:16, 31:17,
    60:10
**ideas** 17:12
**identification.** 27:18, 28:4,
    28:10, 28:15, 29:20, 30:14,
    61:5, 65:6, 84:18
**immediately** 11:23
**impair** 9:10
**In-house** 10:13, 12:6
**in.** 12:19, 14:12, 32:15, 94:25
**inaccuracies** 75:11, 75:14,
    103:17, 103:18
**inaccuracy** 103:24
**inappropriate** 17:14, 65:20
**Inc.** 1:29, 1:43, 4:25
**include** 9:5, 68:19
**included** 60:18
**including** 103:5
**income** 101:4
**incorrectly** 13:12
**increased** 91:25, 92:2
**Independent** 21:7

**individual** 35:16, 43:6, 72:19, 93:22, 98:2, 102:19
**individually** 99:23
**industrial** 47:14
**industry** 92:3, 102:2
**influence** 9:7
**inform** 16:4
**information** 8:15, 42:12, 55:6, 57:3, 57:7, 57:10, 67:20, 69:20, 76:15, 88:9, 88:14, 88:21
**initial** 48:6
**initials** 83:12
**initiated** 48:2
**ink** 18:25
**innovative** 45:9
**inputs** 57:2
**inside** 61:21, 72:23
**installation** 60:5
**instead** 74:7
**insurance** 95:10, 95:12
**integrated** 15:8
**interest** 88:15, 88:21
**interested** 108:17
**interested.** 39:6
**interesting** 90:18, 92:16
**intern** 14:17
**internet** 94:22
**introduced** 47:12
**investigator** 59:12, 63:19
**invited** 83:6
**involved** 10:9, 16:10
**involving** 9:3
**ipad** 60:21
**issue** 15:19, 22:7, 25:19, 50:2, 78:14
**issues** 15:3, 16:12, 18:3, 78:8, 78:10, 78:12, 79:1, 90:16, 90:21, 98:18
**it.** 38:22
**Italian** 15:1, 53:9, 53:10, 53:11, 53:12, 53:16, 53:18, 53:21, 72:9, 86:12, 90:14, 90:15, 90:16, 91:14, 91:15, 91:17
**Italians** 53:13
**item** 18:10, 97:21, 99:2
**itself** 18:23

**< J >**

**J.** 1:12, 54:19, 54:20, 109:3, 110:7
**Jacksonville** 43:8
**James** 1:12, 6:15, 109:3, 110:7
**January** 48:13
**Jason** 34:5
**JEAN** 1:33, 107:7, 107:18, 108:6, 108:22, 110:31
**Jesse** 13:1, 17:20
**Jessie** 50:6
**jmwilkes77@gmail.com** 1:44
**job** 9:20, 12:22, 13:4, 73:16
**jobs** 12:8, 17:9
**Joe** 54:19, 89:17
**Joe.** 54:21
**JUDICIAL** 1:1

**< K >**

**K-e-l-l-y** 19:19
**Karen** 6:16
**keep** 21:23, 22:8, 24:5, 30:1, 47:16, 48:12, 48:14, 72:25, 83:10, 87:16, 91:17
**keeping** 52:22
**Kelly** 19:14, 19:19
**kept** 42:12, 51:22, 102:17, 105:25
**Kerry** 100:20
**kids** 93:13
**kind** 44:25, 63:14, 68:2, 88:4, 102:10
**Kirschner** 33:16, 100:20
**knock** 39:3
**knowledge** 55:8, 57:22, 66:13, 70:8, 75:14, 80:9, 109:8
**known** 54:2
**knows** 31:9, 74:23

**< L >**

**L-a** 6:17
**label** 84:11
**labeled** 42:18
**lady** 17:19
**Lake** 27:11, 27:21, 46:24
**Lakeland** 17:4, 18:17, 19:10, 19:21
**language** 44:15, 90:6, 91:16, 92:15

**languages** 15:1, 86:11
**LARGE** 1:35, 88:3, 107:8, 107:19
**late** 66:12
**later** 68:17, 91:14
**Latin** 15:4, 16:5
**Latino** 15:3
**Law** 2:13, 24:19, 92:10
**lawsuit** 11:3
**lawyer** 24:11
**Layout** 10:7, 12:13, 13:21, 17:1, 18:16
**learned** 38:18
**lease** 27:9
**least** 86:7, 106:8
**leave** 105:15
**left-hand** 71:10
**Legal** 12:10, 12:25, 13:5, 44:25, 45:13, 48:19, 49:1, 49:10, 49:16, 49:18, 50:5, 50:15, 92:8, 92:9, 92:13, 93:8, 94:23
**lengthy** 26:10
**Leon** 14:11
**Leonardo** 14:11, 14:12, 90:8
**Letter** 3:10, 4:7, 110:13, 110:21
**licenses** 93:16
**lied** 64:11
**likely** 104:1
**likes** 90:8
**limited** 32:23
**LINE** 55:7, 55:9, 109:10
**list** 4:14, 16:22, 20:24, 21:20, 25:15, 28:6, 32:14, 32:25, 35:9, 42:15, 56:24, 73:12, 79:18
**listed** 23:17, 56:6, 72:3, 82:1
**Listen** 39:4, 39:23
**little** 7:16, 9:13, 25:22, 55:10, 61:22, 69:13, 78:19, 85:21, 87:7, 98:2, 102:11
**live** 22:20
**living** 45:10
**Liz** 33:13, 33:15, 77:13
**lobby** 82:12
**lobbying** 82:9, 82:14
**local** 15:20, 76:24, 92:20, 92:24
**located** 26:15
**location** 5:11, 10:19, 19:7, 37:23, 37:24, 38:6, 38:25, 42:23, 46:3, 46:8, 46:12, 47:1, 47:19, 59:23, 60:12, 61:7,

