# United States District Court
## For The Middle District of Florida
### Tampa Division

Blake Warner

v.

Hillsborough County
Clerk of Courts

Case Number 8:22-CV-1977

## Plaintiff's Response to Defendant's Motion for Summary Judgment

## I   Introduction

*Plaintiff* responds in opposition to *Defendant's Motion for Summary Judgment* D.E. 37 ("DMSJ"), and adopts and reincorporates his Verified Partial Motion for Summary Judgment D.E. 33 ("PMSJ").

Why would the states bother administering custodial unclaimed property programs with the goal of reuniting unclaimed property with their rightful owners if they could just seize ownership of the funds after a brief dormancy period and posting a thirty-day notice in a Spanish newspaper that practically no one reads reads, and then invoking the doctrine of "no taksies backsies" when the rightful owners try to reclaim their property? *Defendant*'s position is of course nonsensical, and would be a radical

1

departure from existing takings clause jurisprudence. Widespread support for their position would systematically lead to the dismantling of existing unclaimed property laws, and then the erection of true escheatment statutes in their wake.

## II  Disputed Facts

*Plaintiff* disputes Fact #4 in *DMSJ*:

> "4. In the Eviction Case, the county court determined Mr. Warner's landlord was entitled to the deposited funds and requested a proposed order directing disbursement to the landlord. (JSOF ¶ 12, Ex. C; Doc. 33, VI.11)."

This "fact" is disputed insofar as it mischaracterizes the cited material as indicating that the court *ruled* or *ordered* that the landlord was entitled to the funds. The actual cited material speaks for itself. Especially in light that this assertion contradicts the cited materials which specifically state that no disbursement order was made. *see* JSOF ¶ 12, Ex. C; Doc. 33, VI.11.

## III  Funds

*Defendant* repeatedly presents argument in their DMSJ that would seem to imply or state that the deposited $3,600 does not belong to *Plaintiff*. *see* "The only suggestion (without any record evidence) the funds might belong to Mr. Warner, and not his landlord, is Mr. Warner's sworn statement filed in this case in June 2023" and "Moreover, the record in the Eviction Case would only indicate the funds belonged to the landlord and not to Mr. Warner". *Defendant* neither argues that Mr. Warner's statement would not be admissible at trial nor presents any evidence to rebut it. Such an argument is improper in a motion for summary judgment and should be stricken. Presumably they know this, which is why they stipulated to it. *see* JSOF ¶ 13.

Assuming *arguendo* that *Defendant*'s assertion is true and the amount the court indicated ($3,398 *see* JSOF Exhibit C) was the landlords, they do not dispute that the remaining over-payment of $202 is rightfully *Plaintiffs*. *see* JSOF ¶ 4. Therefore their argument is not about liability at all, but rather disputing the amount of the damages.

## IV   DUE PROCESS

*Defendant* misrepresents that "Mr. Warner predicates his due process claim on the allegation that 'La Gaceta does not meet the requirements of Fla. Stat. § 50.031 for a newspaper to be eligible to publish legal notices' and 'La Gaceta does not meet the 'newspaper of general circulation' requirement of Fla. Stat. § 116.21.'". The due process challenge is a lot more than just those two positions. The quoted positions were in reference to the clerk not complying with the requirements of § 116.21 and applicable state law negating their affirmative defense. Though it is *Plaintiff*'s position that notice by publication never satisfies due process if the identity of the owner(s) is known. And that if *Defendant* needed a determination as to whether Mr. Warner or his landlord was the rightful owner, then they should have filed an interpleader action.

The *BAC Home Loans Servicing* case *Defendant* cited as support for the assertion that La Gaceta meets the newspaper of general circulation requirement is not relevant here, because it interpreted an old version of Fla. Stat. § 50.011 that was superseded on January 1, 2022 with a new statutory requirement that the newspaper must be circulated to at least ten percent of the population which *Plaintiff* invoked in his PMSJ. The old law had no minimum circulation requirement.

*Defendant* also cites to *Lee v. U.S. Postmaster Gen* for it's contention that due process is satisfied if they simply mail a letter to the last known address. The instant

3

action is distinguished because:

1. Lee had been arrested on drug charges and the were funds seized via civil asset forfeiture. Here, Mr. Warner was neither arrested in the eviction action nor were the escrow funds accused of being related to criminal activity.