61:9, 61:17, 62:4, 66:15, 67:4, 67:7, 75:7
**log** 21:24
**logs** 22:8, 28:22, 29:6
**long** 7:13, 9:16, 10:11, 10:19, 21:15, 31:5, 31:9, 47:18, 54:2, 61:20, 64:6, 87:20, 92:8, 92:13
**longer** 32:18, 64:9, 73:9
**look** 8:2, 14:6, 16:17, 31:21, 51:6, 56:24, 62:8, 65:1, 65:14, 65:18, 67:17, 69:22, 71:5, 71:6, 83:20, 84:10, 84:14, 93:22, 96:8, 97:20, 99:24, 100:2, 100:5, 102:22
**looked** 65:16, 81:25
**looking** 62:11, 67:21, 82:16, 100:11
**looks** 10:16, 33:13, 61:19, 65:19, 65:23, 67:19, 68:2, 68:21, 100:13
**lose** 99:4
**losing** 91:16
**lost** 37:23, 37:25, 38:5, 80:25
**lot** 16:8, 76:12, 89:15, 90:17, 90:20, 95:4, 95:14
**Louise** 12:24
**Luis** 47:11
**lying** 39:18

**< M >**
**M-a-n-t-e-i-g-a** 7:5
**M-o-o-d-y** 22:18
**M.** 1:33, 2:2, 107:7, 107:18, 108:6, 108:22, 110:31, 110:35
**ma'am** 85:23, 86:9, 86:19, 94:3, 94:11
**Mail** 4:10, 17:5, 20:7, 20:19, 32:12, 32:15, 32:23, 50:19, 73:23, 86:23, 86:24, 95:21, 95:23, 95:24, 96:5, 98:4, 101:14, 101:20
**mail.** 74:4
**mailed** 31:8, 33:4, 33:5, 43:17, 96:2
**Mailing** 31:10, 31:20, 32:9, 42:15, 45:19, 46:1, 48:24, 51:7, 51:13, 51:14, 51:25, 52:18, 79:18, 80:13, 91:1,

101:13
**main** 10:16
**Male** 13:2
**man** 13:14
**Management** 83:8
**Manasota** 43:8
**Manatee** 23:16, 32:17, 32:18, 40:13, 44:16, 56:7, 64:22
**Manatee/** 47:14
**manned** 44:18
**Manteiga** 1:21, 3:2, 6:8, 6:10, 6:24, 7:4, 7:6, 7:8, 13:22, 27:17, 28:3, 28:9, 28:14, 29:19, 30:13, 33:20, 50:12, 61:4, 65:5, 84:17, 103:9, 107:9, 108:9, 109:6, 109:29, 110:2, 110:9, 110:11
**manual** 44:20
**Marathon** 66:3, 66:10, 66:12, 66:14, 66:15, 67:2, 67:7, 67:25, 68:19
**marble** 60:4
**March** 49:2
**Mariachi** 5:5, 35:7, 58:8, 58:9, 66:3, 66:23, 68:1, 68:20
**mark** 27:16, 28:1, 28:8, 28:13, 29:5, 29:12, 29:17, 61:3
**marked** 27:17, 28:3, 28:9, 28:14, 29:19, 30:13, 61:4, 65:5, 84:17
**market** 95:7
**Martinez** 18:11
**math** 91:20
**matter** 71:6
**mean** 10:22, 14:11, 18:12, 26:18, 31:8, 39:2, 42:17, 55:6, 55:16, 61:14, 66:11, 67:19, 69:10, 71:13, 73:10, 78:19, 92:2, 96:4, 98:8, 99:22, 104:24
**meaning** 16:4
**means** 7:20, 31:23, 42:18, 43:7, 81:23
**meant** 11:25
**medications** 9:10
**meet** 31:22, 54:1
**melds** 16:24
**member** 81:9, 81:23, 82:2
**mentioned** 87:8, 89:1
**met** 47:11, 53:24, 64:13
**metal** 71:16

**mileage** 24:5
**milk** 23:7
**mind** 58:23
**mine** 24:11
**minority** 16:2
**missed** 14:10
**missing** 67:25
**mission** 14:20
**mistake** 53:17
**moment** 95:16
**Monday** 106:7
**money** 41:13, 42:1, 99:4, 102:5, 102:8, 102:9
**month** 41:16, 42:4, 87:13, 89:22
**months** 37:10, 37:15, 37:16, 48:23, 83:19
**Moody** 4:27, 22:17, 29:1, 29:14, 38:11, 38:12, 63:20, 64:6, 101:8, 101:13
**morning** 6:14, 23:8, 23:25, 85:17
**mostly** 41:6, 41:9, 76:7, 94:21
**mother** 12:24
**moved** 46:10, 47:19, 48:1, 73:2, 94:13, 94:14
**Muga** 89:21
**mutual** 53:12
**myself** 49:7, 82:12

**< N >**
**name** 6:15, 7:2, 7:3, 7:4, 7:5, 10:9, 13:10, 13:11, 14:5, 17:24, 19:15, 22:15, 25:2, 54:6, 54:12, 61:16, 70:3, 82:21
**named** 17:18
**names** 33:1, 34:14
**Natalya** 34:3
**NC** 109:4
**necessarily** 32:9, 78:13, 101:20, 102:2
**necessary** 45:21
**need** 7:22, 7:23, 8:13, 8:15, 8:16, 10:11, 18:5, 25:5, 57:15, 65:8, 69:23, 70:2, 94:18, 97:14, 102:18, 102:19, 102:23, 103:10, 104:13, 104:14, 104:17, 104:19
**needed** 45:3
**needs** 8:13