2. The notice sent to Lee was received and signed for by his girlfriend and the court cited that notices received by family members combined with newspaper publication satisfies due process. In the instant action, it is undisputed that Mr. Warner did not live at the Fremont address and that the mailed notices were returned undelivered. *see* JSOF ¶ 15, PMSJ Undisputed Fact #14, Warner Affidavit #9, and Exhibit warner lease 05-17-19 to 04-30-20. *Defendant* presented no facts that a) anyone associated with Mr. Warner lived at the Fremont address at the time the notice was sent and b) that they received the notice on Mr. Warner's behalf. In fact, Mr. Warner does not know who moved into the Fremont apartment after he moved out. And *Defendant* presented no facts that the letter was sent via *certified* mail and *Plaintiff* denies knowing anyone that lived at the *Fremont* address after he moved out. *see* Warner Declaration ¶ 16.

And finally, *Defendant* cited to *Acevedo v. First Union Nat. Bank*, which is distinguished because the FDIC had neither knowledge of the identity of the owner the cashiers check nor any last known address, so the court accepted notice by publication. In the instant case, *Defendant* knew the identities of all possible owners, had addresses, and had reasonable means to contact them, therefore notice by publication does not satisfy due process here.

4

# V  Inaction

*Plaintiff* disagrees with *Defendant*'s representations that the period of dormancy is calculated from the date of deposit (may 2018) to the date that *Plaintiff* tried to claim the funds (March 31 2022). *see* "Mr. Warner waited nearly four years, until March 31, 2022". Rather, the period of dormancy is property calculated from the date the complete eviction action was dismissed on June 12, 2020 to the date *Plaintiff* tried to claim the funds (March 31 2022) or roughly one year and nine months. *see* JSOF ¶ 16.

*Defendant* conflates Mr. Warner knowing where the money is, and knowing that it has been (or will be seized). From Mr. Warner's perspective, the funds are in an escrow account which is a safe place just like a bank account, to hold money until you retrieve it. After all, no one refers to or thinks of money deposited in a bank checking account as "seized" or otherwise in jeopardy. And this is why the instant case is distinguished from the cited *City of West Covina v. Perkins*: The property owner in *City of West Covina* was informed that his property had been seized and he failed to act. *Defendant* has produced no evidence that suggests that Mr. Warner knew *Defendant* was intending to escheat his funds or that his funds were at risk in any way.

It is very telling that the *Defendant* intended to embezzle the escrow funds because the courts rules that *Defendant* cites to explicitly states that "when the clerk is required to serve notices and other documents, the clerk may do so by e-mail", yet the clerk elected to instead serve via mail to an old address with thirteen returned undelivered notices. And that mailed notice was not mandatory, the clerk had a choice: email or known bad address, and they intentionally chose the known bad address. *Defendant*

never claims that they did not know what *Plaintiff*'s email was.

Finally, inaction is not enough to constitute abandonment. *Defendant* has failed to present any evidence that *Plaintiff* took any affirmative steps to indicate the abandonment of the funds. If inaction was enough, States across the country would just seize all property held in their respective unclaimed property divisions.

## VI  Electronic Service

Not once had *Defendant* stated that they could not take the reasonable steps of contacting *Plaintiff* via email, e-service, phone number, drivers license, or a more diligent address search. Their entire defense is not that they did not that any of those contact methods were unreasonable or unavailable, but rather because of an obscure court rule that gave them *discretion* not to try. That cited administrative order conflicts with federal minimum due process' reasonable notice provisions, and is thus preempted.

Indeed the general public can electronically serve documents or notice in *any* thirteenth judicial circuit court case. *see* Warner Declaration ¶ 12 - 15. If the general public can do it, so can the clerk.

And the *Defendant*'s own website setup to guide *pro se* litigants states that they would serve various court documents electronically begining April 2019:

> "Effective in April 2019, the Clerk's Office will begin electronically serving various court documents to Attorneys of Record and litigants registered for e-service through the Florida Court E-Filing Portal for all civil court cases." *see* attached clerk_prose_guide.pdf and Warner Declaration ¶ 17

Mr. Warner knew nothing of any duty to continuously file address change notices on the docket, he believed that once he registered for e-service that all documents

would be served electronically. *see* Warner Declaration ¶ 2 - 10. The one address change that Mr. Warner posted was to notify the landlord of his new address to facilitate the return of his rental deposit, and to inform the court that he was no longer in possession of the subject dwelling. *see* Warner Declaration ¶ 11.