negative 16:1
neighbor 23:5
New 21:2, 32:5, 35:21, 35:23,
    36:4, 46:8, 46:12, 46:13,
    46:14, 47:1, 48:8, 66:15
newest 57:12
news 88:9
newsrack 71:14, 72:10
newsracks 72:3, 72:14, 72:16,
    72:17, 72:20, 74:14, 74:21
next 26:13, 28:11, 33:16, 66:23,
    71:12, 106:6
nice 25:22
Nobody 22:25, 44:24
nodding 7:24
non-profit 53:22
None 27:22, 29:6, 29:9, 29:10,
    77:2, 77:21
nor 108:15, 108:16
Nora 34:9
normally 48:15, 73:20
North 1:30, 26:16
NOTARY 1:34, 85:11, 85:12,
    107:8, 107:19
note 24:11, 73:12
nothing 6:6, 6:12, 17:13, 56:11,
    61:23
notice 25:14, 94:2
notices 88:6
Notification 4:10
notifications 93:8
nowadays 44:23
NR 71:12, 71:13
Number 21:11, 27:4, 27:9, 27:18,
    28:4, 28:10, 28:15, 29:18,
    29:20, 29:23, 30:12, 30:14,
    30:17, 31:18, 31:25, 32:10,
    32:25, 33:13, 45:7, 61:5, 65:6,
    80:24, 83:17, 85:3, 91:24
Numbers 30:5, 39:17, 56:25,
    63:1, 63:11, 63:18, 64:1,
    84:18, 100:1


< O >
O'neill 89:17
OATH 3:7, 107:1
objection 55:2, 55:16
objections 55:14
Observer 31:18

obtain 31:19
Obviously 55:2
Occasionally 31:8, 35:20, 37:2,
    39:20, 73:3, 79:4
occasions 59:13
occurred 51:5
odd 51:20, 63:14
odds 89:10
offered 57:22, 59:15
offering 49:16, 60:1
Office. 19:9, 30:21
offices 32:14, 32:19, 44:18,
    62:24, 76:22, 76:25, 77:2,
    92:21, 96:5, 101:21
official 88:6, 107:12
often 8:12, 8:13, 45:24, 56:25,
    57:2, 57:6, 86:2
Oftentimes 78:15, 78:19
old 9:18, 21:1, 21:23, 54:22
old-fashioned 48:25
older 74:1
OMX 42:16, 42:19, 43:7
Once 18:4, 18:16, 22:11, 22:22,
    22:25, 38:16, 41:16, 42:4,
    57:1, 86:5, 86:25, 87:13, 96:3,
    96:5, 96:15, 104:5, 110:25
one-year 100:17, 100:19
one. 11:7, 28:8
ones 33:9, 72:7
online 10:16
open 41:11, 42:23, 43:5, 44:17,
    87:25
opened 43:9
operate 53:6
operates 53:14, 53:18, 95:11,
    95:12
operation 74:15, 74:22
opinion 88:8
opinions 76:11
opportunity 103:17
Orange 40:15, 41:5
order 81:19, 104:11, 104:12
Ordered 68:4, 68:22, 68:24
ordering 110:25, 110:26
organize 21:21
original 110:24
originally 49:25, 71:25, 91:7
originating 45:16
Orlando 95:11
Osceola 40:18, 40:19, 41:6

others 32:24, 90:13
ourselves 88:3
out-of-house 10:14
outdoors 89:24
outside 53:18, 56:23
overlap 85:21
owed 41:14
own 24:3, 24:4, 53:6, 72:10,
    82:25, 83:2
owned 71:25, 72:1, 72:4, 72:5,
    72:17
owner 9:24, 11:18, 46:12, 53:5,
    54:17
owners 37:1, 88:15
Ownership 11:24, 15:19, 15:25,
    83:8
owns 54:24, 56:5, 56:8, 71:24


< P >
p.m. 105:17, 106:15
PAGE 3:2, 4:2, 5:2, 42:9, 65:24,
    67:21, 109:10
PAGE/ERRATA 3:9, 109:1
pages 42:14, 99:14, 109:7
Paid 21:8, 21:10, 21:12, 43:19,
    43:21, 43:25, 97:22, 99:12,
    99:22, 100:3
Palmas 5:5, 26:23, 58:14, 58:15,
    66:5
paper 15:12, 16:18, 18:25,
    42:20, 72:17, 76:20, 87:15,
    90:24, 91:11, 99:17
papers 16:2, 20:12, 21:2, 21:14,
    23:19, 42:19, 43:12, 44:1,
    76:15, 91:24, 99:3, 101:10
park 47:14
part 82:10, 82:14, 83:1
part-time 11:13
part-timer 19:14
part-timers 12:18
particular 42:22, 68:6, 77:19,
    97:21
particularly 24:10, 39:21
parties 108:14, 108:15, 110:26
party 34:1, 110:25
Pasco 41:5
pass 92:10
passed 11:20, 12:4, 97:23
past 82:14

**Pastry** 5:6, 26:23, 58:19, 58:20, 66:6
**Patrick** 1:21, 3:2, 6:10, 7:4, 7:5, 7:8, 60:25, 102:16, 105:7, 107:9, 108:9, 109:6, 109:29, 110:2, 110:9
**Patterson** 34:9
**pay** 33:12, 36:18, 42:3, 42:4, 45:6, 45:8, 87:14, 97:23, 98:9
**paying** 98:23, 98:24
**payments** 4:19, 4:27, 28:12, 28:25, 29:14
**PDF** 104:9, 104:13, 104:14, 104:16, 104:17
**penalties** 109:24
**penny** 97:14
**people** 10:12, 10:13, 18:5, 18:6, 19:6, 21:18, 22:11, 32:7, 34:13, 35:18, 36:17, 39:7, 44:1, 44:23, 49:15, 49:16, 53:22, 55:4, 63:24, 73:7, 74:1, 80:13, 89:25, 91:14, 93:16, 94:18, 94:21, 94:25, 95:3, 95:5
**per** 32:2, 32:10, 70:24, 90:19, 100:25
**percent** 86:7, 92:14
**performing** 90:9
**period** 12:3, 73:6
**Periodical** 32:12, 32:15, 32:23, 51:1, 51:14, 52:19, 86:18, 87:1
**Periodicals** 4:11, 27:20, 29:23, 30:17, 32:5, 32:20, 48:25
**perjury** 109:24
**Permit** 31:20, 32:10, 48:24, 51:7, 91:1, 91:3, 101:24, 101:25
**permitted** 101:21
**person** 12:9, 12:10, 12:11, 12:12, 12:22, 19:13, 20:12, 20:13, 52:12, 66:7, 70:3, 75:7, 75:13
**personal** 9:13
**personally** 10:22, 31:13, 36:2, 36:24, 59:11, 77:7, 107:9
**Pete** 90:22, 93:2, 95:10
**petty** 9:5
**PHONE** 2:6, 2:17, 74:25
**Photographs** 5:10
**Photos** 5:22, 103:5