## VII   Count II: Takings Clause

*Defendant* cites *Bennis v. Mich.*, 516 U.S. 442, 452 (1996) for its contention that a taking can only occur in cases involving eminent domain where the property has been lawfully acquired under the exercise of governmental authority.

*Bennis* was a joint owner of a car that was seized via civil asset forfeiture after her husband engaged in illegal sexual activity with a prostitute in the car. *Bennis* had notice and opportunity to be heard because she was sued directly by the state in a civil asset forfeiture action and appeared for that action.

The case is distinguished because it was not about adequate notice or opportunity to be heard, rather it was about the joint-property interest in property subject to civil asset forfeiture. The court specifically noted that "The gravamen of petitioner's due process claim is not that she was denied notice or an opportunity to contest the abatement of her car; she was accorded both ... Rather, she claims she was entitled to contest the abatement by showing she did not know her husband would use it to violate Michigan's indecency law.". Additionally the property in that case was seized by the state via a lawful court order, unlike the instant action. The "the exercise of governmental authority" was the court order, *not* mere statutory authority as we have here.

The ruling merely affirms that the state is not obligated to provide just compensa-

tion for property that is forfeited pursuant a court order.

## VIII    Count III: Breach of Fiduciary Duty

*Defendant* contends that the breach of fiduciary duty claim must fail because " the Clerk complied with Florida Statute § 116.21" and "no duty was breached;". *see* DMSJ IV.A.4.  However in a circular argument, they claim no duty was breached because they complied with § 116.21 so their sole argument here is effectively that they complied with § 116.21.

*Plaintiff* agrees that if the court finds that a) Fla. Stat. § 116.21 is constitutional and b) that *Defendant* complied with all of it's requirements, than that is a complete defense to this breach of fiduciary duty claim.  To be clear, it would still be a breach, however *Defendant* could not be held liable for it under *state law*.

To that end, *Plaintiff* has already sufficiently briefed the constitutionality of § 116.21 in PMSJ, as well as addressed the non-compliance with § 116.21 (which might afford *Defendant* a defense to state law claims). Of particular note, *Plaintiff* previously argued and presented evidence in PMSJ that the July 9, 2021 edition of La Gaceta merely reached less than 1 percent of the population of Hillsborough County which fell woefully short of the statute's 10 percent requirement.

The clerk contends that they are "not required to hold the funds in the registry indefinitely until such time as Mr. Warner desires to seek their return.". *Plaintiff* would love to be "burdened" with being paid approximately 3 percent upfront to hold the funds on top of collecting interest on the principal indefinitely with the possibility that the owner may never show up to claim the funds. I would gladly hold any funds anyone wants to give me for as long as they want.  To even pretend that they were

harmed or burdened by this is nonsensical. The states engage in aggressive custodial takings statutes solely to collect interest. *see MARON v. PATRONIS* (N.D. Fla. 2022) No. 4:22-cv-00255.

In any event, once they were sufficiently fed up with collecting free money, they should have sent the money to the State's Unclaimed Property Division as their letter notice indicated that they would do, not kept it for themselves.

## IX    COUNT IV: DEFAMATION

*Plaintiff* was initially going to invoke the doctrine of compelled self-publication defamation and waiver of qualified privilege, however he does not believe it is an efficient use of anyone's time to argue this count, therefore he elects to major on the majors and abandons Count IV.

## X    COUNT V: FIRST AMENDMENT VIOLATION

*Defendant* only challenges that "he ... suffered an adverse action" and "a causal relationship exists". They then misrepresent the basis of the adverse action as being based on threatened counterclaims, attorney fees, and costs associated with an unsuccessful civil claim. To be clear, the adverse action was the veiled threat of criminal prosecution.

As for the causal relationship, the adverse action was embedded in a direct response to Mr. Warner's first amendment activity. Specifically, petitioning his government for redress and his speech. And it is clear from the context of that letter that *Defendant*'s goal when referencing the criminal statute was to chill Mr. Warner's first amendment rights.

7-1-2023

Date

[signature: Blake W.]

Signature

Blake Warner, *pro se*

2211 S Village Ave

Tampa, FL 33612

E-Service: BLAKE@NULL3D.COM