**phrase** 10:21, 74:1
**physical** 20:8, 20:20, 52:6, 91:24, 94:10
**physically** 45:4, 94:13, 94:24, 94:25
**PI** 57:16
**pick** 7:24, 17:4, 19:6, 19:22, 21:1, 23:23, 35:21, 37:24, 38:21, 39:23, 66:8, 66:21, 75:8, 87:12
**picked** 34:14, 35:23, 36:5, 38:24
**picking** 22:9, 36:7, 66:15, 71:18
**picks** 23:1, 23:10
**picture** 62:1, 62:11, 62:13
**pictures** 61:2, 62:6, 105:23, 105:24
**piece** 98:12, 98:14
**Pinellas** 36:22, 37:7, 37:8, 40:23, 41:4
**PLACE** 1:29, 45:2, 45:4, 94:18
**places** 26:15, 35:21, 35:23, 36:4, 42:3
**Plaintiff** 1:8, 2:10, 6:21, 85:19
**plan** 21:18
**Plant** 11:9, 23:8
**plead** 55:23
**pleadings@mckilloplawfirm.co m** 2:19
**Please** 6:3, 110:15
**point** 35:10, 37:21, 46:7, 48:21, 49:22
**political** 76:16, 90:3
**politician** 77:8
**politics** 15:11, 18:15, 76:11, 76:12
**Polk** 40:19, 41:8, 41:9, 41:18
**Porter** 27:10, 27:21, 46:24
**portion** 65:21, 67:22
**Postal** 19:4, 27:24, 83:14, 98:19
**Postmaster/manager** 4:9
**posts** 70:23
**pound** 98:12, 98:16
**poundage** 99:2
**pounds** 98:17
**preceding** 109:7
**prefers** 95:23
**preliminary** 8:22
**prepress** 17:3
**presentation** 15:13
**preserving** 55:15

**President** 10:2, 53:21, 89:20
**Press** 17:4, 18:17, 81:9, 81:25, 82:8
**pretty** 16:6, 41:1
**previously** 85:22, 86:16, 86:21
**Pricing** 4:8
**PRIMARY** 2:19
**print** 17:4, 17:15, 18:22, 28:25, 43:14, 97:7
**printed** 18:23
**printer** 23:21, 23:22, 97:7
**Printout** 4:24, 29:13
**private** 59:12, 63:19
**Probably** 10:14, 42:20, 43:23, 47:5, 48:23, 49:13, 54:3, 69:22, 71:4, 74:17
**problem** 46:20, 58:25, 81:20
**Procedure** 110:45, 110:46
**process** 17:5, 19:3, 20:6, 51:19, 51:21, 52:18, 52:21
**processing** 45:12
**produce** 16:12, 25:21, 92:21
**produced** 91:25
**producing** 16:20
**production** 16:9, 16:11, 16:17
**Professional** 1:29, 1:43, 110:32
**promote** 16:5
**Proof** 5:16, 5:19, 51:25, 84:21, 85:3
**proofread** 17:1
**proofreader** 12:19, 12:20, 14:12
**proofreading** 14:14
**property** 88:16
**PUBLIC** 1:34, 87:5, 88:6, 88:10, 88:22, 90:19, 107:8, 107:19
**Publication** 5:19, 79:22, 80:2, 80:3, 85:4, 91:24
**Publications** 18:20, 18:24
**publish** 88:5, 92:17, 92:21, 93:6, 93:24
**published** 48:18, 86:2, 86:5, 86:10, 88:16
**Publisher** 9:21, 9:23, 10:4, 11:25, 12:1, 12:2, 16:23, 23:20, 47:12
**publisher.** 12:5
**publishes** 14:19
**Publishing** 4:4, 4:24, 92:8, 99:4
**pull** 57:15, 73:3
**pulling** 71:19

Case 6:22-cv-01977-MSS-SPF   Document 33-19   Filed 06/19/23   Page 124 of 128 PageID 651

purchased 72:21
purpose 14:21
**Put** 6:19, 17:5, 18:16, 18:25,
 20:11, 26:6, 39:8, 39:9, 39:10,
 43:6, 46:2, 51:17, 55:1, 60:21,
 60:22, 72:17, 73:12, 76:20,
 79:25, 87:10, 91:17, 102:16,
 103:23, 105:10, 105:18
**puts** 13:22, 23:7, 23:9, 57:3
**putting** 16:18, 71:18

**< Q >**

qualification 27:24
qualified 86:17, 86:22, 87:1
question 8:5, 8:6, 24:7, 46:16,
 50:24, 55:18, 55:19, 55:24,
 57:18, 59:5, 63:14, 79:24
questioning 55:7, 55:10, 55:17
questions 7:22, 8:7, 8:10, 8:22,
 39:14, 55:4, 58:8, 63:21, 84:6,
 85:14, 85:20, 85:25, 94:9,
 95:15, 102:12, 103:8
quite 92:4

**< R >**

**R-a-n-d-a-l-l** 19:17
**R-i** 18:1
race 77:19
rack 72:24
racks 72:21, 73:1, 73:9
radio 15:20, 15:25
raise 6:2
raised 15:19
rallying 16:1
Ramos 34:5
Randall 19:14, 19:21, 20:2,
 25:21
ranges 10:14
rarely 78:2
RE 110:6
re-define 81:18
read 15:13, 103:11, 103:17,
 103:23, 104:3, 104:6, 109:7,
 109:24, 110:16
reading 103:12, 110:39
ready 8:18
Real 81:20, 101:17
realize 34:13

really 39:2, 49:5, 52:23, 69:10
**REASON** 40:5, 55:23, 82:10,
 94:20, 109:10
reasonable 110:21
recall 77:7
receipt 41:25, 110:20
Receipts 27:5, 27:20, 28:24,
 29:11, 40:6, 42:8
receive 36:17, 51:13, 51:14
received 4:19, 28:12, 110:25
recent 76:14
recently 94:15
reception 47:17
recess. 44:6, 79:7
recognition 18:5
recollection 7:18
record 7:3, 16:14, 30:24, 31:3,
 55:2, 55:16, 59:20, 75:1, 75:3,
 79:14, 94:7, 102:14, 105:8,
 105:11, 105:18, 108:11
record. 31:2, 60:23, 75:2, 94:5
records 29:22, 30:16, 48:15,
 51:24, 52:4, 52:7
**RECROSS-EXAMINATION** 3:6,
 101:18
**REDIRECT** 3:5, 95:19
reference 79:11
refresh 7:17
regard 110:22
regarding 58:8, 75:14, 76:7,
 76:21
regards 11:3, 18:13, 21:2
registered 51:1, 56:6
regular 94:1
regularly 78:24
rehab 73:3
related 28:18, 78:16, 82:16
relation 33:22
relationship 44:14, 75:21, 87:9,
 87:20, 87:23
relative 108:13, 108:15
release 105:7
released 105:14
relevant 78:25
remember 15:16, 36:6, 39:1,
 39:2, 48:22, 50:18, 57:9,
 61:12, 62:16, 62:23, 66:17,
 67:11, 67:12, 77:17, 82:4,
 82:16, 96:24
remind 79:13

replaced 14:15
report 22:3, 57:16, 73:10, 108:8
**REPORTED** 1:33
**Reporter** 3:8, 6:2, 6:9, 7:20, 8:2,
 13:9, 29:18, 30:12, 81:15,
 84:13, 103:10, 104:8, 104:12,
 104:16, 104:18, 104:20,
 104:23, 105:1, 105:4, 105:12,
 105:22, 106:4, 106:6, 106:10,
 106:13, 107:7, 108:1, 108:6
**Reporting** 1:29, 1:43, 103:18,
 110:32
represent 6:15, 85:18
representation 59:10, 65:15
representations 57:15, 57:17
representative 6:18, 6:25
represented 8:20, 10:3, 94:15
representing 24:16
requested 108:10
required 96:13
requirements 31:22
reserve 95:16
residents 88:15
respond 69:12
response 52:16
responses 82:22
responsible 24:23, 49:10, 66:15
rest 8:16, 33:10, 42:15, 44:5,
 70:25, 87:16
restaurant 53:7, 53:10, 53:17,
 57:23, 58:3
retail 35:3, 41:2
retailers 42:7
return 22:4, 41:25
Returned 5:8, 22:6, 30:5
review 108:9, 110:15, 110:17,
 110:19
Richard 89:21, 89:22, 89:23
right-hand 65:10, 67:15
rights 78:12, 89:15
Rizzano 17:18, 17:25
Road 2:14
Robert 33:20
Roland 1:21, 3:2, 6:10, 7:4,
 107:9, 108:9, 109:6, 109:29,
 110:2, 110:9
role 13:19
room 8:16, 44:5
Roughly 87:19, 92:3, 97:15,
 97:19

**route** 20:24, 21:4, 21:16, 38:7, 38:8, 39:11, 40:1, 40:2, 60:13, 74:18
**routes** 21:18
**RPR-CP** 1:33, 107:7, 107:18, 108:6, 108:22
**Rule** 110:45, 110:46
**rules** 7:17, 43:13
**Rules\*** 110:21
**run** 10:6, 16:23, 19:24, 43:15, 73:18, 74:11, 79:22, 80:3, 83:18, 90:20
**run.** 80:2
**running** 77:13, 77:16
**runs** 24:21, 53:9, 53:16
**rush** 8:14


**< S >**
**S-a-l-a-d-i-n-o** 25:3
**S-i-u-d-u-t** 13:12
**sack** 42:16, 42:22, 42:23, 42:25, 43:2
**sad** 89:22
**Sal** 53:3, 53:24, 54:2, 54:15, 54:19, 54:23, 56:5, 56:18, 56:21
**Saladino** 24:22
**Sale** 5:19, 59:15, 85:4, 87:4
**sales** 10:7, 40:6, 40:7, 41:13
**Sals** 54:5
**Salvatore** 53:1, 54:5
**Sandwich** 26:23, 66:6
**satellite** 44:17
**satisfied** 30:18, 32:3
**Save** 5:4, 35:7, 37:25, 38:5, 38:18, 38:19, 58:7, 59:23, 60:3, 60:11, 80:25
**Save/atco** 26:15
**saw** 10:16, 53:18, 76:14
**saying** 25:5, 37:22, 39:21, 39:22, 52:9, 73:12, 73:14
**says** 26:2, 33:13, 40:2, 40:10, 42:9, 63:19, 86:10
**scale** 91:9
**scan** 26:6, 41:15, 41:24, 102:19, 102:20, 102:21, 102:24
**Schmechel** 12:24
**School** 11:9
**schools** 98:20

**screen** 61:1, 74:16, 84:15
**screw** 54:6
**se** 90:19
**se.** 32:2, 70:24
**seal** 107:12
**Second** 15:2, 30:25, 31:20, 31:23, 32:8, 32:12, 32:15, 32:19, 39:13, 48:24, 50:19, 51:7, 51:13, 51:25, 52:18, 91:1, 94:4
**SECONDARY** 2:20
**secretarial** 12:11
**secretary** 13:18, 47:11, 61:24, 62:16
**section** 65:24, 75:7
**Security** 78:14, 90:11
**seems** 17:8
**seen** 48:11, 93:25
**sees** 22:25
**sell** 27:2, 41:3, 41:4, 41:11, 41:12, 42:7
**send** 17:3, 20:7, 41:15, 42:22, 87:13, 87:14, 102:20, 103:2, 106:4, 106:6, 106:11
**sending** 16:21, 34:14
**sense** 103:1
**sent** 18:17, 24:11, 25:14, 95:1
**separate** 17:8, 99:2
**separately** 29:5
**series** 26:13
**serve** 16:5
**served** 68:10, 68:13, 68:16, 68:25
**Service** 4:8, 5:16, 14:24, 19:4, 19:5, 83:14, 84:21, 93:21
**set** 20:7, 20:11, 20:13, 22:1, 35:16, 56:13, 56:16, 61:2, 62:5, 63:20, 63:23, 67:6, 67:7
**seven** 7:15, 11:2, 80:16
**seven.** 21:5
**several** 17:1, 48:23
**sewer** 73:22, 74:3
**Shaking** 7:23
**SHEET** 3:9, 32:13, 104:6, 109:1
**Sheriff** 93:2, 93:3
**Shop** 26:23, 66:6
**short** 79:6, 101:17
**shortage** 91:11
**shot** 61:15, 61:21
**show** 57:16, 58:2, 60:15, 60:25,

61:16, 67:13, 67:21, 80:7
**showing** 4:14, 4:27, 29:13, 29:22, 30:16, 51:4, 60:16
**shown** 74:15
**shows** 60:10
**sic** 63:14
**sick** 12:3
**side** 26:7, 71:10
**Siete** 4:5, 5:10, 44:14, 44:15, 44:19, 45:5, 45:6, 45:18, 46:23, 46:25, 47:4, 47:18, 48:9, 48:13, 56:21, 61:9, 62:17
**sign** 104:6, 110:17
**Signature** 3:9, 84:24, 85:5, 85:6, 85:10, 109:1, 110:43
**signed** 48:11
**signing** 110:40
**similar** 89:17, 91:5, 102:7
**Simpson** 13:1, 13:4, 50:6
**Sincerely** 110:28
**Singer** 24:13, 24:14
**single** 33:5, 36:14
**Sir** 7:10, 11:22, 35:15, 53:10, 61:20, 62:15, 63:7, 63:10, 71:21, 76:23, 77:1, 81:11, 81:15, 81:17, 84:16, 84:23, 85:7, 101:6
**site** 81:20, 81:22, 82:6
**sites** 72:5
**sits** 16:23
**Siudut** 13:8, 85:8, 85:9, 85:10, 89:9
**Six** 7:15, 11:2, 12:6, 12:15, 14:24, 74:16, 81:2
**six.** 10:13
**size** 52:25
**skip** 58:7
**slip** 7:7
**Small** 23:14, 47:13, 69:2, 88:2
**smaller** 15:12
**so-and-so** 39:23
**Social** 53:14, 78:13, 90:11
**society** 53:12
**sold** 27:5, 27:20, 30:17, 41:6, 87:13, 87:14
**soldiers** 91:12
**solely** 78:8, 78:10, 78:16
**solemnly** 6:4
**somebody** 38:21, 39:12, 39:14,

39:22, 45:3, 68:2, 68:7, 72:17,
73:2, 73:13, 73:19
**someone** 13:20, 19:10, 49:11
**sometime** 49:2, 60:3
**Sometimes** 17:15, 49:15, 52:24,
66:12, 70:1, 73:4, 73:6, 73:7,
78:13, 91:10
**son** 54:11
**Sorry** 46:18, 48:25, 51:14, 58:25,
79:14, 81:13, 84:7
**sort** 18:3, 18:8, 95:25
**sorted** 43:9
**sorting** 95:25
**Soshnikova** 34:3
**sound** 8:2, 49:4
**sounds** 70:18, 75:17, 90:17,
94:13
**space** 72:24
**spaces** 72:25
**Spain** 14:25
**Spanish** 12:13, 12:20, 13:24,
14:1, 14:12, 14:23, 44:15,
86:12, 90:5, 90:6, 90:13,
92:18
**Spanish-language-only** 91:8
**specific** 8:23, 93:19
**Specifically** 76:1, 76:6, 78:2
**specify** 78:19
**speculate** 63:10
**spell** 7:2, 13:9, 14:5, 25:2
**spelled** 7:5, 13:12
**spent** 101:13
**spotlight** 18:4
**spread** 15:4
**spreadsheet** 29:25, 57:4
**St.** 90:22, 93:2, 95:10
**stack** 23:7, 25:17, 26:1, 102:21,
102:22
**stacks** 5:22, 105:24, 105:25
**staff** 22:25, 45:20, 45:24, 47:13
**stamp** 60:19
**standard** 8:23, 102:1
**start** 7:17, 22:7, 25:18, 34:13,
57:11, 57:12, 65:9, 85:24
**Started** 14:22, 14:23, 34:12,
34:14, 34:17, 48:21, 49:25,
53:13, 54:3, 90:24, 90:25,
91:1, 91:13, 91:14, 96:14
**Starting** 11:22, 34:24
**STATE** 1:35, 93:3, 93:5, 93:15,

93:18, 107:3, 107:8, 107:20,
108:3
**stated** 109:25
**Statement** 14:20, 48:15, 83:7,
103:19, 105:17
**statements** 16:3
**States** 32:4
**statewide** 76:21
**station** 15:24, 15:25
**stations** 15:20
**status** 52:19, 66:11
**Statute** 110:22
**Statutes** 31:21
**stay** 102:13
**steal** 73:7
**stenographically** 108:8
**step** 20:23
**steps** 20:5
**Steve** 24:22, 25:1, 25:2, 70:5,
70:19
**stopped** 38:24, 59:25, 60:3
**stops** 55:17
**storm** 32:6
**strange** 51:19
**Street** 1:30, 2:4, 67:3
**strokes** 20:6
**struggling** 92:3
**stuff** 16:21, 17:13, 38:23, 44:25,
45:17, 61:1, 77:19
**STYLE** 109:2
**Subject** 4:10
**subjects** 90:17
**subpoena** 25:15, 48:6, 68:10,
68:25, 69:12
**subscribed** 65:21
**subscriber** 4:14, 28:6
**subscribers** 33:7, 33:9, 43:20,
99:12, 100:3
**subscription** 100:17, 100:19,
100:24
**subscriptions** 4:15, 4:21, 28:6,
99:6, 99:16, 101:5, 102:3,
102:5, 102:7, 102:10
**subsequent** 30:5
**subsidize** 102:11
**substantially** 21:15
**Substitute** 5:16, 84:21
**suggested** 110:19
**Suite** 1:30, 46:24
**sum** 16:5

**Sun** 18:20, 18:24
**Sunny** 23:5, 23:6, 23:11, 53:5,
54:18
**supervised** 17:11
**supposed** 46:21
**swear** 6:4
**sworn** 6:11, 107:10
**system** 15:24, 29:13

**< T >**
**talked** 17:21, 31:19, 35:18,
38:11, 38:15, 39:12, 39:14,
47:21, 47:23, 56:18, 57:8,
91:15
**talks** 38:16, 57:1, 67:22
**Tampa** 1:30, 1:31, 2:5, 10:17,
15:4, 15:18, 18:6, 36:22, 37:4,
37:5, 43:1, 43:8, 71:10, 72:1,
72:14, 72:18, 76:4, 76:7,
76:12, 78:10, 78:16, 90:21,
93:1, 93:3, 95:4, 95:5, 95:25,
96:2, 110:4
**TARA** 2:2, 6:19, 6:20, 26:7,
85:18, 104:20, 110:35
**technology** 94:21
**Temple** 93:2
**ten** 40:11, 80:17, 84:1, 86:21
**ten-minute** 74:20
**ten.** 10:15
**Teresa** 33:20
**term** 73:22, 74:3
**Terrace** 93:2
**testified** 6:13, 62:3, 66:20, 86:16
**testify** 6:11
**testimony** 6:4, 94:16, 108:11
**text** 104:16
**Thanks** 59:1
**theft** 9:5
**themselves** 70:7
**there.** 39:10, 39:24
**They'll** 102:18, 104:24
**They've** 15:7, 88:4, 95:1, 96:15
**third** 15:2, 33:18
**Thirteen** 97:16, 97:18
**Thirteen:** 28:5
**thirty-nine** 83:21
**though** 46:22, 101:20
**three** 37:10, 37:15, 37:16, 47:5,
66:18, 83:18, 86:11, 102:15,

Case 6:22-cv-01977-MSS-SPF   Document 33-19   Filed 06/10/23   Page 127 of 128 PageID 654

105:24

**throw** 58:23, 74:6

**Thursday** 24:1

**tied** 25:22

**Tiffany** 17:18, 17:21

**tile** 60:4, 60:11

**title** 9:20, 10:2, 12:5

**titles** 10:1, 89:8

**tmcdonald@gilbertgrouplaw.c om** 2:9

**today** 8:15, 8:20, 9:8, 16:18, 24:9, 24:16, 25:20, 45:10

**together** 13:22, 15:21, 16:18, 16:24, 18:16, 84:1, 91:18

**took** 11:24, 12:4, 31:21, 96:24

**tool** 70:12

**top** 30:4, 39:9, 47:2, 92:25, 98:18, 101:12

**total** 43:14, 43:19, 79:22, 80:20, 81:6, 100:14, 100:15

**town** 15:23, 53:7

**track** 24:5, 41:13, 48:16

**traffic** 11:4

**transcript** 7:25, 8:3, 15:13, 26:10, 102:17, 106:5, 108:10, 110:13, 110:17, 110:19, 110:24, 110:40

**transcription** 103:24

**transmitted** 22:13

**travel** 28:22, 29:6, 90:15

**tremendously** 15:6

**Tribune** 15:24, 72:1, 72:20

**truck** 23:7

**true** 108:11, 109:26

**truth** 6:6, 6:7, 6:11, 6:12

**try** 23:23, 49:7, 52:23, 88:1

**trying** 32:3, 44:17, 45:10, 98:1, 100:11

**turn** 53:13

**turned** 60:4

**TV** 15:24

**TWELFTH** 1:1

**Twelve:** 27:23

**two** 17:8, 19:15, 20:10, 30:7, 49:19, 54:5, 68:17, 69:12, 70:19, 79:21, 80:6, 84:10, 100:9

**Two-year** 99:23, 100:22, 100:23

**Two.** 19:16

**txt** 104:15, 104:17

**type** 98:21, 103:15

**typed** 104:5

**typical** 48:15

**< U >**

**understand** 8:19, 44:13, 45:11, 46:17, 50:22, 50:23

**understanding** 20:18, 36:16, 37:21

**understood** 8:6

**unh-unh** 8:1

**United** 32:4

**unless** 21:15, 54:6, 55:22, 73:2

**unsold** 22:8

**until** 39:19

**untrue** 63:3

**up-to-date** 71:1

**update** 25:13, 68:7, 68:24, 70:11

**updated** 46:14, 56:25, 68:2, 68:5, 68:21, 70:1

**updates** 24:23

**updating** 66:12, 69:25, 70:1

**upper** 65:9, 67:14

**upset** 69:13

**uses** 93:9, 93:15, 93:16

**USF** 14:17

**using** 46:11, 46:23, 46:24, 102:10

**USPS** 4:8, 83:7, 83:14

**utilized** 94:20, 95:7

**< V >**

**vague** 78:20

**value** 88:15, 88:21

**variety** 76:10, 89:18, 90:3

**various** 27:7, 76:15

**Vega** 33:18

**vehicles** 24:3, 24:4, 28:22

**Vendor** 4:25

**Venta** 14:12, 90:8

**verbal** 7:23, 8:3

**verbally** 51:16

**Vern** 77:19

**versus** 98:17, 99:6

**Vicki** 33:18

**Violet** 2:4

**visited** 47:3, 47:9, 61:25

**vs** 1:10, 109:2, 110:6

**< W >**

**Wait** 29:5, 51:12

**waive** 103:12, 110:17, 110:39

**WAIVER** 110:37

**Walk** 16:9, 20:5, 20:22, 23:3, 38:17, 69:9

**walked** 62:17

**walks** 44:24

**wanted** 12:2, 34:13, 45:2, 94:17

**wants** 89:16

**war** 91:9, 91:12

**Washington** 26:16

**Watch** 5:6, 26:24, 59:5, 59:6, 66:6

**water** 32:5

**Wawa** 41:10, 41:15, 41:17, 87:7, 87:9, 87:10, 87:20

**Wawas** 41:10

**ways** 63:17

**Weatherford** 89:13

**website** 5:13, 23:17, 24:21, 24:24, 25:4, 25:8, 40:10, 56:6, 64:24, 65:15, 65:21, 67:22, 68:3, 68:4, 68:7, 68:19, 68:21, 69:25, 70:1, 70:4, 70:6, 70:11, 70:13, 70:25, 75:5, 75:6, 82:1

**websites** 66:12

**week** 12:21, 14:13, 14:16, 14:24, 16:23, 18:5, 18:11, 19:10, 22:11, 22:22, 22:25, 25:9, 33:5, 36:14, 38:16, 47:20, 47:23, 57:1, 86:5, 87:12, 87:14, 97:8

**Weekly** 16:15, 19:24, 78:7, 80:22, 86:3, 89:5, 97:11

**West** 2:4

**Whatever** 8:17, 17:14, 21:13, 73:4, 89:16, 89:20, 90:1

**whatsoever** 81:21

**whether** 59:15, 64:1, 70:15, 71:6, 74:14, 74:21, 103:10, 103:11

**whoever** 39:15, 50:4, 73:11

**whole** 6:6, 6:11, 43:2, 69:2, 102:21, 102:22

**wide** 89:18, 90:3

**wife** 13:22, 47:23, 70:23

**Wilkes** 1:29, 1:33, 1:43, 107:7,

107:18, 108:6, 108:22,
110:31, 110:32
**will** 6:5, 8:12, 17:19, 17:20,
19:21, 20:2, 42:5, 44:1, 59:10,
60:19, 65:1, 65:4, 73:3, 73:4,
73:5, 78:24, 89:24, 95:16,
102:17, 104:4, 105:7, 105:25,
106:13, 110:26
**wire** 14:24
**wish** 97:1
**within** 4:16, 4:22, 29:24, 86:13,
110:20
**WITNESS** 13:11, 55:19, 55:21,
58:25, 81:17, 84:16, 99:19,
103:14, 103:20, 103:25,
104:3, 104:7, 105:16, 107:12,
108:11
**women** 78:12, 89:14, 89:15
**Wordpress** 70:16, 70:17
**words** 41:21, 86:7
**work** 9:14, 10:14, 12:12, 17:19,
20:22, 23:15, 44:18, 72:16
**worked** 9:16, 31:21, 45:8, 50:9
**working** 10:12, 11:15, 16:19,
51:9, 64:6, 87:21
**works** 86:11
**world** 23:14, 45:10
**wrapped** 77:5
**Write** 10:6, 15:10, 18:9, 18:13,
21:9, 39:10, 76:1, 76:4, 78:11,
79:3, 79:4, 89:24, 90:2, 90:9
**writer** 17:15
**writers** 10:8, 16:19, 17:7, 17:17,
75:23, 76:1, 76:4, 77:21, 79:4
**writes** 89:9, 89:13, 89:17, 89:21,
89:23, 90:6, 90:15
**writing** 17:20, 78:12
**written** 15:5, 21:17, 26:14, 27:1,
48:13, 48:17, 52:12, 89:14
**wrote** 48:10, 77:15, 77:16,
103:21


**< Y >**
**Ybor** 18:12, 20:3, 23:4, 44:10,
72:8, 79:1, 79:3, 79:4
**year** 21:15, 31:24, 35:24, 35:25,
36:5, 51:8, 51:12, 62:6, 86:25,
91:2, 92:6, 96:5, 96:15, 97:2,
99:16, 100:12, 100:25, 101:7

**year.** 96:3
**years** 7:15, 11:2, 14:25, 28:18,
31:9, 47:5, 72:18, 87:22,
89:23, 91:19, 91:23, 100:9
**yes.** 39:7, 39:15, 56:12
**York** 32:5


**< Z >**
**z-z-a-n-o** 18:2
**zone** 98:15
**zones** 98:24
**zoom** 65:8